FILED
CLERK, U.S. DISTRICT COURT

JAN I 9 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

**MILBERG LLP**
JEFF S. WESTERMAN (SBN 94559)
jwesterman@milberg.com
DAVID E. AZAR (SBN 2318319)
dazar@milberg.com
CHRISTIAN KEENEY (SBN 269533)
ckeeney@milberg.com
300 South Grand, Suite 3900
Los Angeles, California 90071
Telephone:  (213) 617-1200
Facsimile:  (213) 617-1975

**KLEIN KAVANAGH COSTELLO, LLP**
GARY KLEIN
SHENNAN KAVANAGH
KEVIN COSTELLO
JOHN MCGOWAN
85 Merrimac Street, 4th Floor
Boston, Massachusetts 02114
Telephone: 617.357.5500
Facsimile: 617.357.5030
Email: klein@kkcllp.com
kavanagh@kkcllp.com
costello@kkcllp.com
mcgowan@kkcllp.com

*Interim Lead Class Counsel*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE: CITIMORTGAGE, INC. HOME AFFORDABLE MODIFICATION PROGRAM ("HAMP") LITIGATION | Case No. 11-ml-2274 DSF (PLAx) |
| | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| This document relates to: | |
| | JUDGE:          Hon. Dale S. Fischer |
| Beverly King, et al. v. CitiMortgage, Inc., CV 10-3792 DSF (PLAx) | **JURY TRIAL DEMANDED** |
| Balbir Singh v. CitiMortgage, Inc., CV 11-8322 DSF (PLAx) | |
| Leslie Barry, et al. v. CitiMortgage, Inc., CV 11-8323 DSF (PLAx) | COPY |
| Davidson Calfee, et al. v. CitiMortgage, Inc., | |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

|     | |
| --- | --- |
| 1 | CV 11-8324 DSF (PLAx) |
| 2 | Juan Silva, et al. v. CitiMortgage, Inc., |
| 3 | CV 11-8325 DSF (PLAx) |
|   | Jo Ann Gastineau v. CitiMortgage, Inc., |
| 4 | CV 11-8326 DSF (PLAx) |
|   | William T. Whiting v. CitiMortgage, Inc., |
| 5 | CV 11-8327 DSF (PLAx) |
| 6 | David G. DeRosa, et al. v. CitiMortgage |
|   | Inc., |
| 7 | CV 11-8328 DSF (PLAx) |
| 8 | Keith Goodyk, et al. v. CitiMortgage Inc., |
| 9 | CV 11-00443 DSF (PLAx) |
|   | Robert Coons, et al. v. CitiMortgage Inc., |
| 10 | CV 11-01655 DSF (PLAx) |
| 11 | Joaquin Sequeira, et al. v. CitiMortgage |
|   | Inc. |
| 12 | CV 11- 9179 DSF(PLAx) |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

JURISDICTION & VENUE .......................................................................... 5

PARTIES ......................................................................................................... 6

THE RESIDENTIAL MORTGAGE CRISIS ............................................. 8

THE LOAN SERVICING INDUSTRY ....................................................... 9

THE HOME AFFORDABLE MODIFICATION PROGRAM (HAmP) ... 12

CITI'S PARTICIPATION IN HAMP .......................................................... 18

CITI ROUTINELY BREACHES ITS TPP AGREEMENTS ................... 23

CITI'S ACTIONS HAVE CAUSED INJURY TO PLAINTIFFS ............. 24

CLAIMS OF NAMED PLAINTIFFS ......................................................... 25

     Maria & Pedro Betancourt (California) .................................................. 25

     Hanna Bernard (California) ....................................................................... 26

     Audrey & Hugh Pierson (California) ....................................................... 27

     Beverly King & Nancy Glennon (California) ......................................... 28

     Balbir Singh (California) ........................................................................... 29

     Carla Chui & Maurizio Verdini (Florida) .............................................. 30

     Elizabeth Daniel (Florida) ........................................................................ 31

     Leslie Barry (Illinois) ................................................................................ 31

     John & Maria Petrides (Illinois) ............................................................. 32

     Robert & Raeanda Coons (Iowa) ............................................................ 33

     Keith Goodyk (Iowa) ................................................................................. 34

     Joaquin Sequeira (Maryland) .................................................................. 35

     Robert Gatti (Massachusetts) ................................................................... 35

     Karen Grover (Massachusetts) ................................................................. 36

     Daniel Korzep (Massachusetts) ............................................................... 37

     Jo Ann Gastineau (New Jersey) ............................................................... 38

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1        Juan & Elizabeth Silva (New Jersey) ................................................39

2        David Derosa & Erin Logan (Pennsylvania)...................................39

3        Eugene & Tawanna Frasier (Pennsylvania) ..................................40

4        James & Jennifer Garcia (Pennsylvania)........................................41

5        Minnie Glover (Pennsylvania)...........................................................42

6        Renee & Stephen Johnson (Pennsylvania) .....................................42

7        William Whiting (Pennsylvania) .......................................................43

8  CLASS ACTION ALLEGATIONS ............................................................44

9        Statewide HAMP Trial Period Plan ("HAMP TPP") Classes.....................44

10       Iowa Delinquency Cure Class .........................................................47

11 CLAIMS........................................................................................................49

12 COUNT I ......................................................................................................49

13       By All Statewide HAMP TPP Classes  Breach Of Contract/Breach Of
            Duty Of Good Faith & Fair Dealing ....................................49
14

15       Plaintiffs & Class Members With TPP Agreements ......................50

16       Plaintiffs & Class Members With Repudiated Permanent Loan
            Modifications.........................................................................52

17 COUNT II .....................................................................................................54

18       By All Statewide HAMP TPP Classes  Breach Of Contract (Deeds Of
            Trust, Mortgages and Loan Notes)........................................54
19

20 COUNT III.....................................................................................................55

21       By All Statewide HAMP TPP Classes  Promissory Estoppel, In The
            Alternative ..............................................................................55

22 COUNT IV....................................................................................................57

23       By The CA, FLA & IA Statewide HAMP TPP Classes  Breach Of
            Implied Covenant Of Good Faith & Fair Dealing ...........................57
24

25 COUNT V ......................................................................................................58

26       By The CA Statewide HAMP TPP Class  Violation of Cal. Civ. Code
            § 1785.25(a).............................................................................58

27       By The CA, FLA, IL, MD, MA, NJ & PA Statewide HAMP TPP
            Classes  Violation Of Consumer Protection, False Advertising,
28          & Unfair & Deceptive Acts & Practices Law ..............................59

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

California—False Advertising (Cal. Bus. & Prof. Code § 17500 et seq.).................................................................................61

California—Unfair Competition (Cal. Bus. & Prof. Code § 17200 et seq.).................................................................................63

Florida.........................................................................................66

Illinois.........................................................................................68

Maryland.....................................................................................70

Massachusetts .............................................................................74

New Jersey...................................................................................75

Pennsylvania ...............................................................................76

COUNT VI.............................................................................................77

By The CA, MD & IA Statewide HAMP TPP Classes  Violations Of State Fair Debt Collection Practices Laws.................................77

California.....................................................................................77

Maryland.....................................................................................78

Iowa  79

ADDITIONAL ALLEGATIONS & CLAIMS OF THE IOWA DELINQUENCY CURE CLASS ..............................................................79

COUNT VII ...........................................................................................83

By The Iowa Delinquency Cure Class  Breach Of Original Mortgage Agreement ...........................................................................83

COUNT VIII ..........................................................................................86

By The Iowa Delinquency Cure Class  Breach Of Implied Covenant Of Good Faith & Fair Dealing ...........................................86

PRAYER FOR RELIEF..........................................................................87

DEMAND FOR JURY TRIAL................................................................89

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1      The named Plaintiffs in each one of the above-referenced consolidated

2  actions against CitiMortgage, Inc. ("Defendant" or "Citi"), by and through their

3  attorneys, hereby consolidate those actions and intend to preserve the allegations in

4  each complaint, as if reasserted and alleged herein.[1]  In addition, Plaintiffs Audrey

5  and Hugh Pierson (California) are new parties in this Consolidated Amended

6  Complaint, and shall be deemed as added to the *King* action. The Plaintiffs allege

7  the following based on, among other things, the investigation made by Plaintiffs by

8  and through their attorneys:

## INTRODUCTION

10      1.    Plaintiffs bring this class action to challenge Citi's false promises of

11  affordable loan modifications and failure to comply with its obligations to

12  permanently modify loans at the end of trial modification periods.  Contrary to

13  Citi's express commitment to "helping our customers facing financial hardship

14  remain in their homes" and "work[ing] with you to find the best option for you,"

15  Citi's delay, incompetence and obstruction in the modification process have left

16  countless homeowners—not with lower monthly payments—but actually worse off

17  than they were before seeking a modification from Citi.  Citi's aggressive

18  solicitations, misrepresentations, and misconduct violate its contractual obligations

19  and the promises it makes to homeowners.  Citi's conduct undermines the very

20  purpose of trial loan modification programs, and is illegal under California,

21  Florida, Illinois, Iowa, Maryland, Massachusetts, New Jersey and Pennsylvania

22  law.

---

[1] In light of *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 33-34 (1998), the constituent cases will be returned to the District Courts where they originated after consolidation for pretrial proceedings.  The underlying cases do not lose their separate identity from having been consolidated temporarily in this Court.  Johnson v. Manhattan RailwayCo., 289 U.S. 479, 496-97 (1933) ("[c]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.").

2.     Plaintiffs represent thousands of financially distressed homeowners with mortgages owned and/or serviced by Citi.   As casualties of the global economic crisis following the mortgage industry meltdown, these homeowners already faced serious financial hardship, including unemployment and/or lost income, rendering them unable to sustain their current mortgage payments.

3.     Citi exacerbated the mortgage crisis and its reverberating negative effects for its borrowers.  Citi aggressively and falsely advertised its commitment to help homeowners obtain affordable loan modifications, including those available under the federal Home Affordable Modification Program ("HAMP")—a government program designed to alleviate the foreclosure crisis by providing affordable mortgage loan modifications and other foreclosure alternatives to eligible borrowers.[2]   However, after enticing borrowers to apply for loan modifications and obtaining basic eligibility information regarding their income and debts, Citi consistently delayed, avoided, or otherwise failed to permanently modify the loans, while racking up illegitimate fees and/or unpaid interest (often then added to the principal of the loan) against those borrowers who could least afford them.

4.     Specifically, Citi informed Plaintiffs and Class members who applied for a modification that (a) they were prequalified for a loan modification or that they qualified based on an initial application, (b) they would be placed in a 90-day "trial period" during which they could make reduced payments, and (c) the trial modification would become permanent if, consistent with Citi's instructions, they made the reduced payments during the trial period and provided additional documentation to Citi to substantiate their qualifications.

---

[2] Having taken $45 billion from the United States government as part of the Troubled Assets Relief Program, 12 U.S.C. § 5211 et seq. ("TARP"), Citi was subject to mandatory inclusion in HAMP.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

5.     Plaintiffs and Class members fulfilled their end of the bargain, making timely reduced payments and providing requested documentation (in many cases more than once).   Despite their compliance, Citi flouted its obligation to permanently modify the loans at the end of the trial modification period.  Instead, Citi subjected Plaintiffs and Class members to trial periods extending far beyond the promised 90 days and in some cases over one year.  After more delay, Citi rejected their requests for a permanent modification and often neglected to inform borrowers that their applications were denied.

6.     Worse, upon denial, Citi demanded thousands of dollars in lump sum payments and previously undisclosed fees—immediately—which were almost certain to drive Plaintiffs into foreclosure.   In addition, some of the Plaintiffs discovered that Citi reported them as delinquent to credit reporting agencies, even those who were current on payments when they began the trial period or who Citi instructed to miss payments as a condition to receiving a trial period agreement, and despite the fact they made timely reduced payments consistent with Citi's modification instructions.

7.     Citi's failure to provide the promised permanent, affordable loan modifications in the agreed time frame was inevitable.   Despite aggressively marketing loan modifications to its customers and touting its participation in HAMP, Citi did not allocate the necessary resources to timely or accurately process modification requests.  Citi failed to staff an adequate number of trained, supervised personnel to process the volume of loan modification requests that came in.  Not surprisingly, these poorly equipped personnel often 1) improperly denied modification requests, 2) placed borrowers in other "assistance" programs that did not modify the loan terms to make payments more affordable but merely changed the payment schedule with a looming required lump-sum payment; and/or 3) offered worse terms than those for which the borrowers actually qualified.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

8. Perversely, Citi's lack of preparedness, delay, and other misconduct in the modification process served to profit Citi with increased fees, interest, principal balances and servicing compensation, at the expense of Plaintiff and Class members who were deprived of an opportunity to cure their delinquencies, pay their loans, and/or save their homes and credit. Furthermore, relying on Citi's false promises of affordable loan modifications, borrowers lost out on other options to their detriment, including immediate short sale or foreclosure, which would have allowed them to preserve cash on hand and seek cheaper living arrangements such as renting. Refinancing options likewise disappeared because Citi's inaccurate and misleading credit reporting damaged Plaintiffs' and Class members' credit. All the while, Plaintiffs and Class members struggled to continue paying Citi large sums, believing that Citi would process their loan modification requests in a timely manner without adverse credit consequences. Now, having waited months or years for Citi to process their loan modification requests—only to have them either delayed or denied, Plaintiffs and Class members find themselves at risk of foreclosure with depleted cash on hand, ruined credit, and few options for alternative living arrangements.

9. Borrowers who were denied permanent modifications through no fault of their own should not find themselves in a worse position than when they applied for a modification. But here, Citi's abject failure to honor its agreements, coupled with its misrepresentations and omissions about how it implemented its "Homeowner Assistance" program, left Plaintiffs and Class members financially devastated.

10. Plaintiffs bring this lawsuit against Citi on behalf of themselves and all others similarly situated, alleging common law claims for breach of contract, breach of the duty of good faith and fair dealing, and promissory estoppel. Plaintiffs also allege statutory violations under the consumer protection and unfair

1    and deceptive acts and practices laws of California, Florida, Illinois, Iowa,
2    Maryland, Massachusetts, New Jersey and Pennsylvania law.

3         11.    Plaintiffs seek declaratory and injunctive relief to obtain promised
4    modifications and to stop Citi from its unfair and oppressive actions, as well as
5    damages, restitution, and costs of suit as may be appropriate.

6                              **JURISDICTION & VENUE**

7         12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §
8    1332(d) because this action is between citizens of different states and at least one
9    member of the classes of Plaintiffs is a citizen of a state different from the
10   Defendant, a class action has been pled, and the matter in controversy exceeds the
11   sum or value of $5,000,000, exclusive of interest and costs, and there are 100 or
12   more members in the proposed classes.  For diversity jurisdiction purposes, a
13   national bank is a citizen of the state designated as its main office on its
14   organization certificate. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306
15   (2006).  Citi is, on information and belief, a New York corporation with
16   headquarters in Missouri.  Plaintiffs are citizens of California, Florida, Illinois,
17   Iowa, Maryland, Massachusetts, New Jersey and Pennsylvania.

18        13.    This Court also has personal jurisdiction over Defendant because a
19   substantial portion of the wrongdoing alleged in this Complaint took place in this
20   state. Citi is authorized to do business here, has sufficient minimum contacts with
21   this state, and otherwise intentionally avails itself of markets in this state through
22   the promotion, marketing, and servicing of loans in this state so as to render the
23   exercise of jurisdiction by this Court permissible under traditional notions of fair
24   play and substantial justice.

25        14.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), both
26   because Defendant transacts business in this District, and pursuant to the Transfer
27   Order of the Judicial Panel on Multidistrict Litigation ("JPML") dated October 6,
28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    2011 (filed in this Court on October 7, 2011), as well as the JPML's Conditional

2    Transfer Orders of October 20, 2011 and November 7, 2011.

3                                    **PARTIES**

4        15.    Individual and Representative Plaintiff Hanna Bernard is a citizen of

5    California.  Ms. Bernard is a representative of the HAMP TPP Class.

6        16.    Individual and Representative Plaintiffs Maria and Pedro Betancourt

7    are citizens of California.  The Betancourts are representatives of the HAMP TPP

8    Class.

9        17.    Individual and Representative Plaintiffs Audrey and Hugh Pierson are

10   citizens of California.  The Piersons are representatives of the HAMP TPP Class.

11       18.    Individual and Representative Plaintiffs Beverly King and Nancy

12   Glennon are citizens of California.  Ms. King and Ms. Glennon are representatives

13   of the HAMP TPP Class.

14       19.    Individual and Representative Plaintiff Balbir Singh is a citizen of

15   California.  Mr. Singh is a representative of the HAMP TPP Class.

16       20.    Individual and Representative Plaintiffs Carla Chui and Maurizio

17   Verdini are citizens of Florida.  Ms. Chui and Mr. Verdini are representatives of

18   the HAMP TPP Class.

19       21.    Individual and Representative Plaintiff Elizabeth Daniel is a citizen of

20   Florida.  Ms. Daniel is a representative of the HAMP TPP Class.

21       22.    Individual and Representative Plaintiff Leslie Barry is a citizen of

22   Illinois.  Ms. Barry is a representative of the HAMP TPP Class.

23       23.    Individual and Representative Plaintiffs John and Maria Petrides are

24   citizens of Illinois.  The Petrides are representatives of the HAMP TPP Class.

25       24.    Individual and Representative Plaintiffs Robert and Raeanda Coons

26   are citizens of Iowa.  The Coons are representatives of the HAMP TPP Class.

27

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

25.     Individual and Representative Plaintiff Keith Goodyk is a citizen of Iowa.  He is a representative of the Iowa Delinquency Cure Class and the HAMP TPP Class.

26.     Individual and Representative Plaintiff Joaquin M. Sequeira is a citizen of Maryland.  Mr. Sequeira is a representative of the HAMP TPP Class.

27.     Individual and Representative Plaintiff Robert Gatti is a citizen of Massachusetts.  Mr. Gatti is a representative of the HAMP TPP Class.

28.     Individual and Representative Plaintiff Karen Grover is a citizen of Massachusetts.  Ms. Grover is a representative of the HAMP TPP Class.

29.     Individual and Representative Plaintiff Daniel Korzep is a citizen of Massachusetts.  Mr. Korzep is a representative of the HAMP TPP Class.

30.     Individual and Representative Plaintiff Jo Ann Gastineau is a citizen of New Jersey.  Ms. Gastineau is a representative of the HAMP TPP Class.

31.     Individual and Representative Plaintiffs Juan and Elizabeth Silva are citizens of New Jersey.  The Silvas are representatives of the HAMP TPP Class.

32.     Individual and Representative Plaintiffs David G. Derosa and Erin N. Logan are citizens of Pennsylvania.  Mr. Derosa and Ms. Logan are representatives of the HAMP TPP Class.

33.     Individual and Representative Plaintiffs Eugene D. & Tawanna G. Frasier are citizens of Pennsylvania.  The Frasiers are representatives of the HAMP TPP Class.

34.     Individual and Representative Plaintiffs James A. and Jennifer Garcia are citizens of Pennsylvania.  The Garcias are representatives of the HAMP TPP Class.

35.     Individual and Representative Plaintiff Minnie Glover is a citizen of Pennsylvania.  Ms. Glover is a representative of the HAMP TPP Class.

36. Individual and Representative Plaintiffs Renee and Stephen B. Johnson are citizens of Pennsylvania. The Johnsons are representatives of the HAMP TPP Class.

37. Individual and Representative Plaintiff William T. Whiting is a citizen of Pennsylvania. Mr. Whiting is a representative of the HAMP TPP Class.

38. Defendant CitiMortgage, Inc. is owned by Citigroup, Inc., a New York corporation. Defendant is headquartered at 1000 Technology Drive, O'Fallon, Missouri, 63368, and is the fourth largest mortgage servicer in the United States.

## THE RESIDENTIAL MORTGAGE CRISIS

39. Over the last several years, the United States has been in a foreclosure crisis. The collapse of the residential real estate market in 2007 and 2008 and the resulting recession led to an unprecedented foreclosure crisis in the United States.

40. In 2008, more than two million homes entered foreclosure proceedings. In 2009, an additional 2.8 million homeowners entered foreclosure. In late 2009, a Congressional oversight panel noted that one in eight U.S. mortgages was in foreclosure or default.[3] In 2010, a record 2.9 million homes, or one out of every forty-five, received a foreclosure filing. The forecast for 2011 was worse, with "lenders poised to take back more homes this year than any other since the U.S. housing meltdown began in 2006."[4]

41. Economists predicted that interest rate resets on the riskiest of lending products—adjustable rate mortgages—would not peak until sometime in 2011.[5]

---

[3] Congressional Oversight Panel, Oct. 9, 2009 report at 3. *Available at:* http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT52671/pdf/CPRT-111JPRT52671.pdf (last viewed January 11, 2012).

[4] Janna Herron, *Housing Woes Not Over for State, Nation*, Seattle Times, Jan. 14, 2011, at A13.

[5] See Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, fig. 30.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

42.     A home is typically a family's most important asset and investment. The effects of default or foreclosure-related actions on a personal level are understandably devastating.    Default and foreclosure-related actions damages credit, making it difficult for families to purchase another home or even rent another place to live.

43.     The crippling effects of loan defaults and foreclosure-related activity extend beyond just the plight of one household.    Communities also suffer from decreased property values and low tax revenue.[6]

## THE LOAN SERVICING INDUSTRY

44.     Despite the crippling and rippling effects of the mortgage crisis, mortgage servicers like Citi have little incentive to modify loans, and instead have every incentive to precipitate borrower default and, ultimately, foreclosures.

45.     Mortgage loans are generally originated with the intention of selling them to investors.  Loans can be sold in whole on the secondary market, so that a single investor owns the entire loan, or, more commonly today, securitized.   In securitization, thousands of loans are pooled together in common ownership held by a trust.   Bonds are issued to investors based on the combined, anticipated payment streams of the pooled loans.   The bonds that are issued may be for different categories of payments, such as interest payments, principal payments, prepayment penalties or late payments.   The different groups of bond holders are paid from different categories of money and in different orders.

46.     With the advent of securitization, a new industry of loan servicers has emerged.    Loan servicers collect and process payments on mortgage loans, maintain the records of payments, and are the entities through which any request for a loan modification must pass.

---

[6] *Id*. at 5

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

47.    Loan servicers compete for the right to service pools of mortgages at the time the mortgage pool is created.  Securitization agreements (also known as pooling and servicing agreements or PSAs) generally identify a master servicer who receives a portion of payments on a mortgage pool until the mortgage is paid off.

48.    The PSAs provide no meaningful restrictions on individual loan modifications and, therefore, loan servicers generally have the ability to approve and analyze loan modifications.

49.    Loan servicers derive their income from direct payments based on the principal balance of the pool of loans.  Servicers benefit from keeping principal loan balances high, such as by capitalizing arrears and unpaid fees or by refusing loan modifications with principal reductions.

50.    Loan servicers also derive income from fees imposed on borrowers, such as late fees, foreclosure fees, inspection fees, and broker opinion fees.  The PSAs allow servicers to collect these fees directly from the borrower, or if the home is foreclosed, directly from the top of foreclosure proceeds.  These fees create a potential profit center for large servicers.

51.    Servicers also derive interest income on the float between the time when payments are received from borrowers and when they are passed on to the investors, among other things.  Servicers create interest income by stretching the time to turn over funds—i.e., paying the taxes or insurance late or at the last moment possible—to create more float income.  Thus, prepayments of loans increase the float income because there are then larger amounts of money sitting in the float account, generating interest, until turned over to investors.  Float interest income thus gives servicers an incentive to favor any resolution that involves a prepayment, such as a refinance, a sale of the home, or a foreclosure.

52.    Servicers may also make additional income through affiliated businesses, such as insurance companies, property valuation companies and

inspection companies.  Servicers contract with these affiliated businesses (which often specialize in providing services for loans in default) for various services and the costs are imposed on borrowers.

53.   Loan servicers who fail to modify loans face few consequences. Although investors generally do not have an interest in foreclosure, large mortgage pools may involve hundreds of investors with differing views about whether a foreclosure is appropriate.  Further, investors may feel the financial pain of default differently because, as alleged above, different investors often own different parts of the security, i.e., principal payments, interest payments, or prepayment penalties and are paid in different order based on their assigned priority.

54.   Even if an investor favors loan modification, investors do not have authority to directly control a loan servicer's actions.  Investors generally can only take action through the trustee and only if a majority of the investors agree. Trustees can fire a servicer in rare cases, but this right is seldom invoked and then only when the servicer does not pay monthly payment advances on the loans.

55.   Because of this lack of direct control, loan servicers have little incentive to aggressively pursue loan modifications, especially in light of the compensation scheme described above.  First, maintaining borrowers in default and delaying decisions on loan modifications generate profits for loan servicers through late fees, inspection fees, and the like.   Second, performing loan modifications is expensive.  Third, putting borrowers in a position of refinancing or foreclosure can create additional float interest income and allow servicers to recoup advanced principal and interest payments.  Fourth, imposing junk fees and capitalizing arrears can increase principal balances and servicing compensation. These facts actually favor foreclosures and short-term repayment plans, and gives context to Citi's misconduct.

**THE HOME AFFORDABLE MODIFICATION PROGRAM (HAMP)**

56.    On October 3, 2008, Congress passed the Emergency Economic Stabilization Act ("EESA") "to immediately provide authority and facilities that the Secretary of the federal Department of the Treasury ("Secretary" or "Treasury") can use to restore liquidity and stability to the financial system of the United States." 12 U.S.C. §§ 5201, *et seq.*

57.    One of the main purposes of EESA is to "help families keep their homes and to stabilize communities." 12 U.S.C. § 5213.  The EESA mandates that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners and use the authority of the Secretary to encourage the servicers of the underlying mortgages, considering net present value to the taxpayer," to take advantage of "available programs to minimize foreclosures." 12 U.S.C. § 5219.

58.    The EESA authorized the Secretary to establish the Troubled Asset Relief Program ("TARP") to purchase troubled assets from financial institutions. 12 U.S.C. § 5211.  Congress allocated up to $700 billion to the Department of the Treasury for TARP.  12 U.S.C. § 5225.

59.    In February 2009, the Treasury created the Making Home Affordable Program ("MHA") under its authority under the EESA.  One of the major initiatives under the MHA is the Home Affordable Modification Program ("HAMP").[7]

60.    The purpose of HAMP is to modify eligible mortgages to lower the monthly mortgage payments for homeowners in default or at risk of default.[8] HAMP sets forth a uniform structure for offering modified loans to qualifying

---

[7] Office of the Special Inspector General for the Troubled Asset Relief Program, Factors Affecting Implementation of the Home Affordable Modification Program, March 25, 2010 ("SIGTARP Report"), at 1, available at http://www.sigtarp.gov/reports/audit/2010/Factors_Affecting_Implementation_of_the_Home_Affordable_Modification_Program.pdf (last viewed January 11, 2012).

[8] *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

borrowers.[9]  The Obama Administration allocated $75 billion to HAMP, including $50 billion in TARP funds.[10]

61.    Participating servicers enter into a Servicer Participation Agreement ("SPA") with the United States (through its agent, Fannie Mae).  As of January 2010, 110 servicers, including Citi, have entered into an SPA to participate in HAMP.[11]  A signed copy of the SPA between Paul R. Ince, Citi's Chief Financial Officer, and Fannie Mae, dated April 13, 2009, is attached hereto as Exhibit 1.

62.    A servicer's duties and responsibilities under HAMP are set forth in the SPA.  The SPA incorporates supplemental instructions and directions to servicers issued by the Treasury, Fannie Mae, and Freddie Mac, referred to as "Program Documentation."  Until recently, directions to servicers were issued primarily in the form of "Supplemental Directives," regarding the servicer's duties. Now, the HAMP rules are compiled in a "Handbook for Servicers of Non-GSE Mortgages."  The Treasury also provides Frequently Asked Questions ("FAQ")

---

[9] HAMP Supplemental Directive 9-01 ("SD 9-01") at 1.  The HAMP "Program Documentation," which includes SD 9-01 and other supplemental instructions and directions to Servicers issued by the Treasury, Fannie Mae, and Freddie Mac is available at the HAMP Administrative Website for Servicers: https://www.hmpadmin.com/portal/index.jsp (last viewed January 11, 2012). Specifically, the Handbook, 2009 Supplemental Directives, and 2010 Supplemental Directives, and archives are available at: https://www.hmpadmin.com/portal/programs/guidance.jsp (last viewed January 11, 2012).

HAMP checklists and NPV model documents are available at https://www.hmpadmin.com/portal/programs/servicer.jsp (last viewed January 11, 2012).

The FAQs are available at https://www.hmpadmin.com/portal/programs/ servicer.jsp and https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/ hampconversionfaqs.pdf (last viewed January 11, 2012).

[10] Office of the Special Inspector General for the Troubled Asset Relief Program, Quarterly Report to Congress, April 20, 2010 report at 8, available at http://www.sigtarp.gov/reports/congress/2010/April2010_Quarterly_Report_to_Congress.pdf (last viewed January 11, 2012).

[11] *Id.* at 10.

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    documents that clarify the Supplemental Directives for HAMP.[12]   Each servicer is

2    required to review these documents and the "frequently asked questions constitute

3    supplemental documentation that is included in, and shall be deemed part of, the

4    HAMP Program Documentation described in Section 1 of the SPA."[13]

5        63.    The  SPA  provides  that  the  servicer  *shall*  perform  the  loan

6    modification  and  foreclosure  prevention  services  described  in  the  Program

7    Documentation.  SPA at ¶ 1A (emphasis in original).

8        64.    A homeowner is eligible for HAMP if he or she meets certain criteria.

9    The borrower's mortgage must be delinquent or at risk of imminent default due to

10   changes in financial circumstances, such as unemployment.[14]   The borrower must

11   have a monthly mortgage payment ratio of greater than 31 percent.  The mortgage

12   must have originated before January 1, 2009, be secured by a 1-4 unit property

13   (one of which is the borrower's principal residence), and fall within HAMP's

14   maximum  unpaid  principal  balance  requirements.[15]    The  home  may  not  be

15   investor-owned,  vacant  or  condemned.    Borrowers  in  bankruptcy  may  be

16   considered  for  HAMP  and  borrowers  engaged  in  litigation  regarding  their

17   mortgage  also  qualify.[16]    All  borrowers  must  sign  a  Hardship  Affidavit  that

18   describes their reason for applying for a HAMP modification.

---

[12]  See e.g. Supplemental Documentation—Frequently Asked Questions, April 2, 2010 ("April FAQ").

[13]  *Id.* at 1.

[14]  Default is generally defined as being at least 60 days late on a mortgage payment.  *See* SD 9-01 at 2; *see also* SIGTARP Report, *supra* at 3.

[15]  In other words, duplexes or condominiums containing more than one unit, but not to exceed four, also qualify for HAMP modification as long as one of the units is the borrower's principal residence.

[16]  SD 9-01 at 2; SIGTARP Report, *supra* at 4.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

65.     Pursuant to Supplemental Directive 09-01, "a borrower that is current or less than 60 days delinquent who contacts the servicer for a modification, and claims a hardship must be screened for imminent default."[17]

66.     If a borrower is determined to be at risk of imminent default or is 60 days or more delinquent and the mortgage meets the HAMP requirements discussed above, the servicer *must* evaluate the loan to determine whether it qualifies for modification.[18]

67.     First, the servicer must determine whether, by changing the interest rate, duration, or other terms of the loan in a particular sequence known as the "Standard Modification Waterfall," the borrower's total payment can be reduced to 31% of the borrower's monthly income.[19]   By going through these steps, the servicer arrives at proposed modification terms.

68.     Next, the servicer uses those terms arrived at through the waterfall to perform a "Net Present Value" ("NPV") test to determine whether the borrower's loan should be modified.[20]   The NPV test determines whether it is economically advantageous to modify the loan.  Factors considered under the NPV include the value of the mortgage, the homeowner's credit score, the home's location, the loan's delinquency status, and the homeowner's debt to income ratio.[21]   The Treasury provided "Base Net Present Value (NPV) Model Specifications" that servicers may use or customize (provided that the servicer's test conforms to HAMP requirements).[22]

---

[17] SD 9-01 at 3-4.

[18] *Id.*; see also SPA at ¶ 1A.

19 *Id.* at 8-10; HAMP Checklist at 6.

20 *Id*; see also SPA at ¶ 1A.

21 SIGTARP Report, *supra* at 4.

22 Home Affordable Modification Program Base Net Present Value (NPV) Model Specifications.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

69.   Servicers *must* offer a HAMP modification if the homeowner has a positive NPV, "which indicates that it is economically advantageous to modify the loan; *i.e.*, the modification will cause less loss to the owner of the mortgage than proceeding with foreclosure."[23]   If a borrower has a negative NPV, the servicer may perform the modification at its discretion.   Regardless of whether a modification is pursued, the servicer must maintain documentation.

70.   Once a borrower qualifies for loan modification, servicers must perform a two-step process for HAMP modifications.   First, the servicer provides the borrower with a Trial Period Plan ("TPP").[24]   The Trial Period Plan Agreement or Notice outlines the terms of the trial period.[25]   The Trial Period Plan and Notice promise that the servicer will permanently modify the loan if the borrower sends in requested income documentation and makes timely trial period payments.[26]

71.   The effective date of the trial period is set forth in the TPP Agreement or Notice.[27]   The borrower must be current under the terms of the TPP at the end of the trial period to receive a permanent modification.   If the borrower makes all required trial period payments no later than 30 days from the date the final payment is due, then he or she is current.[28]

---

[23] 09-02 at 4, 14-15; SIGTARP Report, supra at 4. see also NPV Model Specifications.

[24] At the inception of the program, the offer was in the form of a Trial Period Plan Agreement which borrowers signed and returned to accept.   After Supplemental Directive 09-07 was issued in October 2009, servicers were permitted to use either the TPP Agreement or a simple TPP Notice which offered the trial modification, which the borrower accepted by making the first payment under the plan.   After March 2010, servicers were required to use only the TPP Notice SD-09-06.   See SD-09-07, at 6-7, and Exs. C and D thereto.   In this Complaint, references to "Trial Period Plan" or "Trial Period Plan Agreement" refer to any and all of the above, and also, unless the context clearly dictates otherwise, any document that is the functional equivalent of any of those documents.

[25] SD 9-01 at 14.

[26] *Id.* at 15, 17-18.

[27] *Id.*

[28] *Id.*

72.    If the borrower has provided the necessary documentation, signed the TPP Agreement (where applicable), and made all the TPP monthly payments, then Step 2 of HAMP is triggered and the borrower receives a permanent modification.[29]

73.    HAMP directives mandate specific protections for borrowers applying for modification under the program.  Servicers may not proceed with foreclosure until the borrower has been evaluated for the program, and borrowers are protected against foreclosure during the application process and trial period.[30]  Servicers cannot force borrowers to waive their legal rights, or demand certain fees from them.[31]  Servicers are required to give borrowers information so they can engage in informed decision-making.[32]  After January 1, 2010, servicers were required to give borrowers written explanations for denying a modification.[33]

74.    Finally, servicers are required to report a "full file" status report to credit reporting agencies while they evaluate borrowers for eligibility during the TPP.  "If the borrower is current when they enter the trial period, the servicer should report the borrower as current but on a modified payment . . . ."[34]

75.    HAMP rules and directives create explicit rules and rigorous timelines for the HAMP modification program.  Time is of the essence in the servicer's processing borrower requests and evaluating eligibility for a permanent modification.    HAMP  rules  require  that  servicers  evaluate  the  income

---

[29] *Id.* at 18; *see also* April FAQ at 19.

30 SD 09-01 at 14, 19; SD 10-02 at 4-7.

31 SD 09-01 at 2, 22.

32 SD 09-01 at 13.

33 SD 09-07 at 7; SD 09-08 at 2-3.

34 April FAQ at 20.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    documentation submitted "upon receipt"—later clarified to mean within 30 days.[35]

2    In all cases, HAMP rules direct servicers to prepare the permanent HAMP

3    modification agreement early "to allow sufficient processing time for the

4    modification to become effective on the first day of the month following the final

5    trial period month."[36]

6        76.   HAMP rules demand that servicers "comply with HAMP

7    requirements" and "document the execution of loan evaluation, loan modification

8    and accounting processes."[37]  Servicers "must have adequate staffing, resources,

9    and facilities for receiving and processing the HAMP documents and any requested

10   information that is submitted by borrowers.  Servicers must also have procedures

11   and systems in place to be able to respond to inquiries and complaints about the

12   HAMP."[38]  Servicers must retain documents and keep detailed records.[39]

13                  **CITI'S PARTICIPATION IN HAMP**

14       77.   Citi aggressively solicited its borrowers to apply for modifications

15   under HAMP through various advertisements and representations, including

16   mailers such as the one attached hereto as Exhibit 2.

17       78.   Citi's website proclaims "We understand that many homeowners

18   across the country are having trouble making their mortgage payments.  We also

19   understand that your situation is personal.  That is why CitiMortgage is here to

20   help you find a solution that works for you.  If you are having trouble making

21

22

23           _____

24   35 *Id.* at 5, 15 ("upon receipt"); SD 09-07 at 1 (after October 8, 2009, review within 30 days).

25   36 SD 9-03.

26   37 SD 9-01 at 25.

27   38 *Id.* at 13.

28   39 *Id.*

payments on your mortgage, CitiMortgage will work with you to find a mortgage solution."[40]

79.     Citi repeatedly touted its supposed intent and ability to help needy homeowners.  For example, during the time that Plaintiffs applied for loan modifications, under "Homeowner Assistance" and "Hardship Assistance," the Citi website stated:

> Citi is committed to helping keep people in their homes.  There are many possible solutions to manage your mortgage payment, and the most important step you can take is to reach out for help today. . . .
> **Are you concerned about your ability to pay your bills?  Help Is Free!** . . . Many homeowners are having trouble with their mortgage payments and you may have the option to modify or change certain parts of your mortgage loan agreement.  Sometimes altering the interest rate, the term of the mortgage or even the mortgage product may be able to help you manage your monthly payments. . . . Citi understands sometimes situations occur that make it difficult for you to make your monthly mortgage payments.  Our Workable Solutions Program was specifically created to help our customers who are experiencing these hardships.  If you're facing foreclosure, you may still be able to keep your home.  This requires you to be proactive and work with your lender or servicer, or a professional counselor.

80.     Citi's "Homeowner Assistance" publicity campaign, including its participation in HAMP, prompted thousands of customers to contact Citi and apply for loan modifications.  Citi's advertising represents, explicitly and implicitly, that Citi complies with HAMP requirements.  Treasury Service Performance Reports

---

[40] *See* https://www.citimortgage.com/Mortgage/displayHomeOwnerAssistance. do?page=overview (last viewed January 11, 2012).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1   estimate that, since HAMP started, hundreds of thousands of Citi borrowers were

2   potentially eligible for loan modification.

3         81.    In reality, Citi's participation in HAMP and related modification

4   efforts are categorical failures.  As of August 31, 2010, Citi publicly reported that

5   it had initiated only 150,568 HAMP trials, of which it had only 10,400 *active* trial

6   modifications and had made only 49,538 permanent loan modifications.[41]

7         82.    These numbers reflect Citi's failure to process modifications in time

8   or according to HAMP rules.  Citi regularly extends the trial period far beyond the

9   90-day HAMP guideline, erroneously denies permanent loan modifications to

10   qualified borrowers, inaccurately represents that borrowers will suffer no adverse

11   credit consequences during the trial period, wrongly instructs some borrowers to

12   miss payments before entering the trial period, and even places some borrowers in

13   incorrect programs that cannot result in permanent loan modifications.

14         83.    Citi also fails to employ an adequate number of properly-trained

15   employees to handle the large volume of loan modification requests.[42]  Citi hired

16   personnel with minimal education and/or no prior mortgage-related experience and

17   provided a token "training" program that did not prepare those employees for

18   processing incoming loan modification requests in an accurate, timely manner.  It

19   also failed to adequately supervise and monitor them, and address the systematic

20   failures with how it processed loan modification requests.

21         84.    Homeowners have complained about Citi's lack of customer service

22   and poor communication.   For instance, customers complain that despite

23   submitting all of the documentation that Citi requests for a loan modification, Citi

24

25   [41] Servicer Performance Report Through August, 2010, available at:
https://www.hmpadmin.com/portal/news/press.jsp (last viewed January 11, 2012).

26   42 *See* Rebecca Christie and Bradley Keoun, *Treasury May Begin Selling*

27   *Citigroup Shares Today (Update1)*, April 26, 2010, available at:
www.bloomberg.com/apps/news?sid=aAnWrmkWn2Tk&pid=20601087 (last

28   viewed January 11, 2012).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    claims that the documentation is missing and/or Citi claims it did not receive the

2    documentation, and makes repeated demands for it.  Many borrowers complain

3    they cannot get through to Citi to initiate the loan modification process.

4         85.    Citi's slow processing of HAMP applications substantially extends the

5    time period that a loan is considered delinquent, damaging the borrower's credit.

6         86.    When borrowers apply for a modification, they are not adequately

7    informed that their loans will be reported as delinquent even if they make timely

8    modification payments.  In its third quarter earnings report released on October 15,

9    2009, Citigroup stated (although this was not revealed to Class members) that

10   "[l]oans in the trial modification period under the HAMP *continue to remain*

11   *delinquent even if the reduced payments agreed to under the program are made by*

12   *the borrower* . . . [t]he impact of the HAMP also contributed to the $2.0 billion

13   sequential *increase in loans 90+ days past due* in the North America residential

14   real estate lending business" (emphasis added).  The earnings report further stated

15   that Citi "[c]ompleted more than 24,000 mortgage loan modifications during the

16   quarter.  In addition, at the end of the quarter, Citigroup had more than 63,000

17   loans in the trial modification period under the [HAMP]."  Citigroup's first

18   mortgage delinquencies went from $10.2 billion in the second quarter of 2009 to

19   $12.5 billion in the third quarter.

20        87.    Even if a borrower manages to start the TPP process and comply with

21   its terms, Citi often wrongly fails to convert TPP Agreements into permanent

22   modifications and/or delays determining a customer's status for permanent

23   modification.  Class members' trial periods have extended far beyond the 90-day

24   HAMP guideline—often up to 180 days, 270 days or more.

25        88.    The consequences to the borrower are severe.  For example, the

26   borrower's unpaid balance continues to rise because Citi adds the difference

27   between the trial payment and regular payment to the arrearage.  The higher

28   balance makes it harder for the borrower to sell the home, complete a short sale, or

repay the arrearage, whether through a repayment plan or Chapter 13 bankruptcy. The large arrearage amount can make it more difficult for the borrower to qualify for a non-HAMP modification, such as a proprietary or "traditional" loan modification.

89.     Whenever Citi denies a permanent modification and/or delays making a decision, it nevertheless generates profits because it assesses fees for default management on its customers' accounts, such as late fees, inspection fees and other fees. For example, many customers are charged monthly property inspection fees that are automatically scheduled, are forced to pay for forced insurance from affiliated businesses, and/or are required to pay other unnecessary and unreasonable "delinquency" expenses.

90.     In addition, without informing borrowers whether they have been denied a permanent loan modification, Citi sends borrowers default letters demanding thousands of dollars and threatening foreclosure.  Such letters are misleading, improper, deceptive and illegal under various state statutes, since the borrowers are in an agreed trial period plan with Citi.

91.     Citi fails to inform borrowers entering trial plans that thousands of dollars will suddenly become due if their modification is denied.  Homeowners paying under trial plans are, by definition, already facing financial hardship. Citi's demand for the arrearage amount almost immediately after denial effectively guarantees that the borrower will be unable to pay, or forces them into short-term repayment plans to avoid foreclosure.

92.     Citi also reports incomplete and/or inaccurate information to credit reporting agencies about borrowers who are under a TPP.  Citi reports consumer loans as delinquent to credit reporting agencies even if trial payments are made on time and even if a borrower was current at the time the borrower entered a TPP.

93.     Under HAMP, if a borrower is current at the time he or she enters a TPP, Citi should report the borrower as current but on a payment plan.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

94.    Similarly, if a borrower is late at the time he or she enters a TPP, but current for the duration of the TPP, Citi should report the borrower as delinquent for the duration the borrower was delinquent, but report the borrower as current during the TPP but on a payment plan.

95.    Instead, Citi has a uniform written policy of reporting borrowers delinquent, even if they are current during the TPP.  Citi fails to comply with HAMP's credit reporting guidelines, despite its representations that its loan modification programs comply with HAMP.    Notwithstanding HAMP's requirements, Citi's credit reporting policies result in incomplete and/or inaccurate information being reported to credit reporting agencies.

## CITI ROUTINELY BREACHES ITS TPP AGREEMENTS

96.    Standing independent of Citi's failure to follow the rules of HAMP and meet its obligations under the SPA is Citi's routine breach of the form TPP Agreement.

97.    Each and every named plaintiff in the TPP Class was determined by Citi to have met the threshold requirements for HAMP, as described above, prior to being tendered a TPP Agreement or its functional equivalent.

98.    As described above, the TPP Agreement contemplates a finite trial period, during which Citi is permitted to verify the information used to make the initial finding of eligibility and test the borrower's ability to make monthly payments at the modified level.  Under the terms of the TPP Agreement, Citi is not entitled to an ongoing and open-ended period of time in which to review and re-review the borrower's eligibility. "Time Is Of The Essence" is a term of each TPP Agreement.

99.    Citi understood that the TPP Agreement required it to tender permanent modifications to borrowers who successfully completed their three or four month trial period.  Citi represents on its website, and in other standardized

1  written and oral communications, that borrowers who successfully make the trial

2  period payments will be given a permanent loan modification.

3      100.   In order to perform under the terms of the TPP Agreement, Citi must

4  tender a permanent modification that complies with HAMP rules and Program

5  Documentation by the end of the trial period.

6      101.   If Citi believes, based on new and different information it gathers

7  from the homeowner during the trial period, that its initial determination of

8  eligibility was incorrect, it is obligated to notify the homeowner of that fact prior to

9  the end of the trial period.  If Citi fails to do so, it has breached the TPP Agreement

10  and waived its ability to claim ineligibility or non-compliance in the future.

11              **CITI'S ACTIONS HAVE CAUSED INJURY TO PLAINTIFFS**

12      102.   Plaintiffs have suffered injury caused by Citi's actions, including but

13  not limited to longer loan payoff times, improper negative reporting to credit

14  bureaus resulting in monetary harm due to damaged credit, monetary damages

15  from higher principle balances, inappropriate fees and charges assessed to them,

16  including broker price opinion fees, inspection fees, attorney's fees, "process

17  management" fees, late fees and other charges associated with delinquency and

18  default, and increased accrued interest.

19      103.   Plaintiffs also suffered injuries related to being in default because in

20  many instances, Citi actually encouraged or instructed borrowers to default on their

21  loans in order to "qualify" for assistance, when in fact HAMP requires only that an

22  "imminent risk of default" be attested to.

23      104.   Moreover, whenever Citi breaches the TPP Agreement and delays the

24  tender of a permanent HAMP modification beyond the close of the trial period, the

25  terms of any subsequent HAMP or non-HAMP modification are less beneficial to

26  homeowners than they otherwise would be had Citi properly performed.  If class

27  members have accepted a modification on terms that are less favorable than those

28  of a HAMP-compliant modification offered at the close of the trial period, their

1   injury is measured by the difference between the modification they accepted and
2   the modification they were entitled to.

3       105.   If eligible homeowners have not received permanent modifications,
4   their injury is measured by the difference between their current circumstances and
5   the terms of the modification they were entitled to—a difference that includes but
6   is not limited to the wrongful loss of a property interest for those who suffered
7   foreclosure.

8       106.   Citi's behavior has also left Plaintiffs and Class members in limbo,
9   wondering if their home can be saved and preventing homeowners from pursuing
10   other avenues of resolution, including using the money they are putting toward trial
11   period-level payments to fund bankruptcy plans, relocation costs, short sales or
12   other means of curing their default.

13   **CLAIMS OF NAMED PLAINTIFFS**

14       107.   Each of the named Plaintiffs is the owner-occupant of a residential
15   home encumbered by a first-lien loan of less than $729,750 that was originated
16   prior to January 1, 2009, and that is serviced by Citi.   The mortgage loans secured
17   by each named Plaintiff's home was either in default or was at imminent risk of
18   default at the time each named Plaintiff applied to Citi for a loan modification.

19       108.   Each of the named Plaintiffs who represents a statewide HAMP TPP
20   class has received (1) a form TPP agreement substantially similar to the example
21   attached hereto as Exhibit 3, a copy of which is in Citi's possession, and which is
22   incorporated herein by reference, and/or (2) an oral promise referencing an actual
23   TPP Agreement that was forthcoming and that, in form and in substance, contained
24   terms consistent with the TPP Agreement attached hereto as Exhibit 3 or was its
25   functional equivalent.

26   **Maria & Pedro Betancourt (California)**

27       109.   Mr. and Mrs. Betancourt contacted Citi in November 2008 after
28   suffering financial hardship and experiencing difficulty paying their mortgage.

110. They applied for a HAMP loan modification shortly thereafter.

111. Citi approved them for a TPP and sent them a written copy of the TPP in June 2009, substantially in the form of Exhibit 3.

112. They executed and returned the TPP shortly thereafter, along with any modified payment then due.

113. They then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions. Citi accepted their modified mortgage payments.

114. Despite the Betancourts' performance, Citi failed to provide them with the permanent modification on the terms promised to them upon completion of the trial period.

115. Despite the Citi's failure to perform this crucial term of the TPP agreement, the Betancourts diligently attempted to resolve the matter by contacting Citi repeatedly. Citi failed to remedy the situation.

116. Citi, instead, provided the Betancourts with erroneous and misleading information and subjected them to negative credit reporting, among other things, all to their detriment and harm.

**Hanna Bernard (California)**

117. Ms. Bernard contacted Citi in August 2009 after suffering financial hardship and experiencing difficulty paying her mortgage.

118. She applied for a HAMP loan modification shortly thereafter.

119. Citi approved her for a TPP and sent her a written copy of the TPP. *See* Exhibit 3.

120. She executed and returned the TPP shortly thereafter, along with any modified payment then due.

121. She then performed her obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions. Citi accepted her modified mortgage payments.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

122.   Despite Ms. Bernard's performance, Citi failed to provide her with the permanent modification on the terms promised to her upon completion of the trial period.

123.   Despite Citi's failure to perform this crucial term of the TPP agreement, Ms. Bernard diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

124.   Citi, instead, provided Ms. Bernard with erroneous and misleading information, threatened her with foreclosure, imposed unwarranted fees including, without limitation, inspection fees and inflated fees for force-placed insurance, and demanded extraordinary payments from her, among other things, all to her detriment and harm.

**Audrey & Hugh Pierson (California)**

125.   Mr. and Mrs. Pierson contacted Citi in May 2009 after suffering financial hardship and experiencing difficulty paying their mortgage.

126.   They applied for a HAMP loan modification shortly thereafter.

127.   Citi approved them for a TPP and sent them a written copy of the TPP in September 2009, substantially in the form of Exhibit 3.

128.   They executed and returned the TPP shortly thereafter, along with any modified payment then due.

129.   They then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted their modified mortgage payments.

130.   Despite Mr. and Mrs. Pierson's performance, Citi failed to provide them with the permanent modification on the terms promised to them upon completion of the trial period.

131.   Despite Citi's failure to perform this crucial term of the TPP agreement, Mr. and Mrs. Pierson diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

132. Citi, instead, provided Mr. and Mrs. Pierson with erroneous and misleading information and subjected them to negative credit reporting, threatened them with foreclosure, imposed fees including, wihtout limitation, unwarranted inspection fees and other similar charges, and demanded extraordinary payments from them, among other things, all to their detriment and harm.

**Beverly King & Nancy Glennon (California)**

133. Ms. King and Ms. Glennon contacted Citi in April 2009 after suffering financial hardship and experiencing difficulty paying their mortgage.

134. They applied for a loan modification shortly thereafter, at or around which time Citi instructed them to stop making mortgage payments.

135. Citi approved them for a reduced payment plan, where if they made four payments of $1,094.00 between September and December 2009, Citi promised to modify their loan by making the reduced payment amount permanent.

136. Ms. King and Ms. Glennon received confirmation of their "repayment plan" in a document that was not a TPP agreement, but rather, like the TPP agreements, instructed them to make reduced payments. That document referenced a January 2010 payment of $11,401, but a Citi representative told Ms. King that it would not apply if they made all the other payments on time.

137. The document Ms. King and Ms. Glennon received was the functional equivalent of a HAMP TPP.

138. Ms. King executed the repayment plan document, on behalf of herself and Ms. Glennon, and returned the document to Citi shortly thereafter.

139. Ms. King and Ms. Glennon timely submitted each of the modified payments as required under their agreement with Citi and complied with all other terms and conditions. Citi accepted their modified mortgage payments.

140. After a period of collecting reduced payments, Citi abruptly sent Ms. King and Ms. Glennon demands for immediate payment of thousands of dollars, which included purported arrearages, delinquency expenses, unwarranted

1    inspection fees and other unknown and/or unnecessary fees, and threatened them
2    with foreclosure.

3        141.  Despite Ms. King's and Ms. Glennon's performance, Citi failed to
4    provide them with the permanent modification it promised them upon completion
5    of the trial period.

6        142.  Despite Citi's failure to perform this crucial term of the agreement,
7    Ms. King, individually and on behalf of Ms. Glennon, diligently attempted to
8    resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the
9    situation.

10        143.  Citi, instead, provided Ms. King and Ms. Glennon with erroneous and
11    misleading information and subjected them to negative credit reporting, imposed
12    fees including, without limitation, unwarranted inspection fees and other similar
13    charges, and demanded extraordinary payments from them, among other things, all
14    to their detriment and harm.

15    **Balbir Singh (California)**

16        144.  Mr. Singh contacted Citi in October 2009 after suffering financial
17    hardship and experiencing difficulty paying his mortgage.

18        145.  He applied for a HAMP loan modification shortly thereafter.

19        146.  Citi approved him for a TPP over the telephone June 2009.

20        147.  He agreed to the TPP and submitted any modified payment due
21    shortly thereafter.

22        148.  He then performed his obligations per the TPP by making all the
23    reduced payments required per the TPP and complying with all other terms and
24    conditions.  Citi accepted his modified mortgage payments.

25        149.  Despite Mr. Singh's performance, Citi failed to provide him with the
26    permanent modification on the terms promised to him upon completion of the trial
27    period.

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

150. Despite Citi's failure to perform this crucial term of the TPP agreement, Mr. Singh diligently attempted to resolve the matter by contacting Citi repeatedly. Citi failed to remedy the situation.

151. Citi, instead, provided Mr. Singh with erroneous and misleading information, imposed unreasonable fees, including, without limitation, unwarranted inspection fees and other similar charges, demanded extraordinary payments from him, and sent him delinquency and default letters, among other things, all to his detriment and harm.

**Carla Chui & Maurizio Verdini (Florida)**

152. Ms. Chui and Mr. Verdini contacted Citi in April 2009 after suffering financial hardship and experiencing difficulty paying their mortgage.

153. They applied for a HAMP loan modification shortly thereafter.

154. Citi approved them for a TPP and sent them a written copy of the TPP in June 2009, substantially in the form of Exhibit 3.

155. They executed and returned the TPP shortly thereafter, along with any modified payment then due.

156. They then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions. Citi accepted their modified mortgage payments.

157. Despite Ms. Chui's and Mr. Verdini's performance, Citi failed to provide them with the permanent modification on the terms promised to them upon completion of the trial period.

158. Despite Citi's failure to perform this crucial term of the TPP agreement, Ms. Chui and Mr. Verdini diligently attempted to resolve the matter by contacting Citi repeatedly. Citi failed to remedy the situation.

159. Citi, instead, provided Ms. Chui and Mr. Verdini with erroneous and misleading information, imposed unwarranted fees, including, without limitation, unwarranted inspection fees and other similar charges, demanded extraordinary

payments from them, sent them delinquency notices, subjected them to negative credit reporting and threatened them with foreclosure, among other things, all to their detriment and harm.

**Elizabeth Daniel (Florida)**

160.   Ms. Daniel contacted Citi in July 2009 after suffering financial hardship and experiencing difficulty paying her mortgage.

161.   She applied for a HAMP loan modification shortly thereafter.

162.   Citi approved her for a TPP and sent her a written copy of the TPP in September 2009, substantially in the form of Exhibit 3.

163.   She executed and returned the TPP shortly thereafter, along with any modified payment then due.

164.   She then performed her obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted her modified mortgage payments.

165.   Despite Ms. Daniel's performance, Citi failed to provide her with the permanent modification on the terms promised to her upon completion of the trial period.

166.   Despite Citi's failure to perform this crucial term of the TPP agreement, Ms. Daniel diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

167.   Citi, instead, provided Ms. Daniel with erroneous and misleading information, imposed unwarranted fees, including, without limitation, unwarranted inspection fees and other similar charges, demanded extraordinary payments from her, sent her delinquency notices, subjected her to negative credit reporting, among other things, all to her detriment and harm.

**Leslie Barry (Illinois)**

168.   Ms. Barry contacted Citi in December 2009 after suffering financial hardship and experiencing difficulty paying her mortgage.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

169.   She applied for a HAMP loan modification shortly thereafter.

170.   Citi approved her for a TPP and sent her a written copy of the TPP in May 2010, substantially in the form of Exhibit 3.

171.   She executed and returned the TPP shortly thereafter, along with any modified payment then due.

172.   She then performed her obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted her modified mortgage payments.

173.   Despite Ms. Barry's performance, Citi failed to provide her with the permanent modification on the terms promised to her upon completion of the trial period.

174.   Despite Citi's failure to perform this crucial term of the TPP agreement, Ms. Barry diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

175.   Citi, instead, provided the Ms. Barry with erroneous and misleading information and demanded extraordinary payments from her, among other things, all to her detriment and harm.

**John & Maria Petrides (Illinois)**

176.   Mr. and Mrs. Petrides contacted Citi in March 2010 after suffering financial hardship and experiencing difficulty paying their mortgage.

177.   They applied for a HAMP loan modification shortly thereafter.

178.   Citi approved them for a TPP and sent them a written copy of the TPP in June 2010, substantially in the form of Exhibit 3.

179.   They executed and returned the TPP shortly thereafter, along with any modified payment then due.

180.   They then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted their modified mortgage payments.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

181.   Despite the Petrides' performance, Citi failed to provide them with the permanent modification on the terms promised to them upon completion of the trial period.

182.   Despite Citi's failure to perform this crucial term of the TPP agreement, the Petrides' diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

183.   Citi, instead, provided the Petrides' with erroneous and misleading information, imposed unreasonable fees including, without limitation, unwarranted inspection fees and other similar charges, and threatened foreclosure proceedings, among other things, all to their detriment and harm.

**Robert & Raeanda Coons (Iowa)**

184.   Mr. and Mrs. Coons contacted Citi in April 2009 after suffering financial hardship and experiencing difficulty paying their mortgage.

185.   They applied for a HAMP loan modification shortly thereafter.

186.   Citi approved them for a TPP and sent them a written copy of the TPP, substantially in the form of Exhibit 3.

187.   They executed and returned the TPP shortly thereafter, along with any modified payment then due.

188.   They then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted their modified mortgage payments.

189.   Despite the Coons' performance, Citi failed to provide them with the permanent modification on the terms promised to them upon completion of the trial period.

190.   Despite Citi's failure to perform this crucial term of the TPP agreement, the Coons' diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

191.  Citi, instead, provided the Coons' with erroneous and misleading information, imposed unreasonable fees and initiated foreclosure proceedings, among other things, all to their detriment and harm.

**Keith Goodyk (Iowa)**

192.  Mr. Goodyk contacted Citi in early 2010 after suffering financial hardship and experiencing difficulty paying his mortgage.

193.  He applied for a loan modification shortly thereafter.

194.  Citi approved him for a reduced payment plan in July 2010.

195.  He accepted the reduced payment plan and began making the requested payments. Mr. Goodyk was informed that he received a HAMP TPP and that he would ultimately receive a permanent modification consistent with HAMP.

196.  He then performed his obligations per the reduced payment plan by making all the reduced payments required per the plan and complying with all other terms and conditions of the plan.  Citi accepted his modified mortgage payments.

197.  Despite Mr. Goodyk's performance, Citi failed to provide him with the permanent modification on the terms promised to them upon completion of the reduced payment plan.

198.  Despite Citi's failure to perform this crucial term of the reduced payment plan agreement, Mr. Goodyk diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

199.  Citi, instead, provided Mr. Goodyk with erroneous and misleading information, imposed unreasonable fees, including, without limitation, unwarranted inspection fees and other similar charges, demanded extraordinary payments from him, subjected him to negative credit reporting, and initiated foreclosure proceedings, among other things, all to their detriment and harm.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**Joaquin Sequeira (Maryland)**

200.   Mr. Sequeira contacted Citi in late 2009 after suffering financial hardship and experiencing difficulty paying his mortgage.

201.   He applied for a HAMP loan modification shortly thereafter.

202.   Citi approved him for a TPP and sent him a written copy of the TPP in February 2010, substantially in the form of Exhibit 3.

203.   He executed and returned the TPP shortly thereafter, along with any modified payment then due.

204.   He then performed his obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.   Citi accepted his modified mortgage payments.   Mr. Sequeira has never missed any of his mortgage payments before his TPP, during the TPP, or after—even though his income was reduced significantly during the operative attempts to modify his loan from late 2009 through October 2011.

205.   Despite Mr. Sequeira's performance, Citi failed to provide him with the permanent modification on the terms promised to him upon completion of the trial period.

206.   Despite Citi's failure to perform this crucial term of the TPP agreement, Mr. Sequeira diligently attempted to resolve the matter by contacting Citi repeatedly.   Citi failed to remedy the situation.

207.   Citi, instead, provided Mr. Sequeira with erroneous and misleading information, imposed unreasonable fees, including, without limitation, unwarranted inspection fees and other similar charges, subjected him to negative credit reporting, and initiated foreclosure proceedings, among other things, all to his detriment and harm.

**Robert Gatti (Massachusetts)**

208.   Mr. Gatti contacted Citi in February 2009 after suffering financial hardship and experiencing difficulty paying his mortgage.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

209. He applied for a HAMP loan modification shortly thereafter.

210. Citi approved him for a TPP and sent him a written copy of the TPP in October 2009, substantially in the form of Exhibit 3.

211. He executed and returned the TPP shortly thereafter, along with any modified payment then due.

212. He then performed his obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions. Citi accepted his modified mortgage payments.

213. Despite Mr. Gatti's performance, Citi failed to provide him with the permanent modification on the terms promised to him upon completion of the trial period.

214. Despite Citi's failure to perform this crucial term of the TPP agreement, Mr. Gatti diligently attempted to resolve the matter by contacting Citi repeatedly. Citi failed to remedy the situation.

215. Citi, instead, provided Mr. Gatti with erroneous and misleading information, demanded extraordinary payments from him, sent him delinquency notices, subjected him to negative credit reporting, and threatened acceleration of the loan, among other things, all to his detriment and harm.

**Karen Grover (Massachusetts)**

216. Ms. Grover contacted Citi in August 2009 after suffering financial hardship and experiencing difficulty paying her mortgage.

217. She applied for a HAMP loan modification shortly thereafter, at which point a Citi representative instructed her to not make her September 2009 mortgage payment.

218. Citi approved her for a TPP and sent her a written copy of the TPP in September 2009, substantially in the form of Exhibit 3.

219. She executed and returned the TPP shortly thereafter, along with any modified payment then due.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

220.   She then performed her obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted her modified mortgage payments.

221.   Despite Ms. Grover's performance, Citi failed to provide her with the permanent modification on the terms promised to her upon completion of the trial period.

222.   Despite Citi's failure to perform this crucial term of the TPP agreement, Ms. Grover diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

223.   Citi, instead, provided Ms. Grover with erroneous and misleading information, demanded extraordinary payments from her, sent her delinquency notices and threatened acceleration of the loan, among other things, all to her detriment and harm.

**Daniel Korzep (Massachusetts)**

224.   Mr. Korzep contacted Citi in October 2009 after suffering financial hardship and experiencing difficulty paying his mortgage.

225.   He applied for a HAMP loan modification shortly thereafter.

226.   Citi approved him for a TPP and sent him a written copy of the TPP in November 2009, substantially in the form of Exhibit 3.

227.   He executed and returned the TPP shortly thereafter, along with any modified payment then due.

228.   He then performed his obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted his modified mortgage payments.

229.   Despite Mr. Korzep's performance, Citi failed to provide him with the permanent modification on the terms promised to him upon completion of the trial period.

230. Despite Citi's failure to perform this crucial term of the TPP agreement, Mr. Korzep diligently attempted to resolve the matter by contacting Citi repeatedly. Citi failed to remedy the situation.

231. Citi, instead, provided Mr. Korzep with erroneous and misleading information, demanded extraordinary payments from him, sent him delinquency notices, and initiated foreclosure proceedings, among other things, all to his detriment and harm.

**Jo Ann Gastineau (New Jersey)**

232. Ms. Gastineau contacted Citi in June 2009 after suffering financial hardship and experiencing difficulty paying her mortgage.

233. She applied for a HAMP loan modification shortly thereafter.

234. Citi approved her for a TPP and sent her a written copy of the TPP in February 2010, substantially in the form of Exhibit 3.

235. She executed and returned the TPP shortly thereafter, along with any modified payment then due.

236. She then performed her obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions. Citi accepted her modified mortgage payments.

237. Despite Ms. Gastineau's performance, Citi failed to provide her with the permanent modification on the terms promised to her upon completion of the trial period.

238. Despite Citi's failure to perform this crucial term of the TPP agreement, Ms. Gastineau diligently attempted to resolve the matter by contacting Citi repeatedly. Citi failed to remedy the situation.

239. Citi, instead, provided Ms. Gastineau with erroneous and misleading information, imposed unreasonable fees including, without limitation, unwarranted inspection fees and other similar charges, and initiated foreclosure proceedings, among other things, all to her detriment and harm.

**Juan & Elizabeth Silva (New Jersey)**

240.   Mr. and Mrs. Silva contacted Citi in early 2009 after suffering financial hardship and experiencing difficulty paying their mortgage.

241.   They applied for a HAMP loan modification shortly thereafter.

242.   Citi approved them for a TPP and sent them a written copy of the TPP in August 2009, substantially in the form of Exhibit 3.

243.   They executed and returned the TPP shortly thereafter, along with any modified payment then due.

244.   They then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted their modified mortgage payments.

245.   Despite the Silvas' performance, Citi failed to provide them with the permanent modification on the terms promised to them upon completion of the trial period.

246.   Despite Citi's failure to perform this crucial term of the TPP agreement, the Silvas diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

247.   Citi, instead, provided the Silvas with erroneous and misleading information, imposed unreasonable fees, including, without limitation, unwarranted inspection fees and other similar charges, demanded extraordinary payments from them, and initiated foreclosure proceedings, among other things, all to their detriment and harm.

**David Derosa & Erin Logan (Pennsylvania)**

248.   Mr. Derosa and Ms. Logan contacted Citi in November 2008 after suffering financial hardship and experiencing difficulty paying their mortgage.

249.   They applied for a HAMP loan modification shortly thereafter, after having also been advised by a Citi representative that nothing could be done for them unless they were in default and to stop making monthly mortgage payments.

250.   Citi approved them for a TPP and sent them a written copy of the TPP in August 2009, substantially in the form of Exhibit 3.

251.   They executed and returned the TPP shortly thereafter, along with any modified payment then due.

252.   They then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted their modified mortgage payments.

253.   Despite Mr. Derosa's and Ms. Logan's performance, Citi failed to provide them with the permanent modification on the terms promised to them upon completion of the trial period.

254.   Despite Citi's failure to perform this crucial term of the TPP agreement, Mr. Derosa and Ms. Logan diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

255.   Citi, instead, provided Mr. Derosa and Ms. Logan with erroneous and misleading information, imposed unreasonable fees including, without limitation, unwarranted inspection fees and other similar charges, and initiated foreclosure proceedings, among other things, all to their detriment and harm.

**Eugene & Tawanna Frasier (Pennsylvania)**

256.   Mr. and Mrs. Frasier contacted Citi in May 2009 after suffering financial hardship and experiencing difficulty paying their mortgage.

257.   They applied for a HAMP loan modification shortly thereafter.

258.   Citi approved them for a TPP and sent them a written copy of the TPP in August 2009, substantially in the form of Exhibit 3.

259.   They executed and returned the TPP shortly thereafter, along with any modified payment then due.

260.   They then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted their modified mortgage payments.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

261.   Despite the Frasiers' performance, Citi failed to provide them with the permanent modification on the terms promised to them upon completion of the trial period.

262.   Despite Citi's failure to perform this crucial term of the TPP agreement, the Frasiers diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

263.   Citi, instead, provided the Frasiers with erroneous and misleading information, imposed unreasonable fees including, without limitation, unwarranted inspection fees and other similar charges, and initiated foreclosure proceedings, among other things, all to their detriment and harm.

**James & Jennifer Garcia (Pennsylvania)**

264.   Mr. and Mrs. Garcia contacted Citi in May 2009 after suffering financial hardship and experiencing difficulty paying their mortgage.

265.   They applied for a HAMP loan modification shortly thereafter.

266.   Citi approved them for a TPP and sent them a written copy of the TPP in August 2009, substantially in the form of Exhibit 3.

267.   They executed and returned the TPP shortly thereafter, along with any modified payment then due.

268.   They then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted their modified mortgage payments.

269.   Despite the Garcias' performance, Citi failed to provide them with the permanent modification on the terms promised to them upon completion of the trial period.

270.   Despite Citi's failure to perform this crucial term of the TPP agreement, the Garcias diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

271.   Citi, instead, provided the Garcias with erroneous and misleading information, imposed unreasonable fees including, without limitation, unwarranted inspection fees and other similar charges, and threatened foreclosure proceedings, among other things, all to their detriment and harm.

**Minnie Glover (Pennsylvania)**

272.   Ms. Glover contacted Citi in April 2009 after suffering financial hardship and experiencing difficulty paying her mortgage.

273.   She applied for a HAMP loan modification shortly thereafter.

274.   Citi approved her for a TPP and sent her a written copy of the TPP in September 2009, substantially in the form of Exhibit 3.

275.   She executed and returned the TPP shortly thereafter, along with any modified payment then due.

276.   She then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted her modified mortgage payments.

277.   Despite Ms. Glover's performance, Citi failed to provide her with the permanent modification on the terms promised to her upon completion of the trial period.

278.   Despite Citi's failure to perform this crucial term of the TPP agreement, Ms. Glover diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

279.   Citi, instead, provided Ms. Glover with erroneous and misleading information, imposed unreasonable fees including, without limitation, unwarranted inspection fees and other similar charges, and initiated foreclosure proceedings, among other things, all to her detriment and harm.

**Renee & Stephen Johnson (Pennsylvania)**

280.   Mr. and Mrs. Johnson contacted Citi in July 2009 after suffering financial hardship and experiencing difficulty paying their mortgage.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

281.   They applied for a HAMP loan modification shortly thereafter.

282.   Citi approved them for a TPP and sent them a written copy of the TPP in July 2009, substantially in the form of Exhibit 3.

283.   They executed and returned the TPP shortly thereafter, along with any modified payment then due.

284.   They then performed their obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions.  Citi accepted their modified mortgage payments.

285.   Despite the Johnsons' performance, Citi failed to provide them with the permanent modification on the terms promised to them upon completion of the trial period.

286.   Despite Citi's failure to perform this crucial term of the TPP agreement, the Johnsons diligently attempted to resolve the matter by contacting Citi repeatedly.  Citi failed to remedy the situation.

287.   Citi, instead, provided the Johnsons with erroneous and misleading information, imposed unreasonable fees including, without limitation, unwarranted inspection fees and other similar charges, and initiated foreclosure proceedings, among other things, all to their detriment and harm.

**William Whiting (Pennsylvania)**

288.   Mr. Whiting contacted Citi in October 2009 after suffering financial hardship and experiencing difficulty paying his mortgage.

289.   He applied for a HAMP loan modification shortly thereafter.

290.   Citi approved him for a TPP and sent him a written copy of the TPP in January 2010, substantially in the form of Exhibit 3.

291.   He executed and returned the TPP shortly thereafter, along with any modified payment then due.

292. He then performed his obligations per the TPP by making all the reduced payments required per the TPP and complying with all other terms and conditions. Citi accepted his modified mortgage payments.

293. Despite Mr. Whiting's performance, Citi failed to provide him with the permanent modification on the terms promised to him upon completion of the trial period.

294. Despite Citi's failure to perform this crucial term of the TPP agreement, Mr. Whiting diligently attempted to resolve the matter by contacting Citi repeatedly. Citi failed to remedy the situation.

295. Citi, instead, provided Mr. Whiting with erroneous and misleading information, imposed unreasonable fees, including, without limitation, unwarranted inspection fees and other similar charges, demanded extraordinary payments from him, and initiated foreclosure proceedings, among other things, all to his detriment and harm.

## CLASS ACTION ALLEGATIONS

296. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

297. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) on their own behalf and on behalf of all other members of the classes described below.

**Statewide HAMP Trial Period Plan ("HAMP TPP") Classes**

298. Plaintiffs seek certification of eight (8) statewide classes of individuals whose home mortgage loans have been serviced by Citi and who, since April 13, 2009, have entered into a HAMP TPP Agreement, or the functional equivalent of a HAMP TPP Agreement, with Citi and made all payments required by their TPP Agreement. Excluded are borrowers to whom Citi timely tendered either:

1    (a) A Home Affordable Modification Agreement that complied

2 with HAMP rules; or

3    (b) A timely written denial of eligibility consistent with the terms

4 of the trial period agreement.

5  299. Excluded from the HAMP TPP Classes are governmental entities,

6 Defendants, their affiliates and subsidiaries, Citi's current employees and current

7 or former officers, directors, agents, representatives, their family members, the

8 members of this Court and its staff.

9  300. Each HAMP TPP Class also includes a subclass of individuals who

10 received a permanent loan modification that Citi later repudiated.

11  301. These eight statewide classes shall be referred to collectively herein as

12 the "HAMP TPP Classes" and include statewide classes in California, Florida,

13 Illinois, Iowa, Maryland, Massachusetts, New Jersey and Pennsylvania.

14  302. The Named Plaintiffs in the HAMP TPP Classes sue on their own

15 behalf and on behalf of a class of persons under Fed. R. Civ. P. 23(a) and Fed. R.

16 Civ. P. 23 (b).

17  303. Plaintiffs do not know the exact size or identities of the HAMP TPP

18 Classes, since such information is in the exclusive control of Citi.  Plaintiffs

19 believe that each HAMP TPP Class encompasses many thousands of individuals

20 and whose identities can be readily ascertained from Citi's books and records.

21 Therefore, each HAMP TPP Class is so numerous that joinder of all members is

22 impracticable.

23  304. All members of the HAMP TPP Classes have been subject to and

24 affected by the same conduct.  The claims are based on standard form contracts

25 and uniform loan modification processing requirements.  There are questions of

26 law and fact that are common to the HAMP TPP Classes, and predominate over

27 any questions affecting only individual members of the class.  These questions

28 include, but are not limited to the following:

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1       (a)     The nature, scope and operation of Citi's obligations to

2   homeowners under HAMP TPP Agreements and loan modification programs;

3       (b)     Whether Citi's receipt of an executed HAMP TPP Agreement,

4   along with supporting documentation and the required three or four monthly

5   payments, creates a binding contract or otherwise legally obligates Citi to offer

6   class members a permanent HAMP modification;

7       (c)     Whether Citi's permanent loan modifications, where offered,

8   were binding and enforceable;

9       (d)     Whether Citi's failure to provide permanent HAMP

10  modifications in the circumstances described herein and in the underlying

11  complaints amounts to a breach of contract and/or a breach of the duty of good

12  faith and fair dealing;

13      (e)     Whether Citi breached Plaintiffs Deeds of Trust or Mortgages;

14      (f)     Whether Citi's conduct violates applicable state fair debt

15  collection laws and corresponding regulations;

16      (g)     Whether Citi's conduct violates applicable state consumer

17  protection laws and corresponding regulations; and

18      (h)     Whether the Court can order damages and enter injunctive

19  relief.

20      305.   The claims of the HAMP TPP Class named Plaintiffs are typical of

21  the claims of the HAMP TPP Classes and do not conflict with the interests of any

22  other members of the class in that both the named Plaintiffs and the other members

23  of the class were subject to the same conduct, signed the same or functionally

24  equivalent form of agreement and were met with the same absence of a permanent

25  modification.

26      306.   The named Plaintiffs will fairly and adequately represent the interests

27  of the HAMP TPP Classes.  They are committed to the vigorous prosecution of the

28

1    class claims and have retained attorneys who are qualified to pursue this litigation

2    and have experience in class actions—in particular, consumer protection actions.

3    307.   Citi has acted or refused to act on grounds that apply generally to the

4    class so that final injunctive relief or corresponding declaratory relief is appropriate

5    respecting the class as a whole.

6    308.   A class action is superior to other methods for the fast and efficient

7    adjudication of this controversy.   A class action regarding the issues in this case

8    does not create any problems of manageability.

9    309.   This putative class and the proposed subclass meets the requirements

10   of both Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

11   **Iowa Delinquency Cure Class**

12   310.   Named Plaintiff Keith Goodyk, seeks to represent an Iowa statewide

13   class under the corresponding state laws of Iowa and seeks certification of an Iowa

14   statewide class of individuals whose home mortgage loans have been serviced by

15   Citi and who, since April 13, 2009, having been approved by Citi for a temporary

16   loan modification and having performed the terms of that agreement, including the

17   payment of all modified amounts, also paid all additional amounts requested by

18   Citi as being due and necessary to cure their delinquency, following which Citi

19   continued to treat the account as delinquent.

20   311.   The named Plaintiff in the Iowa Delinquency Cure Class sues on his

21   own behalf and on behalf of a class of persons under Fed. R. Civ. P. 23(a) and Fed.

22   R. Civ. P. 23 (b).

23   312.   Plaintiff does not know the exact size or identities of the Iowa

24   Delinquency Cure Class, since such information is in the exclusive control of Citi.

25   Plaintiff believes that the class encompasses many thousands of individuals and

26   whose identities can be readily ascertained from Citi's books and records.

27   Therefore, the Iowa Delinquency Cure Class is so numerous that joinder of all

28   members is impracticable.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

313.   All members of the Iowa Delinquency Cure Class have been subject to and affected by the same conduct.   The claims are based on standard form contracts and uniform loan modification processing requirements.   There are questions of law and fact that are common to the Iowa Delinquency Cure Class, and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

(a)     Whether Citi's attempts to collect any payments beyond the modified monthly payments due, such as to cure an alleged delinquency, in the circumstances described herein and in the underlying complaint, amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

(b)     Whether the loans of Plaintiff and Class Members are appropriately treated as delinquent; and

(c)     Whether the Court can order damages and enter injunctive relief.

314.   The claims of the Iowa Delinquency Cure Class named Plaintiff are typical of the claims of the Iowa Delinquency Cure Class and do not conflict with the interests of any other members of the class in that both the named Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.

315.   The named Plaintiff will fairly and adequately represent the interests of the Iowa Delinquency Cure Class.   He is committed to the vigorous prosecution of the class claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions—in particular, consumer protection actions.

316.   Citi has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

317.   A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

318.   This putative class and the subclass meet the requirements of both Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

## CLAIMS

## COUNT I

### By All Statewide HAMP TPP Classes

### Breach Of Contract/Breach Of Duty Of Good Faith & Fair Dealing

319.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

320.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the HAMP TPP Classes described above.  The relevant common law in the state of each HAMP TPP Class is materially identical for the purposes of this claim.

321.   Citi is obligated by contract and common law to act in good faith and to deal fairly with each borrower so as to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.

322.   Citi routinely and regularly acts in bad faith and breaches this duty for its own economic benefit by:

(a)     Failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs and members of the class;

(b)     Failing to properly train and supervise its agents and employees, including without limitation, its loss mitigation and collection personnel, foreclosure personnel, and personnel implementing its modification programs;

(c)     Failing to permanently modify loans and/or provide alternatives to foreclosure and using unfair means to keep Plaintiffs and the class in trial

periods of indeterminate lengths, including, without limitation, routinely demanding information it already possesses and failing to communicate accurately or consistently with borrowers about the status of their loan modification applications;

(d)    Making inaccurate calculations and determinations of Plaintiffs' eligibility for permanent modifications;

(e)    Encouraging and/or allowing its employees and agents to make inaccurate statements regarding Plaintiffs' and class members' eligibility for permanent loan modifications under HAMP;

(f)    Instructing Plaintiffs and Class Members not to make loan payments as a condition of receiving TPP Agreements, and thus putting them in default or further in default, and then holding that against them later when Citi denied them the promised modification;

(g)    Making misleading offers that do not meet its contractual obligations;

(h)    Failing to follow through on written and implied promises;

(i)    Failing to follow through on contractual obligations; and

(j)    Failing to give permanent HAMP modifications and other foreclosure alternatives to qualified borrowers.

323.   As a result of these failures to act in good faith and the absence of fair dealing, Citi caused Plaintiffs harm, as alleged above.  Citi's bad faith was thus to Plaintiffs' detriment.

**Plaintiffs & Class Members With TPP Agreements**

324.   As described above, the TPP Agreements and their functional equivalents sent by Citi to each Plaintiff constitutes a valid offer.

325.   By executing the TPP Agreements and returning them to Citi, or performing under the TPP Agreements, Plaintiffs accepted Citi's offers.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

326.   Alternatively, Plaintiffs' return of the TPP Agreements constitutes an offer.   Acceptance of these offers occurred when Citi accepted Plaintiffs' TPP payments.

327.   The TPP Agreements were supported by consideration.   First, Plaintiffs' TPP payments to Citi constitute consideration.   By making those payments, Plaintiffs impaired their ability to pursue other means of saving their homes.   Further, homeowners agreed in the TPP Agreements to undertake several duties that they are not otherwise obligated to undertake.   Under Section 1 of the TPP Agreement, the homeowner agreed to undergo credit counseling, if they were asked to do so.   In addition, homeowners agreed to submit financial documentation that they were not otherwise required to provide, to set up newly established escrow accounts, and to make legally binding representations about their personal circumstances.   These agreements constitute both a detriment to the Plaintiffs and a benefit to Citi.   In addition, some homeowners agreed to Citi's request that they miss mortgage payments and become in default as a condition of obtaining a TPP Agreement.

328.   Plaintiffs and Citi thereby formed valid contracts.

329.   All conditions required by the TPP Agreements for Citi's performance had occurred.

330.   Any possible condition subsequent was waived by Citi in that it failed to timely raise it.   Further, Citi is estopped from raising non-compliance with any such condition by its conduct, including, without limitation, continued acceptance of payments after expiration of the deadline for performance of the condition.

331.   By failing to timely offer Plaintiffs permanent HAMP modifications, Citi breached its TPP Agreements.

332.   Plaintiffs remain ready, willing and able to perform under the Contracts, or due to Citi's conduct, Plaintiffs are no longer able to do so.

333. As a direct and proximate result of Citi's breach of the TPP Agreements, Plaintiffs did not receive the benefit of their bargain, were damaged, and are threatened with additional harms.

334. Plaintiffs have suffered harm and are threatened with additional harm from Citi's breach, including but not limited to longer loan payoff times, higher principal balances, improper negative reporting to credit bureaus, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest. If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to. If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to—a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.

335. By making TPP payments both during and after the trial period, Plaintiffs and class members forewent other remedies that might have been pursued to save their home, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. Some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

**Plaintiffs & Class Members With Repudiated Permanent Loan Modifications**

336. Plaintiffs Gatti, Betancourt, DeRosa, Coons and Daniel ultimately received purported permanent loan modification agreements from Citi ("Loan Modification Agreements"). Those Loan Modification Agreements were inconsistent with HAMP requirements and thus were not consistent with the

1  requirements of those Plaintiffs' TPP. Nevertheless, to avoid further delinquency
2  and foreclosure, Plaintiffs Gatti, Betancourt, DeRosa, Coons and Daniel either
3  attempted to or did accept Citi's offer of noncompliant Loan Modification
4  Agreements.

5  337.  Such permanent agreements constituted bargained-for exchanges that
6  were independently supported by consideration, including the newly modified
7  payments.

8  338.  Citi breaches the Loan Modification Agreements by failing to
9  implement and abide by the terms of Plaintiffs' and other homeowners' permanent
10  loan modifications in one or more of the following ways:

11  (a)  Citi fails to capitalize arrearage amounts for past due payments,
12  interest, fees and escrow balances into homeowners' modified principal balances
13  when required under the Loan Modification Agreements.  Rather, it carries through
14  some or all of these amounts as immediately due and owing in full on
15  homeowners' loan accounts after the Loan Modification Agreements become
16  effective.  Where Citi does capitalize amounts required under the Loan
17  Modification Agreements, it double-charges homeowners for the capitalized funds
18  by simultaneously treating the funds as immediately due and owing in full.  Citi
19  also does not implement the modified interest rates and other loan terms provided
20  for under the Loan Modification Agreements.

21  (b)  Citi attempts to collect and in fact collects amounts that are not
22  contractually due under the Loan Modification Agreements, including, without
23  limitation, past due payments, interest, late fees, default-related fees and costs such
24  as property inspection fees, property preservation fees, appraisal fees, title report
25  fees, recording fees and/or subordination fees, foreclosure fees and costs and
26  escrow account charges.

27  (c)  Citi fails to credit payments made pursuant to the requirements
28  of the Loan Modification Agreement, thereby generating account errors including,

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1  without limitation, past due payments, interest, late fees, default-related fees and

2  costs such as property inspection fees, property preservation fees, appraisal fees,

3  title report fees, recording fees and/or subordination fees, foreclosure fees and

4  costs and escrow account charges.

5        (d)  Citi issues notices of foreclosure and initiates foreclosures

6  against homeowners who are in compliance with the terms of the Loan

7  Modification Agreement, thus generating additional foreclosure related fees and

8  inducing stress and anxiety in the affected homeowners.

9        (e)  Citi unilaterally substitutes different less advantageous terms

10  than those contained in the Loan Modification Agreement, often without notice to

11  borrowers, or

12        (f)  Citi unilaterally cancels the Loan Modification Agreement,

13  often without notice to the borrower.

14      339.  By repudiating or failing to properly implement the permanent loan

15  modifications, Citi caused damages in the form of further delinquency-related

16  charges and fees that would not otherwise have accrued.

17  ## COUNT II

18  ## By All Statewide HAMP TPP Classes

19  ## Breach Of Contract (Deeds Of Trust, Mortgages and Loan Notes)

20      340.  Plaintiffs repeat and re-allege every allegation above as if set forth

21  herein in full.

22      341.  Plaintiffs and other Class Members, have mortgage Loan Notes

23  serviced by Citi and secured by Deeds of Trust or Mortgages.

24      342.  Plaintiffs and the Class members fully performed all conditions,

25  covenants and promises required of them under their respective Loan Notes, Deeds

26  of Trust or Mortgages and as modified by Citi in the TPP, including making timely

27  mortgage payments before entering into the TPP, and making timely modified TPP

28  payments.

343.   After Plaintiffs were approved for a TPP, Citi charged them various fees, including, but not limited to, repeated "inspection fees," and high cost force-placed property insurance charges even though they had property insurance in place.   On information and belief, the work orders for Citi's inspection fees are computer-generated requests which are assessed as a matter of course and do not provide any meaningful information to Citi.

344.   The Deeds of Trust or Mortgages, however, only allow Citi to make "reasonable" inspections of the property.   Citi's inspections were not performed or were otherwise unreasonable.   Similarly, the Deeds of Trust or Mortgages and relevant Loan Notes do not allow Citi to charge inflated fees for property insurance, particularly in circumstances where a policy is already in place.

345.   Plaintiffs made timely monthly mortgage payments and occupied their homes at all relevant times.   On information and belief, the initial inspection revealed that Plaintiffs' properties were occupied and in good condition and therefore, multiple inspections after the initial inspection were unreasonable.

346.   As such, Citi's multiple property inspections—and the associated fees—breached the Loan Notes, Deeds of Trust and Mortgages.   Charges for force-placed property insurance breached Loan Notes.

347.   As a proximate result of Citi's breach of the Deeds of Trust or Mortgages, the Plaintiffs and Class members were damaged in an amount to be proven at trial.

**COUNT III**

**By All Statewide HAMP TPP Classes**

**Promissory Estoppel, In The Alternative**

348.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

349.   The HAMP TPP Class Plaintiffs bring this claim on their own behalf and on behalf of each member of the HAMP TPP Classes described above.   The

- 55 -

relevant common law in the state of each HAMP TPP Class is materially identical for the purposes of this claim.

350.   Citi, by way of its TPP Agreements, made representations to Plaintiffs that if they returned the TPP Agreements executed and with supporting documentation, and made their TPP payments, they would receive permanent HAMP modifications.

351.   Representations made in connection with Citi's TPP program were intended to induce Plaintiffs to rely on them by making monthly TPP payments and by foregoing other foreclosure avoidance options, including sales transactions and bankruptcy.

352.   Plaintiffs did rely on Citi's representations by submitting TPP payments and foregoing other options.

353.   Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

354.   Plaintiffs' reliance was to their detriment.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their detrimental reliance is measured by the difference between the modification they accepted and the modification they were entitled to.  If an eligible homeowner has not been tendered a permanent modification, their detrimental reliance is measured by the difference between their current circumstances and the terms of the modification that they were entitled to—a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.  Such detriment includes longer loan payoff times, higher principle balances, improper negative reporting to credit bureaus, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased

accrued interest.   Further, Plaintiffs have lost the opportunity to fund other strategies to deal with their default and to avoid foreclosure.

### COUNT IV

### By The CA, FLA & IA Statewide HAMP TPP Classes

### Breach Of Implied Covenant Of Good Faith & Fair Dealing

355.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

356.   Every contract imposes upon each party a duty of good faith and fair dealing in its performance, which requires that neither party do anything to infringe upon the other party's rights to the benefits of the agreement, or to deprive the other party of the contract's benefits.

357.   Citi breached the implied covenants of good faith and fair dealing contained its trial modification agreements and the Deeds of Trust or Mortgages that Citi services, as alleged above.

358.   Citi also breached an implied contractual term requiring it to offer permanent modifications within a reasonable time following the 90-day trial modification period.

359.   Citi breached the implied covenant by, among other things:

(a)   Failing to make good faith efforts to fulfill its contractual obligations, written and implied promises, and loan servicing functions;

(b)   Failing to make good faith efforts to provide Plaintiffs with a permanent loan modification;

(c)   Making false and/or misleading representations that Plaintiffs were eligible for the trial modification period, which would lead to a permanent loan modification;

(d)   Failing to apply the properly made monthly mortgage payments under the Deeds of Trust, Mortgages and Notes towards the mortgage accounts of Plaintiffs and Class Members and instead showing them as delinquent and issuing

demand letters, while charging various fees, including but not limited to, delinquency fees, late fees, escrow amounts that have already been paid, and interest amounts that have already been paid in a timely manner;

(e)     Initiating unlawful foreclosure proceedings without cause;

(f)     Billing borrowers for unreasonable and unnecessary fees, including, but not limited to, inspection fees;

(g)     Failing to disclose that Plaintiffs modified reduced payments would be reported to credit bureaus as delinquent;

(h)     Delaying processing, demanding duplicate documentation, and failing to provide Plaintiffs with adequate information regarding loan modification programs;

(i)     Instructing Plaintiffs and Class Members not to make loan payments as a condition of receiving TPP Agreements, and thus putting them in default or further in default, and then holding that against them later when Citi denied them the promised modification;

(j)     Failing to provide enough adequately-trained personnel to ensure that loan modification applications were accurately or timely processed; and

(k)     Demanding exorbitant balloon payments, late fees, and delinquency fees from Plaintiffs that neither they, nor any other Class Member, could reasonably be in a position to pay.

**COUNT V**

**By The CA Statewide HAMP TPP Class**

**Violation of Cal. Civ. Code § 1785.25(a)**

360.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

361.    The Consumer Credit Reporting Agencies Act ("CCRAA") prohibits persons from furnishing information on specific transactions "to any consumer

credit reporting agency if the person knows or should know the information is incomplete or inaccurate."

362.   Citi's standard policy and practice during trial periods is to "report [consumer loans] as delinquent to the credit reporting agencies" even if trial payments are made on time and even if a borrower was current at the time the borrower entered a trial payment plan.

363.   Plaintiff and Class Members made timely modified mortgage payments during the TPP.  Citi should have accurately reported those accounts to credit reporting agencies as current, but on a modified payment plan.

364.   Citi, however, reported Plaintiffs' reduced mortgage payments as delinquent to credit reporting agencies without indicating that their payments were timely pursuant to a modified payment plan.

365.   In doing so, Citi furnished information it knew or should have known was incomplete or inaccurate to credit reporting agencies in violation of Cal. Civ. Code § 1785.25(a).

366.   Plaintiffs and Class Members who were (1) current when they entered trial modifications, (2) current until Citi told them to miss payments as a condition of receiving a TPP or its equivalent, or (3) otherwise made timely TPP payments, suffered actual injury, including, but not limited to, damage to their credit scores, a loss of available credit, and increased cost of credit.

367.   Plaintiffs and Class members seek to recover actual damages in an amount to be determined at trial, injunctive and equitable relief, the costs of the action and attorneys' fees under Cal. Civ. Code § 1785.31.

### By The CA, FLA, IL, MD, MA, NJ & PA Statewide HAMP TPP Classes

### Violation Of Consumer Protection, False Advertising, & Unfair & Deceptive Acts & Practices Law

368.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

369. The named Plaintiffs in each of the seven states enumerated above bring this claim on their own behalf and on behalf of each member of the corresponding statewide class.

370. Citi's conduct as set forth herein constitutes the offering, advertising and sale of goods, services and merchandise.

371. Citi's conduct as set forth herein occurred in the course of trade or commerce.

372. Citi's conduct as set forth herein affects the public interest and is part of a generalized course of conduct affecting numerous consumers.

373. Plaintiffs are consumers.

374. Plaintiffs sought to obtain Citi's goods and services primarily for personal, family or household use.

375. Citi made false, deceptive and misleading statements and omissions about material aspects of the goods and services described herein.

376. Citi made these statements and omissions knowingly and willfully and with the intent that Plaintiffs and consumers would rely on them and would enter into contracts or obligations as a result.

377. Citi's conduct was likely to induce reliance and to create confusion and misunderstanding.

378. Plaintiffs did rely on Citi's statements and omissions.

379. Citi's conduct as set forth herein is deceptive, unfair and unconscionable.

380. Citi's conduct as set forth herein is not required, permitted or authorized by any state or federal law.

381. Citi's conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    382.   Citi's conduct as set forth herein proximately caused injury in fact to

2    the business or property of Plaintiffs.

3    383.   As a result of Citi's conduct, Plaintiffs suffered damages and

4    ascertainable losses including:

5         (a)   Wrongful foreclosures;

6         (b)   Otherwise avoidable losses of homes to foreclosure;

7         (c)   Less favorable loan modifications;

8         (d)   Increased fees and other costs to avoid or attempt to avoid

9    foreclosure;

10        (e)   Loss of savings in fruitless attempts to secure loan

11   modifications;

12        (f)   Loss of opportunities to pursue other refinancing or loss

13   mitigation strategies;

14        (g)   Significant stress and emotional distress;

15        (h)   Damages from incorrect credit reporting;

16        (i)   Accrued interest and increased principal balances; and

17        (j)   Less favorable modification terms.

18   384.   Citi's conduct as set forth herein proximately caused injury in fact to

19   the business or property of Plaintiffs.

20   **California—False Advertising (Cal. Bus. & Prof. Code § 17500 et seq.)**

21   385.   Citi's conduct as set forth herein and as alleged in the underlying

22   complaint violates Cal. Bus. & Prof. Code § 17500 et seq.

23   386.   Throughout the Class Period, Citi engaged in a mass advertising and

24   marketing campaign regarding its participation in HAMP and other loan

25   modification and hardship assistance programs, its commitment to helping

26   customers prevent mortgage default and foreclosure through loan modifications,

27   and boasted about its success in helping customers under HAMP and other loan

28   modification programs on a nationwide basis, including in California.

387.   Citi engaged in its advertising and marketing with intent to directly or indirectly solicit customers to inquire about HAMP and other loan modification programs.  By advertising and representing that it was participating in HAMP, Citi implicitly represented its compliance with HAMP's well-publicized rules on loan modification processing and underwriting.

388.   Citi's advertising and representations were made on its website at www.citi.com and through written materials sent to borrowers.

389.   Citi failed to disclose material information to borrowers, such as the risks of entering a HAMP trial modification period with Citi.  Among other things discussed above, Citi failed to disclose that:

(a)   Citi failed adequately to screen Plaintiffs for eligibility before placing them in trial modifications, and they might not receive permanent loan modifications;

(b)   The purported "trial" period could and likely would last for far longer than three months because Citi lacked adequate resources to timely process modification requests;

(c)   Citi believed it could deny a modification and terminate the trial modification at any point, and immediately demand a sizeable balloon payment, plus late and delinquency fees;

(d)   Citi would report modified payments of Plaintiffs who were current when they entered a trial modification as late or in default to credit bureaus;

(e)   Citi would require borrowers who were current to miss payments to become in default as a condition to entering a trial modification, yet Citi used that requested default against the borrowers, including by using it as a premise to accelerate loan terms, impose fees, and initiate foreclosures; and

(f)   Citi would charge borrowers numerous fees, such as late fees and inspection fees.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

390.   Contrary to Citi's advertising, the most common result of attempting to modify a loan with Citi was that borrowers would be left in a worse position than before.

391.   Citi's advertisements and marketing representations are false, misleading, and likely to deceive the public and/or deceived the public because they falsely represented the nature of Citi's trial modification programs and/or their benefits, and concealed material information about risks, as described above.

392.   In making and disseminating the alleged advertising, Citi knew or should have known that the statements were untrue or misleading, in violation of Cal. Bus. & Prof. Code § 17500, et seq.

393.   As a result of Citi's conduct, Plaintiffs and Class Members suffered injury in fact and lost money and/or property, including damage to their credit, additional debt, late fees and delinquency expenses.  Plaintiffs and Class Members would not have inquired about or entered the trial modification period, or made modified payments as represented to them under it, had they been aware of the false, misleading and incomplete nature of Citi's representations about its loan modification programs.

394.   Plaintiffs and seek restitution, declaratory and injunctive relief, and other relief permitted under Cal. Bus. & Prof. Code §17535.

**California—Unfair Competition (Cal. Bus. & Prof. Code § 17200 et seq.)**

395.   By engaging in conduct described above, Citi committed one or more acts of "unfair competition" within the meaning of Cal. Bus. & Prof. Code § 17200 et seq.

396.   Citi committed "unlawful" business acts or practices by, among other things, (a) engaging in false advertising in violation of Cal. Bus. & Prof. Code § 17500, (b) violating Cal. Civ. Code § 1788, (c) violating Cal. Civ. Code § 1785.25(a), (d) systematically breaching the trial modification contracts and agreements with Plaintiffs and Class Members, (e) systematically breaching

1   contractual limitations on permissible fees in Plaintiffs' and Class Members' deeds

2   of trust, (f) systematically breaching the implied covenant of good faith and fair

3   dealing, and/or (g) inducing Plaintiffs and Class Members to rely on Citi's

4   promises to their detriment.

5        397.   Citi committed "unfair" business acts or practices by, among other

6   things:

7              (a)   Engaging in conduct where the utility of such conduct, if any, is

8   outweighed by the gravity of the consequences to Plaintiffs;

9              (b)   Engaging in conduct that is immoral, unethical, oppressive,

10  unscrupulous, or substantially injurious to Plaintiffs; and

11             (c)   Engaging in conduct that undermines or violates the spirit or

12  intent of the consumer protection laws alleged in this Complaint.

13       398.   Citi committed "fraudulent" business acts or practices by, among

14  other things, engaging in conduct Citi knew or should have known was likely to

15  and did deceive the public, including Plaintiffs.

16       399.   As detailed above, Citi's unlawful, unfair and fraudulent practices

17  include, but are not limited to, the following:

18             (a)   Representing that Plaintiffs were applying for and being

19  evaluated for HAMP modifications consistent with HAMP requirements, and

20  failing to comply with HAMP requirements;

21             (b)   Making false and misleading representations that trial

22  modification periods would lead to permanent modifications if Plaintiffs made

23  timely modified payment and complied with documentation requests;

24             (c)   Failing to determine if Plaintiffs are eligible for HAMP before

25  putting them into TPPs;

26             (d)   Failing to timely determine qualification for permanent HAMP

27  modification upon receipt of a borrower's first TPP payment and verification

28  documents or before the end of the three-month trial period;

1        (e)    Failing to provide Plaintiffs with adequate information

2    regarding its loan modification programs;

3        (f)    Delaying HAMP trial periods and determinations of whether

4    Plaintiffs in trial modifications qualified for permanent modifications by, among

5    other things, (i) requesting unnecessary and/or duplicative verification documents;

6    (ii) slowing and obstructing the underwriting process; and (iii) allocating

7    insufficient adequately-trained personnel to process loan modification requests.

8        (g)    Instructing Plaintiffs and Class Members not to make loan

9    payments as a condition of receiving TPP Agreements, and thus putting them in

10   default or further in default, and then holding that against them later when Citi

11   denied them the promised modification;

12       (h)    Failing to inform Plaintiffs that any trial modification period is

13   virtually certain to last longer than 90 days;

14       (i)    Failing to promptly communicate to Plaintiffs that Citi believed

15   they are not eligible for permanent HAMP modifications;

16       (j)    Failing to inform Plaintiffs that Citi believed they do not

17   qualify for HAMP modification, then offering them deceptive and less favorable

18   "Citi Affordable Modifications";

19       (k)    Failing to waive all late fees for borrowers who comply with all

20   terms of HAMP TPPs;

21       (l)    Charging unreasonable repeat inspection fees even though

22   property inspections are unnecessary after the initial inspection;

23       (m)    Reporting loan payments to consumer credit agencies as

24   delinquent for borrowers who do not miss any loan payments and comply with the

25   terms of their TPP agreements;

26       (n)    Failing to disclose to Plaintiffs and Class Members that if they

27   are denied a permanent modification, Citi would demand immediate and sizeable

28   balloon payments, plus late fees and other delinquency related fees; and

1            (o)    Failing to disclose to borrowers before, during and after the

2     loan modification process the type, nature and amount of fees and expenses being

3     assessed to their accounts.

4            400.   As a result of Citi's conduct, Plaintiffs suffered injury in fact and lost

5     money and/or property, including damage to their credit, additional debt, late fees

6     and delinquency expenses.  Plaintiffs would not have inquired about or entered the

7     trial modification period, or made modified payments as represented to them under

8     it, had they been aware of the false, misleading and incomplete nature of Citi's

9     representations about its loan modification programs.

10           401.   Plaintiffs seek restitution, declaratory and injunctive relief, and other

11    relief permitted under Cal. Bus. & Prof. Code § 17203.

12    **Florida**

13           402.   By engaging in conduct described above, Citi violated the Florida

14    Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 et

15    seq.

16           403.   FDUTPA prohibits deceptive and unfair trade practices.

17           404.   Citi's acts and practices, alleged herein, constitute unfair and

18    deceptive trade practices under the FDUTPA.

19           405.   Citi's conduct is unfair and deceptive because it is contrary to its own

20    representations that it complies with HAMP requirements.

21           406.   Citi's conduct is unfair because it offends established public policy

22    and is immoral unethical, oppressive, unscrupulous, and substantially injurious to

23    consumers.

24           407.   Citi's conduct is deceptive because it is likely to mislead consumers.

25    For example, the TPP Agreement misleads borrowers into thinking that making

26    timely modified payments during the trial period will result in a permanent loan

27    modification.

28           408.   Citi's unfair and deceptive trade practices include the following:

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

(a)     Representing that Plaintiffs and Class Members were applying for and being evaluated for HAMP modifications consistent with HAMP requirements, and failing to comply with HAMP requirements;

(b)     Making false and misleading representations that trial modification periods would lead to permanent modifications if Plaintiffs and Class Members made timely modified payment and complied with documentation requests;

(c)     Failing to determine if Plaintiffs and Class Members are eligible for HAMP before putting them into HAMP TPPs;

(d)     Failing to timely determine qualification for permanent HAMP modification upon receipt of a borrower's first TPP payment and verification documents or before the end of the three-month trial period;

(e)     Failing to provide Plaintiffs with adequate information regarding its loan modification programs;

(f)     Delaying HAMP trial periods and determinations of whether Plaintiffs and Class Member in trial modifications qualified for permanent modifications by, among other things, (i) requesting unnecessary and/or duplicative verification documents; (ii) slowing and obstructing the underwriting process; and (iii) allocating insufficient adequately-trained personnel to process loan modification requests.

(g)     Failing to inform Plaintiffs and Class Members that any trial modification period is virtually certain to last longer than 90 days;

(h)     Failing to promptly communicate to Plaintiffs and Class Members that they are not eligible for permanent HAMP modifications;

(i)     Failing to inform Plaintiffs and Class Members that they do not qualify for HAMP modification, then offering them deceptive and less favorable "Citi Affordable Modifications";

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1         (j)    Failing to waive all late fees for borrowers who comply with all

2   terms of HAMP TPPs;

3         (k)    Charging unreasonable and unconscionable fees, including

4   repeated inspection fees even though property inspections are unnecessary after the

5   initial inspection;

6         (l)    Reporting loan payments to consumer credit agencies as

7   delinquent for borrowers who do not miss any loan payments and comply with the

8   terms of their TPP agreements;

9         (m)    Failing to disclose to Plaintiffs and Class Members that if they

10   are denied a permanent modification, Citi would demand immediate and sizeable

11   balloon payments, plus late fees and other delinquency related fees;

12         (n)    Failing to disclose to borrowers before, during and after the

13   loan modification process the type, nature and amount of fees and expenses being

14   assessed to their accounts.

15       409.   As a result of Citi's conduct, Plaintiffs and Class Members have been

16   aggrieved.   Under Fla. Stat. § 501.211(1), Plaintiffs seeks declaratory and

17   injunctive relief.

18       410.   As a result of Citi's conduct, Plaintiffs Chui and Verdini and other

19   Class Members suffered actual damages, calculated as the sum of all inspection

20   fees after the initial inspection fee.   Plaintiffs and Class Members are entitled to

21   declaratory relief, injunctive relief, costs and attorneys' fees and damages.   Fla.

22   Stat. §§ 501.211(1) and (2), 501.2105.

23   **Illinois**

24       411.   Citi's conduct, as set forth herein, and as alleged in the underlying

25   complaint, violates the Illinois Consumer Fraud Act, 815 ILCS 505/2 et seq.

26       412.   At all relevant times hereto, Citi's conduct, as set forth herein,

27   constitutes the offering, advertising and sale of goods, services and merchandise.

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

413.   Citi's conduct, as set forth herein, occurred in the course of trade or commerce.

414.   Citi's conduct, as set forth herein, affects the public interest and is part of a generalized course of conduct affecting numerous consumers.

415.   Plaintiffs are "consumers" as defined and construed under the Illinois Consumer Fraud Act.

416.   Citi is a "person" as defined and construed under the Illinois Consumer Fraud Act.

417.   Citi's conduct, as set forth herein, constitutes unfair methods of competition, deceptive business practices, misrepresentation, and concealment, suppression or omission of material facts in violation of the Illinois Consumer Fraud Act, including its practice of leading borrowers to believe that Citi would offer permanent HAMP modifications of their mortgages upon successfully completing a TPP and due to Citi's illegal collection of late fees and penalties in violation of HAMP regulations.

418.   Citi's conduct, as set forth herein, has occurred in commerce and has caused serious and irreparable injury to Plaintiffs, and unless restrained by the Court, will continue to cause further injury, including but not limited to: payment of increased interest and service fees, longer loan payoff times, higher principal balances, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages.

419.   As a direct and proximate result of Citi's deceptive, unfair, unscrupulous and unconscionable practices, as set forth herein, Plaintiffs are entitled to actual and compensatory damages, penalties, attorneys' fees, and costs, as set forth in § 10 of the Illinois Consumer Fraud Act, 815 ILCS 505/10(a), in an amount to determined at trial.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**Maryland**

420.   Citi's conduct, as set forth herein, and as alleged in the underlying complaint, violates the Maryland Consumer Protection Act, MD. Code Ann Com. Law II § 13-101 et seq. § 13-103 of the Maryland Consumer Protection Act prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts.   The prosecution of a foreclosure action involves both the extension of credit and the collection of debts.   Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts.   The servicing of a mortgage loan, consideration of a loan modification, and threat of a foreclosure action involves both the extension of credit and the collection of debts.   Section 13-316 also requires servicers like Citi to respond to inquiries from consumers within 15 days.   Citi routinely never responds to borrowers within 15 days as demonstrated by the above facts.

421.   The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers; and (b) failure to state a material fact that if the failure deceives or tends to deceive.

422.   By engaging in the acts and omissions set forth above, by making the misrepresentations as set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, Citi has committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act, § 13-101(1) and (3) and § 13-103(4).

423.   Citi's conduct, as set forth herein, had the capacity, tendency or effect of deceiving Plaintifffs, who in fact, were deceived or misled, causing injury and loss through:

1         (a)     The unfair or deceptive prosecution, based upon incomplete and

2 bogus responses to Plaintiffs' requests for modifications of their loan terms, or

3 threat of prosecution of a foreclosure action by Citi through their authorized

4 agents; and

5         (b)     The unfair or deceptive practices of charging Plaintiffs late fees

6 and other charges which resulted when they offered and accepted TPP Agreements

7 and actual made each TPP payment on time.

8     424.  Plaintiffs reasonably relied upon Citi's promises and representations

9 to them as demonstrated by their careful and complete applications as well as Citi's

10 statutory and regulatory duties to them; no reasonable person would expect a

11 national mortgage servicer to conduct themselves in a manner that Citi has acted

12 towards the Plaintiffs with its unsafe, unsound, deceptive practices.

13     425.  In addition, the Maryland Mortgage Fraud Protection Act, Md. Ann.

14 Code, Real Prop. § 7-401 MD. REAL PROP., *et seq.* ("MMFPA") governs the

15 relationship between the Defendant with the Named Plaintiff and Plaintiffs' Class.

16     426.  MD ANN. CODE., REAL PROP. § 7-401 (c) provides: "Homeowner"

17 means a record owner of residential real property. The Plaintiffs and Plaintiffs'

18 Class Members are record owners of the residential properties in question and

19 therefore are Homeowners.

20     427.  MD ANN. CODE., REAL PROP. § 7-401 (e) provides "Mortgage lending

21 process…includes [t]he…servicing…of a mortgage loan."

22     428.  MD ANN. CODE., FINANCIAL INSTITUTIONS CODE. § 11-501 (k)(1)

23 provides: "Mortgage loan" means any loan or other extension of credit that is: (i)

24 Secured, in whole or in part, by any interest in residential real property in

25 Maryland; and (ii) If for personal, household or family purposes, in any amount."

26     429.  The MMFPA works to protect the interests of all parties to mortgage

27 issues in Maryland from misstatements, misrepresentations and omissions; in this

28 instance the MMFPA works to protect borrowers like Mr. Sequeira from mortgage

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    companies like the Defendant and ensure a level, fair playing field between all

2    borrowers and professionals.

3        430.   The Named Plaintiff and Plaintiffs' Class members were or are

4    homeowners in the Mortgage Lending Process as defined by the MMFPA since the

5    actions in dispute in this lawsuit involve the servicing of their residential mortgage

6    loans as it relates to a foreclosure action or threat of foreclosure which is an

7    attempt to collect a certain sum on the mortgage transaction.

8        431.   MD ANN. CODE., REAL PROP. § 7-401 (d) provides:

9    "Mortgage fraud" means any action by a person made with the intent to

10   defraud that involves:

11       (a)    Knowingly    making    any    deliberate    misstatement,

12   misrepresentation or omission during the mortgage lending process with the intent

13   that the misstatement, misrepresentation or omission be relied on by a mortgage

14   lender, borrower or any other party to the mortgage lending process;

15       (b)    Knowingly using or facilitating the use of any deliberate

16   misstatement, misrepresentation, or omission during the mortgage lending process

17   with the intent that the misstatement, misrepresentation, or omission be relied on

18   by a mortgage lender, borrower, or any other party to the mortgage lending

19   process.

20       (c)    Receiving any proceeds or any other funds in connection with a

21   mortgage closing that the person knows resulted from a violation of item (1) or (2)

22   of this section;

23       (d)    Conspiring to violate any provisions of item of (1), (2) or (3) of

24   this section…

25   The Defendants and Defendant Class have committed Mortgage Fraud by:

26       (a)    Knowingly    making,    as    described    herein,    deliberate

27   misstatements, misrepresentations and omissions during the mortgage lending

28   process, including failing to respond to the Named Plaintiff and Plaintiffs Class'

requests for a modification or change of their mortgage loans, with the intent that the misstatements, misrepresentations and omission be relied on by the Named Plaintiff and Plaintiffs Class members (and the general public);

(b)   Knowingly using or facilitating, as described herein, the use of any deliberate misstatements, misrepresentations, and omissions during the mortgage lending process, including the state court foreclosure actions it has commenced and carried out, with the intent that the misstatements, misrepresentations, and omissions be relied on by the Named Plaintiffs and Plaintiffs Class members.

432.   Plaintiff and the Plaintiffs Class Members have been damaged by the Defendant's deliberate misstatements, misrepresentations, and omissions during the mortgage lending process as stated herein including ¶¶ 45 above.

433.   Md Ann. Code., Real Prop. Code. § 7-401 (g) provides:

Pattern of mortgage fraud means two or more incidents of mortgage fraud that:

(a)   Involve two or more residential real properties; and

(b)   Have similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics.

434.   Upon information and belief the Defendant has engaged in a Pattern of Mortgage Fraud by committing similar acts against two or more Maryland residential properties with similar intents, results and methods of commission as that which was committed by Defendant against the Plaintiffs Class as described herein.

435.   Plaintiffs' damages, as alleged herein, were proximately caused by Citi's actions, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury.

**Massachusetts**

436.   Citi has violated and continues to violate the Massachusetts Consumer Protection Act, G.L. c. 93A, § 2 and applicable regulations promulgated by the Massachusetts Attorney General pursuant to G.L. c. 93A, § 2(c) including, without limitation:

(a)   940 C.M.R. § 3.16, in that its conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business;

(b)   940 C.M.R. § 3.16, in that its conduct violated the requirement of good faith and fair dealing applicable to contracts under G.L. c. 106, §§ 1-203;

(c)   940 C.M.R. § 3.16, in that its conduct violated existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare, as detailed below;

(d)   940 C.M.R. § 3.05, in that it made deceptive representations or failed to disclose relevant information as to loan modifications offered to borrowers;

(e)   940 C.M.R. § 8.06, in that it is a Mortgage Lender and made false or misleading representations to borrowers; and

(f)   940 C.MR. § 25.03, because it offers Foreclosure-related Services within the meaning of 940 C.M.R. § 25.01 without adequately describing the services offered.

437.   Plaintiffs have been injured by virtue of Citi's violations.   Said injuries include, but are not limited to:

(a)   Wrongful foreclosures;

(b)   Otherwise avoidable losses of homes to foreclosure;

(c)   Less favorable loan modifications;

(d)   Increased fees and other costs to avoid or attempt to avoid foreclosure;

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(e)   Loss of savings in fruitless attempts to secure loan modifications;

(f)   Loss of opportunities to pursue other refinancing or loss mitigation strategies; and

(g)   Significant stress and emotional distress.

438.   Citi's conduct as described in this complaint was and is willful or knowing within the meaning of the Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

439.   Citi's refusal to grant relief upon demand was and is in bad faith, with knowledge or reason to know that the act or practice complained of violated G.L. c. 93A, §2.

440.   On December 8, 2010, Plaintiff Robert Gatti sent Citi a demand for relief pursuant to G.L. c. 93A on their behalf and on behalf of a group of similarly situated individuals.   Citi responded by letter dated February 16, 2011.   Citi's untimely response has not yielded an offer of settlement to the Plaintiffs or the class of similarly situated individuals identified in the December 8, 2010 letter in accordance with G.L. c. 93A, §9(2).   No offer of settlement was made to the putative class.

**New Jersey**

441.   Citi's conduct as set forth herein and as alleged in the underlying complaints violates the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.

442.   At all relevant times material hereto, Citi conducted trade and commerce within the meaning of the New Jersey Consumer Fraud Act.

443.   Plaintiffs are "persons" as defined and construed by the New Jersey Consumer Fraud Act.

444.   Citi's conduct, as set forth herein, constitutes an unconscionable commercial practice comprised of deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, § 56:8-2, including its practice of leading

1    borrowers to believe that Citi would offer permanent HAMP modifications of their

2    mortgages upon successfully completing a TPP and due to Citi's illegal collection

3    of late fees and penalties.

4        445.   Citi's conduct, as set forth herein, has been unfair in violation of the

5    New Jersey Consumer Fraud Act because the acts or practices violate established

6    public policy, and because the harm they cause consumers in New Jersey greatly

7    outweigh any benefits associated with those practices.

8        446.   Plaintiffs suffered actual and ascertainable losses of money or

9    property as a result of Citi's unconscionable, deceptive and/or unfair trade

10   practices, including, but not limited to, payment of increased interest, longer loan

11   payoff times, higher principle balances, deterrence from seeking other remedies to

12   address their default and/or unaffordable mortgage payments, damage to their

13   credit, additional income tax liability, costs and expenses incurred to prevent or

14   fight foreclosure, and other damages.

15   **Pennsylvania**

16       447.   Citi's conduct as set forth herein and as alleged in the underlying

17   complaints violates the Pennsylvania Unfair Trade Practices and Consumer

18   Protection Law, 73 P.S. § 201-2(xxi).

19       448.   At all relevant times material hereto, Citi conducted trade and

20   commerce within the meaning of the Pennsylvania Unfair Trade Practices and

21   Consumer Protection Law.

22       449.   Citi's conduct, as set forth herein, constitutes an unfair and

23   unconscionable commercial practice comprised of deceptive acts or practices in

24   violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law,

25   73 P.S. § 201-2(xxi), including its practice of leading borrowers to believe that Citi

26   would offer permanent HAMP modifications of their mortgages upon successfully

27   completing a TPP and due to Citi's illegal collection of late fees and penalties in

28   violation of HAMP regulations.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

450.  Citi's conduct, as set forth herein, has been unfair in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law because the acts or practices violate established public policy, and because the harm they cause consumers in Pennsylvania greatly outweighs any benefits associated with those practices.

451.  Plaintiffs suffered actual and ascertainable losses of money or property as a result of Citi's unconscionable, deceptive and/or unfair trade practices, including, but not limited to, payment of increased interest and service fees, longer loan payoff times, higher principle balances, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages.

452.  Plaintiffs are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## COUNT VI

### By The CA, MD & IA Statewide HAMP TPP Classes

### Violations Of State Fair Debt Collection Practices Laws

453.  Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

**California**

454.  Citi is a "debt collector" within the meaning of Cal. Civil Code § 1788.2(c).  The monies allegedly owed by the members of the proposed classes are "debts" within the meaning of Cal. Civil Code § 1788.2(d).

455.  California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.* ("Rosenthal Act"), incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.  Cal. Civ. Code § 1788.17.

456. Citi violated these laws through various acts and practice including, but not limited to:

(a) Using false, deceptive, or misleading representations or means in connection with the collection of any debt, 15 U.S.C. § 1692e;

(b) Using false representations or deceptive means to collect or attempt to collect on any debt, 15 U.S.C. § 1692e(10); and

(c) Using unfair or unconscionable means to collect or attempt to collect any debt, 15 U.S.C. § 1692f.

457. Under California Civil Code §§ 1788.30 and 1788.17, Plaintiffs and Class Members are entitled to recover actual damages sustained as a result of Citi's Rosenthal Act violations, in an amount to be proven at trial.

458. Under California Civil Code §§ 1788.30 and 1788.17, Plaintiffs and Class Members are entitled to recover attorney's fees, costs, and expenses.

**Maryland**

459. By threatening an intent to foreclose, Citi has acted as a collector, directly and indirectly, as that term is defined by § 14-201(b) of MD. CODE, COMM. LAW.

460. The Plaintiffs are persons as defined by § 14-201(d) of MD. CODE, COMM. LAW.

461. The underlying mortgage transaction and threat of foreclosure related to this complaint constitutes a "consumer transaction" as defined by § 14-201(c) of MD. CODE, COMM. LAW.

462. Citi has claimed, attempted or threatened to enforce a right with knowledge that their right did not exist under Maryland or federal law until they complied with Maryland's Equal Credit Protection Act and MD. CODE REGS. 09.03.06.20.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

463. Plaintiffs damages as alleged herein were proximately cause by Citi's actions, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury.

**Iowa**

464. Citi is a debt collector within the meaning of Iowa Code § 537.7102 and was engaged in the collection of debt as defined in Iowa Code § 537.7102.

465. Citi's representation of the existence and amount of delinquent debt, which debt neither existed nor was delinquent, constitutes a false accusation made by a person, that Plaintiff and Class Members were willfully refusing to pay a just debt in violation of Iowa Code § 537.7103(1)(c).

466. Citi's representation to credit reporting agencies and to Plaintiff and Class Members constitutes an intentional misrepresentation or a representation that tended to create a false impression of the character, extent or amount of a debt, which debt did not, in fact, exist in violation of Iowa Code § 537.7103(4)(e).

**ADDITIONAL ALLEGATIONS & CLAIMS
OF THE IOWA DELINQUENCY CURE CLASS**

467. Plaintiffs repeat and re-allege every allegation above as if set forth fully herein.

468. During the time prior to Citi's granting of the trial plan, Mr. Goodyk had continued to make his monthly mortgage payments in full while his application for a loan modification was pending.

469. Mr. Goodyk had every reason to believe that these mortgage payments had been received and applied accordingly.

470. However, Mr. Goodyk received letters dated June 30 and July 28, 2010 that returned the above loan payments because they were insufficient to cure his delinquency and alerting him that his loan was in foreclosure.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

471.   Notwithstanding that he was working towards obtaining a permanent loan modification, Citi initiated foreclosure proceedings against Mr. Goodyk on or about July 20, 2010.

472.   Mr. Goodyk also received a July 29, 2010 notice of pay-off for reinstatement of all past amounts due, by fax on August 3, 2010, from the attorneys representing Citi in the foreclosure action.

473.   Mr. Goodyk now was confused since he thought he was in a trial loan modification period.  Because of the foreclosure proceeding and uncertainty of the modification program, Mr. Goodyk hired an attorney.

474.   Mr. Goodyk's was told by with Citi's agents that his July 29, 2010 phone payment was part of a trial modification plan and that if he would continue to make a series of three modified payments, his mortgage terms would be permanently modified.  Relying on these instructions, Mr. Goodyk made another modified payment in August 2010.

475.   On August 26, 2010, Mr. Goodyk made a payment of $9,536.02, to Citi.  This payment was made pursuant to the notice of pay-off, which gave a break up of the amount due as follows:

| | |
|---|---|
| Total Payments | $6,819.35 |
| Late Charges | $1,363.80 |
| Inspections | $  138.00 |
| BPO Appraisal | $    84.00 |
| Servicing Fees | $      .87 |
| Legal Fees & Costs | $1,130.00 |
| TOTAL | $9,536.02 |

476.   On August 26, 2010, Mr. Goodyk was told by a Citi representative that payment of $9,536.02 reinstated his loan and made him current on his mortgage payments.  Citi representatives told Mr. Goodyk that he could continue

in Citi's loan modification program and make a payment of $322.09 in September 2010, as this was the only amount that he owed.  Relying on these instructions, Mr. Goodyk made the said payment.

477.   Thereafter, Citi told Mr. Goodyk that he had completed all his trial payments successfully and will receive a permanent modification of his mortgage.

478.   Thereafter, Mr. Goodyk, continued to make his full mortgage payments through January 2011 as he had been making in the past under the original mortgage agreement, while waiting for the permanent modification agreement.

479.   Since he had not heard anything to the contrary, Mr. Goodyk continued to believe that he will receive a permanent modified agreement.

480.   On January 18, 2011, Mr. Goodyk called Citi Customer Service to check the status of his loan and balance, and to find out when he will receive the permanent modified agreement.   Plaintiff first spoke with Citi representative, Sareana, ID Number FN63175, who informed him that his loan was in foreclosure and that he was delinquent by the sum of $5,660.92 from October 1, 2010 to January 1, 2011.

481.   Mr. Goodyk pointed out to Sareana that he had a confirmation of October 3, 2010 payment to Citi in the amount of $1,363.87, and that he could prove that he had made all his monthly mortgage payments.  Sareana indicated that upon further research, the amount of $4,091.61 was sitting in an unapplied or suspended fund account.

482.   On being asked why Citi had been accepting but failing to apply his payments and Sareana answered, "That's a good question."

483.   Mr. Goodyk attempted to determine the status of his account and his status in the loan modification program, but was unable to receive confirmation from Sareana that he had completed the program successfully.  She noted that he needed to talk to his loan counselor, Tiffany.

484. According to Sareana, it appeared from Tiffany's file notes that Mr. Goodyk needed to provide one more piece of information for Citi to complete his loan modification.

485. Mr. Goodyk asked Sareana for confirmation of the current balance or pay-off of his loan was and she referred Mr. Goodyk to the foreclosure department.

486. A Customer Service Representative in the foreclosure department told Mr. Goodyk that his original loan had been made in the amount of $205,000.00, which was funded on or about November 30, 2007. As of January 18, 2011, Plaintiff's total loan pay-off amounted to $206,695.54—an amount greater than his original loan.

487. Mr. Goodyk inquired what the amounts were and how it could be possible that his three years of making full payments, including the charges, penalties, interest, fees, etc., he could owe in excess of his original loan amount. He was told that he owed amounts including late charges, reinstatement fees and now an escrow deficiency.

488. Mr. Goodyk was again told that he needed to speak with Tiffany, his loan counselor. After calling Customer Service once again, he was told by Customer Service that they could not give out Tiffany's direct number since it was not an 800 number. In addition, they could not give out her email address, but they would send her an email to once again have her call him.

489. Customer Service indicated that they had file notes indicating that Tiffany last tried to contact Mr. Goodyk on his cellular phone on November 30, 2010. However, Mr. Goodyk does not recall ever receiving a telephone call, nor did he ever receive a voice mail on his cell phone.

490. On January 18, 2011, Citi issued a payoff statement to Mr. Goodyk. Pursuant to this statement, Mr. Goodyk owes the Citi the following payments:

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| Principal Balance as of 09/01/10 | $198,904.61 |
| Interest from 09/01/10 to 02/01/11 @ 7% | $5,801.40 |
| Escrow Overdraft | $1,860.00 |
| Late Charges | $272.76 |
| Delinquency Expenses | $144.10 |
| Total Secured by Mortgage | $206,694.67 |
| TOTAL TO PAY LOAN IN FULL | $206,695.54 |

491. On January 26, 2011, Mr. Goodyk received yet another notice of default from Citi informing him that he was delinquent and must make payments of $5,728.24, including $272.78 in late charges. He was instructed that this payment must be made by February 26, 2011. In this letter Citi also informed Mr. Goodyk that "[t]his is an attempt to collect a debt, and any information will be used for that purpose."

492. Upon information and belief, Mr. Goodyk believes that Citi has misapplied his payments to pay illegal fees and charges.

493. He has been current on his mortgage since August 25, 2010, and has been regularly making all mortgage payments under his mortgage and note. Yet, Citi has reported him as delinquent to the credit agencies and is demanding late fees and delinquent fees, all to his detriment and harm.

## COUNT VII

### By The Iowa Delinquency Cure Class

### Breach Of Original Mortgage Agreement

494. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

495. Citi waived the terms of the mortgage loan by asking Plaintiff and Class Members not to make any payments as required by the mortgage loan agreement when it asked Plaintiff and Class Members to make new modified

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    payments under the oral modification agreement with a promise that doing so will

2    result in a permanent modification agreement.

3        496.   Plaintiff and Class Members complied with the modified payment

4    terms and were making timely payments and ready and willing to make timely

5    modified mortgage payments and Citi had waived the terms and conditions of the

6    original mortgage.  Plaintiff and Class Members also complied with all conditions,

7    covenants, and promises required of them under the original mortgage agreement

8    and as modified by the oral agreement.

9        497.   Despite the promise to modify the original mortgage and waiver of the

10   benefit terms, Citi charged Plaintiff and Class Members various fees, including,

11   but not limited to, telephone payment fees, late charges, inspection fees, appraisal

12   fees, servicing fee, and other foreclosure related fees and costs, and thereafter

13   proceeded to file a foreclosure action which Plaintiff and Class Members had to

14   defend at their own costs.

15       498.   Citi could not have penalized Plaintiff and Class Members for their

16   compliance with Citi's terms of making modified mortgage payments, by treating

17   them as delinquent and by demanding exorbitant balloon payments, charging them

18   late and delinquency fees, and other related fees and charges, and declaring them

19   as delinquent to the credit rating agencies.

20       499.   After making a balloon payment of the arrears, as well as the illegal

21   fees and charges, Plaintiff and Class Members made timely monthly mortgage

22   payments and complied with all conditions, covenants, and promises required of

23   them under the mortgage.

24       500.   Under the mortgage, delinquency fees, late fees and other related fees

25   and charges can only be made if mortgage payments are not made in a timely

26   manner.

27       501.   Despite receiving all the payments on the mortgage and the note, Citi

28   continues to show Plaintiff and Class Members in default by failing to apply their

1   payments to their accounts, and allegedly keeping the payments in suspension

2   accounts.

3       502.  Citi breached the mortgage and note by demanding arrears in the

4   escrow account, late fees, delinquency fees etc.

5       503.  Upon information and belief, the fees and charges are computer-

6   generated requests that do not provide any meaningful information to Citi.

7       504.  Also, upon information and belief, Citi's computer system

8   automatically generates and charges delinquency fees, late fees, and related fees if

9   payments are not reflected as having been received against the account, which it

10  did because Citi posted all the payments received under the modified oral

11  agreement in a separate suspension account.

12      505.  Upon information and belief, Citi deducts the illegal charges and fees

13  from the escrow accounts.

14      506.  As a proximate result of Citi's breach of original mortgage, Plaintiff

15  and Class Members have suffered damages on account of the unlawful fees and

16  charges, and having to defend an unlawful foreclosure action in an amount to be

17  proven at trial.

18      507.  Plaintiff and Class Members were damaged, and are threatened with

19  additional harm, including, being charged late fees, excessive interest on principal

20  amounts for which Citi refused to apply payments in a timely manner, adding

21  substantially to mortgagors' overall debt.  Plaintiffs and Class Members have also

22  suffered emotional distress, wrongfully being placed in imminent danger of losing

23  their homes, impairment in their ability to sell their property, and attorneys' fees in

24  defending fraudulent foreclosures.  Moreover, Plaintiff and Class Members have

25  suffered damages, including, but not limited to, uncertainty of clear title, which

26  causes a smaller pool of potential buyers, lowers home values, real estate owned

27  sales resulting in higher deficiency judgment, and decreased time to negotiate a

28  modification or workout of the loan.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## COUNT VIII

### By The Iowa Delinquency Cure Class

### Breach Of Implied Covenant Of Good Faith & Fair Dealing

508.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

509.   Every contract imposes upon each party a duty of good faith and fair dealing in its performance, which requires that neither party do anything to infringe upon the other party's rights to the benefits of the agreement, or to deprive the other party of the contract's benefits.

510.   Citi has a duty of good faith and fair dealing with respect to its dealings with borrowers, including Plaintiff and Class Members.   Citi had an implied duty to insure that its loan modification and foreclosure procedures were not fraudulent or unconscionable with respect to borrowers.

511.   Citi breached the implied covenant of good faith and fair dealing contained its oral agreement and the original mortgage agreement that Citi services, as alleged above.

512.   Citi breached the implied covenant by, among other things, (a) failing to fulfill its contractual obligations, written or implied promises, and loan servicing functions; (b) failing to apply the properly made monthly mortgage payments under the mortgage and note towards the mortgage accounts of Plaintiff and Class Members and instead showing them as delinquent and issuing demand letter, while charging various fees, including but not limited to, delinquency fees, late fees, escrow amounts that have already been paid, and interest amounts that have already been paid in a timely manner;   (c) initiating unlawful foreclosure proceedings without cause; (d) failing to make good faith efforts to provide the loan servicing functions owed to Plaintiff and the Class in connection with their review and retention of documentation, including loan modification applications; (e) failing to make good faith efforts to provide Plaintiff and Class Members with a

permanent loan modification; (f) failing to disclose that Plaintiff modified reduced payments would be reported to credit bureaus as delinquent; and (g) demanding exorbitant balloon payments, late fees, delinquency fees from Plaintiff and Class Members instead of providing the modification of the mortgage; and (h) billing borrowers for unreasonable and unnecessary and unlawful fees, including, but not limited to, inspection fees, delinquency fees, and late fees.

513.   In so doing, Citi acted recklessly, maliciously, in bad faith, and without good cause, thereby preventing Plaintiff and the Class from receiving their reasonably expected benefits under their contracts.

514.   As a direct and proximate result Citi's breaches of implied covenant of good faith and fair dealing, Plaintiff and the Class Members were damaged. Plaintiff and Class Members were damaged, and are threatened with additional harm, including, being charged late fees, excessive interest on principal amounts for which Citi refused to apply payments in a timely manner, adding substantially to mortgagors' overall debt.   Plaintiffs and Class Members have also suffered emotional distress, wrongfully being placed in imminent danger of losing their homes, impairment in their ability to sell their property, and attorneys' fees in defending fraudulent foreclosures.   Moreover, Plaintiff and Class Members have suffered damages, including, but not limited to, uncertainty of clear title, which causes a smaller pool of potential buyers, lowers home values, real estate owned sales resulting in higher deficiency judgment, and decreased time to negotiate a modification or workout of the loan.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.     Certify this case as a class action and appoint the named Plaintiffs to be class representatives for each class for which they are designated and their counsel to be class counsel;

B.     Enter a judgment declaring the acts and practices of Citi complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members on the terms promised in class members' temporary modifications, together with an award of monetary damages and other available relief on those claims;

C.     Grant a permanent or final injunction enjoining Citi's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

D.     Order Citi to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under all its loan modification programs, including HAMP;

E.     Order specific performance of Citi's contractual obligations together with other relief required by contract and law;

F.     Award actual, multiple, exemplary and/or statutory minimum damages and equitable relief to those statewide classes alleging claims under Count V and Count VI, as appropriate;

G.     Award restitution and prejudgment interest;

H.     Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1     I.     Grant Plaintiffs and the Class such other and further relief as this

2  Court finds necessary and proper.

3  **DEMAND FOR JURY TRIAL**

4     Plaintiffs hereby demand trial of their claims by jury to the extent authorized

5  by law.

6

| Date:  January 19, 2012 | **MILBERG LLP**<br>JEFF S. WESTERMAN<br>DAVID E. AZAR<br>CHRISTIAN KEENEY |
|---|---|
| | JEFF S. WESTERMAN |
| | One California Plaza<br>300 S. Grand Avenue, Suite 3900<br>Los Angeles, CA  90071<br>Telephone:  (213) 617-1200<br>Facsimile:  (213) 617-1975<br>Email: jwesterman@milberg.com<br>dazar@milberg.com<br>ckeeney@milberg.com |
| | *Interim Lead Class Counsel*<br>*Counsel for Plaintiffs Beverly King and Nancy Glennon* |
| | **KLEIN KAVANAGH COSTELLO, LLP**<br>GARY KLEIN<br>SHENNAN KAVANAGH<br>KEVIN COSTELLO<br>JOHN MCGOWAN |
| | GARY KLEIN |
| | 85 Merrimac Street, 4th Floor<br>Boston, Massachusetts 02114<br>p. 617.357.5500<br>f. 617.357.5030<br>Emails: klein@kkcllp.com<br>kavanagh@kkcllp.com<br>costello@kkcllp.com<br>mcgowan@kkcllp.com |
| | *Interim Lead Class Counsel*<br>*Counsel for Plaintiff Davidson Calfee* |

- 89 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINKELSTEIN THOMPSON LLP**
ROSEMARY M. RIVAS
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone: (415) 398-8700
Facsimile:  (415) 398-8704
Email: rrivas@finkelsteinthompson.com

**FINKELSTEIN THOMPSON LLP**
TRACY D. REZVANI
1050 30th St. NW
Washington DC 20007
Telephone: (202) 337-8000
Facsimile:  (202) 337-8090
trezvani@finkelsteinthompson.com

**BERGER & MONTAGUE, PC**
SHERRIE R. SAVETT
RUSSELL D. PAUL
ERIC LECHTZIN
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile:  (215) 875-5715
ssavett@bm.net
rpaul@bm.net
elechtzin@bm.net

**CUNEO GILBERT & LADUCA LLP**
ALEXANDRA C. WARREN
BRENDAN S. THOMPSON
CHARLES J. LADUCA
MATTHEW L. WIENER
507 C Street NE
Washington DC 20002
Telephone: (202) 789-3960
Facsimile:  (202) 789-1813
awarren@cuneolaw.com
brendant@cuneolaw.com
charles@cuneolaw.com
wiener_matthew@yahoo.com

**CUNEO GILBERT & LADUCA LLP**
PREETPAL GREWAL
Rockefeller Center
620 Fifth Avenue
New York, NY 10020
Telephone: (202) 789-3960
Facsimile:  (202) 789-1813
pgrewal@cuenolaw.com

**THE STURDEVANT LAW FIRM**
JAMES C. STURDEVANT
WHITNEY HUSTON

- 90 -

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

354 Pine Street, 4th Floor
San Francisco, CA 94104
Telephone: (415) 477-2410
Facsimile:  (415) 477-2420
jsturdevant@sturdevantlaw .com
whuston@sturdevantlaw .com

**HOUSING AND ECONOMIC RIGHTS
ADVOCATES**
MAEVE ELISE BROWN
ELIZABETH S. LETCHER
NOAH ZINNER
CYNTHIA SINGERMAN
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Telephone: (510) 271-8443
Facsimile:  (510) 868-4521
melisebrown@heraca.org
eletcher@heraca.org
esingerman @heraca.org

**NATIONAL CONSUMER LAW CENTER**
CHARLES M. DELBAUM
STUART T. ROSSMAN
7 Winthrop Square, 4th Floor
Boston, MA 02110
Telephone: (617) 542-8010
Facsimile:  (617) 542-8033
cdelbaum@nclc.org
srossman @nclc.org

**STONEBARGER LAW**
GENE JOSEPH STONEBARGER
75 Iron Point Circle, Suite 145
Folsom, CA 95630
Telephone: (916) 235-7140
Facsimile:  (916) 235-7141
gstonebarger@stonebargerlaw .com

**LEVIN, FISHBEIN, SEDRAN &
BERMAN**
CHARLES E. SCHAFFER
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone: 877.882.1011
Facsimile:  215.592.4663
CSchaffer@lfsblaw.com

**LOCKRIDGE GRINDAL & NAUEN
PLLP**
ROBERT SHELQUIST
100 Washington Ave S.
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1
2

Facsimile:  (612) 339-0981
rkshelquist@locklaw.com

3
4
5
6

**HOLLAND GROVES SCHNELLER STOLZE**
ERIC D. HOLLAND
300 N. Tucker Suite 801
St. Louis, MO 63101
Telephone: 877-255-3352(O)
Facsimile:  314-241-5554
eholland@ALLFELA.com

7
8
9
10
11

**HUDSON MALLANEY SHINDLER ANDERSON P.C.**
J. BARTON GOPLERUD
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa  50265
Telephone: (515) 223-4567
Facsimile:  (515) 223-8887
jbgoplerud@hudsonlaw.net

12

*Members of thePlaintiffs' Executive Committee*

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**1**

Agreement

### 1. Services

A.    Subject to Section 10.C., Servicer shall perform the loan modification and other foreclosure prevention services (collectively, the "Services") described in (i) the Financial Instrument attached hereto as Exhibit A (the "Financial Instrument"); (ii) the Program guidelines and procedures issued by the Treasury, including, without limitation, the net present value assessment requirements of the Program (the "Program Guidelines"); and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program (the "Supplemental Directives" and, together with the Program Guidelines, the "Program Documentation"). The Program Documentation will be available to all Participating Servicers at www.financialstability.gov. The Program Documentation, as the same may be modified or amended from time to time in accordance with Section 10 below, is hereby incorporated into the Commitment by this reference.

B.    Servicer's representations and warranties, and acknowledgement of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Program and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as Exhibit B (the "Annual Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below).

C.    The recitals set forth above are hereby incorporated herein by this reference.

### 2. Authority and Agreement to Participate in Program

A.    Servicer shall perform the Services for all mortgage loans its services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor"). Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under the Program.

B.    Notwithstanding subsection A., if (x) Servicer is unable to obtain all necessary consents and waivers for modifying a mortgage loan, or (y) the pooling and servicing agreement or other similar servicing contract governing Servicer's servicing of a mortgage loan prohibits Servicer from performing the Services for that mortgage loan, Servicer shall not be required to perform the Services with respect to that mortgage loan and shall not receive all or any portion of the Purchase Price (as defined below) otherwise payable with respect to such loan.

C.    Notwithstanding anything to the contrary contained herein, the Agreement does not apply to GSE Loans. Servicers are directed to the servicing guides and bulletins issued by Fannie Mae and Freddie Mac, respectively, concerning the Program as applied to GSE Loans.

D.    Servicer's performance of the Services and implementation of the Program shall be subject to review by Freddie Mac and its agents and designees as more fully set forth in the Agreement.

### 3. Set Up; Prerequisite to Payment

Servicer will provide to Fannie Mae: (a) the set up information required by the Program Documentation and any ancillary or administrative information requested by Fannie Mae in order to process Servicer's participation in the Program as a Participating Servicer on or before the Effective Date of the Commitment; and (b) the data elements for each mortgage eligible for the Program

- 2 -

as and when described in the Program Documentation and the Financial Instrument. Purchase Price payments will not be remitted pursuant to Section 4 with respect to any modified mortgage for which the required data elements have not been provided.

### 4. Agreement to Purchase Financial Instrument; Payment of Purchase Price

A.   Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as Exhibit A, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price (defined below). The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of the Commitment and the Financial Instrument by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

B.   Solely in its capacity as the financial agent of the United States, and subject to subsection C. below, Fannie Mae shall: (i) remit compensation payments to Servicer; (ii) remit incentive payments to Servicer for the account of Servicer and for the credit of borrowers under their respective mortgage loan obligations; and (iii) remit payments to Servicer for the account of Investors, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit of borrowers or for the account of Investors under the Program Documentation shall be applied by Servicer to the borrowers' respective mortgage loan obligations, or remitted by Servicer to Investors, as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

C.   The Purchase Price will be paid to Servicer by Fannie Mae as the financial agent of the United States as and when described herein and in the Program Documentation in consideration for the execution and delivery of the Financial Instrument by Servicer on or before the Effective Date of the Agreement, upon the satisfaction of the conditions precedent to payment described in subsections A. and B. above.

D.   The value of the Agreement is limited to $2,071,000,000 (the "Program Participation Cap"). Accordingly, the aggregate Purchase Price payable to Servicer under the Agreement may not exceed the amount of the Program Participation Cap. For each loan modification that becomes effective, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be reduced by the maximum Purchase Price potentially payable with respect to that loan modification. In the event the Purchase Price actually paid with respect to that loan modification is less than the maximum Purchase Price potentially payable, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be increased by the difference between such amounts. Notwithstanding the foregoing, no agreements with borrowers intended to result in new loan modifications will be effected under the Agreement, and no payments will be made with respect to any new loan modifications from and after the date on which the aggregate Purchase Price paid or payable to Servicer under the Agreement equals the Program Participation Cap. Treasury may, from time to time in its sole discretion, adjust the amount of the Program Participation Cap. Servicer will be notified of all adjustments to the Program Participation Cap in writing by Fannie Mae.

E.   Servicer shall maintain complete and accurate records of, and supporting documentation for, the borrower payment, including, but not limited to, PITIA (principal, interest, taxes, insurance (including homeowner's insurance and hazard and flood insurance) and homeowner's association and/or condo fees), and delinquency information and data provided to Fannie Mae regarding each agreement relating to a trial modification period and each loan modification agreement executed under the Program, which will be relied upon by Fannie Mae when calculating, as financial agent for the United States, the Purchase Price to be paid by the Treasury through Fannie Mae or any other financial agent. Servicer agrees to provide Fannie Mae and Freddie Mac with documentation and

- 3 -

other information with respect to any amounts paid by the Treasury as may be reasonably requested by such parties. In the event of a discrepancy or error in the amount of the Purchase Price paid hereunder, at Fannie Mae's election, (x) Servicer shall remit to Fannie Mae the amount of any overpayment within thirty (30) days of receiving a refund request from Fannie Mae, or (y) Fannie Mae may immediately offset the amount of the overpayment against other amounts due and payable to Servicer by Fannie Mae, as financial agent of the United States, upon written notice to Servicer. Servicer shall still be obligated to credit to the respective mortgage loan obligations of borrowers, and to the respective accounts of Investors, any portion of the Purchase Price to which they are entitled (if any) notwithstanding such offset unless otherwise directed by Fannie Mae.

F.  At the election and upon the direction of the Treasury and with prior written notice to Servicer, Fannie Mae may deduct from any amount to be paid to Servicer any amount that Servicer, Investor, or borrower is obligated to reimburse or pay to the United States government, provided, however, that any amount withheld under this subsection F. will be withheld only from the amounts payable to, or for the account or credit of, the party which is liable for the obligation to the United States government.

G.  In the event that the Agreement expires or is terminated pursuant to Section 5 or Section 6, and subject to Fannie Mae's rights under Section 6, Fannie Mae shall, solely in its capacity as the financial agent of the United States, continue to remit all amounts that are properly payable pursuant to subsection A. above to Servicer in accordance with the Program Documentation until paid in full, provided, however, that Purchase Price payments will be made only with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae for inclusion in the Program in accordance with the Program Documentation prior to the date of expiration or termination and that do not exceed the Program Participation Cap.

H.  Notwithstanding anything to the contrary contained in subsection G. above, in the event that the Agreement is terminated pursuant to Section 6 B. in connection with an Event of Default by Servicer under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the account of the Servicer subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer (or, at Fannie Mae's discretion, an alternative provider) for the account of borrowers and Investors, as provided in the Agreement.

I.  Notwithstanding anything to the contrary contained in subsection F. above, in the event that the Agreement is terminated pursuant to Section 6 C. in connection with an Event of Default by an Investor or a borrower under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the credit or account of the defaulting party subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer for the credit or account of non-defaulting parties as described in the Program Documentation.

J.  Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer under Section 4.B., or obtain repayment of prior payments made under Section 4.B., in connection with an Event of Default by Servicer or in connection with an evaluation of performance that includes any specific findings by Freddie Mac that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient; provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted by, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default or findings giving rise to this remedy. These remedies are not exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

K.  Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer for the credit or account of an Investor or a borrower under Section 4.B., or obtain repayment of prior payments made for the credit or account of such parties under Section 4.B., in connection with an Event of Default by an Investor or a borrower. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mac in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection. These remedies are not

- 4 -

exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

**5. Term**

A. Qualifying mortgage loans may be submitted by Servicer and accepted by Fannie Mae as described in the Financial Instrument and the Program Documentation from and after the Effective Date until December 31, 2012 (the "Initial Term"), subject to Program extensions by the Treasury or earlier termination of the Agreement by Fannie Mae pursuant to the provisions hereof or suspension or termination of the Program by the Treasury, provided, however, no new qualifying mortgage loans may be submitted by Servicer or accepted by Fannie Mae from and after the date on which the Program Participation Cap is reached.

B. Servicer shall perform the Services described in the Program Documentation in accordance with the terms and conditions of the Agreement during the Initial Term and any extensions thereof (the Initial Term, together with all extensions thereof, if any, the "Term"), and during such additional period as may be necessary to: (i) comply with all data collection, retention and reporting requirements specified in the Program Documentation during and for the periods set forth therein; and (ii) complete all Services that were initiated by Servicer, including, but not limited to, mortgage modifications and the completion of all documentation relating thereto, during the Term. Servicer agrees that it will work diligently to complete all Services as soon as reasonably possible after the end of the Term or earlier termination.

C. The Agreement may be terminated by Fannie Mae or Servicer prior to the end of the Term pursuant to Section 6 below.

**6. Defaults and Early Termination**

A. The following constitute events of default under the Agreement (each, an "Event of Default" and, collectively, "Events of Default"):

(1) Servicer fails to perform or comply with any of its material obligations under the Agreement, including, but not limited to, circumstances in which Servicer fails to ensure that all eligibility criteria and other conditions precedent to modification specified in the Program Documentation are satisfied prior to effectuating modifications under the Program.

(2) Servicer: (a) ceases to do business as a going concern; (b) makes a general assignment for the benefit of, or enters into any arrangement with creditors in lieu thereof; (c) admits in writing its inability to pay its debts as they become due; (d) files a voluntary petition under any bankruptcy or insolvency law or files a voluntary petition under the reorganization or arrangement provisions of the laws of the United States or any other jurisdiction; (e) authorizes, applies for or consents to the appointment of a trustee or liquidator of all or substantially all of its assets; (f) has any substantial part of its property subjected to a levy, seizure, assignment or sale for or by any creditor or governmental agency; or (g) enters into an agreement or resolution to take any of the foregoing actions.

(3) Servicer, any employee or contractor of Servicer, or any employee or contractor of Servicers' contractors, or any Investor or borrower, commits a grossly negligent, willful or intentional, or reckless act (including, but not limited to, fraud) in connection with the Program or the Agreement.

(4) Any representation, warranty, or covenant made by Servicer in the Agreement or any Annual Certification is or becomes materially false, misleading, incorrect, or incomplete.

(5) An evaluation of performance that includes any specific findings by Freddie Mac, in its sole discretion, that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient, or any failure by Servicer to comply with any

- 5 -

directive issued by Fannie Mae or Freddie Mac with respect to documents or data requested, findings made, or remedies established, by Fannie Mae and/or Freddie Mac in conjunction with such performance criteria or other Program requirements.

B. Fannie Mae may take any, all, or none of the following actions upon an Event of Default by Servicer under the Agreement:

(1) Fannie Mae may: (i) withhold some or all of the Servicer's portion of the Purchase Price until, in Fannie Mae's determination, Servicer has cured the default; and (ii) choose to utilize alternative means of paying any portion of the Purchase Price for the credit or account of borrowers and Investors and delay paying such portion pending adoption of such alternative means.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer under Section 4.B; and/or (ii) require repayment of prior payments made to Servicer under Section 4.B, provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default giving rise to the remedy.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may terminate the Agreement and cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement.

(5) Fannie Mae may require Servicer to submit to information and reporting with respect to its financial condition and ability to continue to meet its obligations under the Agreement.

C. Fannie Mae may take any, all, or none of the following actions upon an Event of Default involving an Investor or a borrower in connection with the Program:

(1) Fannie Mae may withhold all or any portion of the Purchase Price payable to, or for the credit or account of, the defaulting party until, in Fannie Mae's determination, the default has been cured or otherwise remedied to Fannie Mae's satisfaction.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer for the credit, or account of, the defaulting party under Section 4.B; and/or (ii) require repayment of prior payments made to the defaulting party under Section 4.B. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mac in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement that relate to the defaulting Investor or borrower.

D. In addition to the termination rights set forth above, Fannie Mae may terminate the Agreement immediately upon written notice to Servicer:

- 6 -

(1) at the direction of the Treasury;

(2) in the event of a merger, acquisition, or other change of control of Servicer;

(3) in the event that a receiver, liquidator, trustee, or other custodian is appointed for the Servicer; or

(4) in the event that a material term of the Agreement is determined to be prohibited or unenforceable as referred to in Section 11.C.

E. The Agreement will terminate automatically:

(1) in the event that the Financial Agency Agreement, dated February 18, 2009, by and between Fannie Mae and the Treasury is terminated; or

(2) upon the expiration or termination of the Program.

F. The remedies available to Fannie Mae upon an Event of Default under this Section are cumulative and not exclusive; further, these remedies are in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

G. If the event of termination of the Agreement under any circumstances, Servicer and Fannie Mae agree to cooperate with one another on an ongoing basis to ensure an effective and orderly transition or resolution of the Services, including the provision of any information, reporting, records and data required by Fannie Mae and Freddie Mac.

H. If an Event of Default under Section 6.A.1., Section 6.A.4., or Section 6.A.5. occurs and Fannie Mae determines, in its sole discretion, that the Event of Default is curable and elects to exercise its right to terminate the Agreement, Fannie Mae will provide written notice of the Event of Default to Servicer and the Agreement will terminate automatically thirty (30) days after Servicer's receipt of such notice, if the Event of Default is not cured by Servicer to the reasonable satisfaction of Fannie Mae prior to the end of such thirty (30) day period.  If Fannie Mae determines, in its sole discretion, that an Event of Default under Section 6.A.1., Section 6.A.4, or Section 6.A.5. is not curable, or if an Event of Default under Section 6.A.2. or Section 6.A.3. occurs, and Fannie Mae elects to exercise its right to terminate the Agreement under Section 6.B.4., Fannie Mae will provide written notice of termination to the Servicer on or before the effective date of the termination.

## 7. Disputes

Fannie Mae and Servicer agree that it is in their mutual interest to resolve disputes by agreement.  If a dispute arises under the Agreement, the parties will use all reasonable efforts to promptly resolve the dispute by mutual agreement.  If a dispute cannot be resolved informally by mutual agreement at the lowest possible level, the dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter.  This will be done in an expeditious manner.  Servicer shall continue diligent performance of the Services pending resolution of any dispute.  Fannie Mae and Servicer reserve the right to pursue other legal or equitable rights they may have concerning any dispute.  However, the parties agree to take all reasonable steps to resolve disputes internally before commencing legal proceedings.

## 8. Transfer or Assignment

A.  Servicer must provide written notice to Fannie Mae and Freddie Mac pursuant to Section 9 below of: (i) any transfers or assignments of mortgage loans subject to this Agreement; and (ii) any other transfers or assignments of Servicer's rights and obligations under this Agreement.  Such notice must include payment instructions for payments to be made to the transferee or assignee of the mortgage loans subject to the notice (if applicable), and evidence of the assumption by such transferee or assignee of the mortgage loans or other rights and obligations that are transferred, in the form of Exhibit C (the "Assignment and

- 7 -

Assumption Agreement"). Servicer acknowledges that Fannie Mae will continue to remit payments to Servicer in accordance with Section 4.B. with respect to mortgage loans that have been assigned or transferred, and that Servicer will be liable for underpayments, overpayments and misdirected payments, unless and until such notice and an executed Assignment and Assumption Agreement are provided to Fannie Mae and Freddie Mac. Any purported transfer or assignment of mortgage loans or other rights or obligations under the Agreement in violation of this Section is void.

B. Servicer shall notify Fannie Mae as soon as legally possible of any proposed merger, acquisition, or other change of control of Servicer, and of any financial and operational circumstances which may impair Servicer's ability to perform its obligations under the Agreement.

### 9. Notices

All legal notices under the Agreement shall be in writing and referred to each party's point of contact identified below at the address listed below, or to such other point of contact at such other address as may be designated in writing by such party. All such notices under the Agreement shall be considered received: (a) when personally delivered; (b) when delivered by commercial over-night courier with verification receipt; (c) when sent by confirmed facsimile; or (d) three (3) days after having been sent, postage prepaid, via certified mail, return receipt requested. Notices shall not be made or delivered in electronic form, except as provided in Section 12 B. below, provided, however, that the party giving the notice may send an e-mail to the party receiving the notice advising that party that a notice has been sent by means permitted under this Section.

> To Servicer:
>
>> CitiMortgage, Inc.
>> 1000 Technology Drive
>> O'Fallon, Missouri 63368
>> Attention: Office of the General Counsel
>> Telephone: ▮▮▮▮▮
>> Facsimile: ▮▮▮▮▮
>> email: ▮▮▮▮▮
>
> To Fannie Mae:
>
>> Fannie Mae
>> 3900 Wisconsin Avenue, NW
>> Washington, DC 20016
>> Attention:  General Counsel
>> Facsimile: ▮▮▮▮▮
>> email: ▮▮▮▮▮
>
> To Treasury:
>
>> Chief
>> Office of Homeownership Preservation
>> Office of Financial Stability
>> Department of the Treasury
>> 1500 Pennsylvania Avenue, NW
>> Washington, DC 20220
>> Facsimile: (202) 622-9219

- 8 -

To Freddie Mac:

Freddie Mac
8100 Jones Branch Drive
McLean, VA 22102
Attention:  Vice President, Making Home Affordable -- Compliance
Facsimile: (703) 903-2544
Email to: MHA_Compliance@freddiemac.com

## 10. Modifications

A.  Subject to Sections 10.B. and 10.C., modifications to the Agreement shall be in writing and signed by Fannie Mae and Servicer.

B.  Fannie Mae and the Treasury each reserve the right to unilaterally modify or supplement the terms and provisions of the Program Documentation that relate (as determined by Fannie Mae or the Treasury, in their reasonable discretion) to the compliance and performance requirements of the Program, and related remedies established by Freddie Mac, and/or to technical, administrative, or procedural matters or compliance and reporting requirements that may impact the administration of the Program.

C.  Notwithstanding Sections 10.A. and 10.B., any modification to the Program Documentation that materially impact the borrower eligibility requirements, the amount of payments of the Purchase Price to be made to Participating Servicers, Investors and borrowers under the Program, or the rights, duties, or obligations of Participating Servicers, Investors or borrowers in connection with the Program (each, a "Program Modification" and, collectively, the "Program Modifications") shall be effective only on a prospective basis; Participating Servicers will be afforded the opportunity to opt-out of the Program when Program Modifications are published with respect to some or all of the mortgage loans sought to be modified under the Program on or after the effective date of the Program Modification, at Servicer's discretion.  Opt-out procedures, including, but not limited to, the time and process for notification of election to opt-out and the window for such election, will be set forth in the Program Documentation describing the Program Modification, provided, however, that Servicer will be given at least thirty (30) days to elect to opt-out of a Program Modification.  For the avoidance of doubt, during the period during which Servicer may elect to opt-out of a Program Modification and after any such opt-out is elected by Servicer, Servicer will continue to perform the Services described in the Financial Instrument and the Program Documentation (as the Program Documentation existed immediately prior to the publication of the Program modification prompting the opt-out) with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae prior to the opt-out.

## 11. Miscellaneous

A.  The Agreement shall be governed by and construed under Federal law and not the law of any state or locality, without reference to or application of the conflicts of law principles.  Any and all disputes between the parties that cannot be settled by mutual agreement shall be resolved solely and exclusively in the United States Federal courts located within the District of Columbia. Both parties consent to the jurisdiction and venue of such courts and irrevocably waive any objections thereto.

B.  The Agreement is not a Federal procurement contract and is therefore not subject to the provisions of the Federal Property and Administrative Services Act (41 U.S.C. §§ 251-260), the Federal Acquisition Regulations (48 CFR Chapter 1), or any other Federal procurement law.

C.  Any provision of the Agreement that is determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement, and no such prohibition or unenforceability in any jurisdiction shall invalidate such provision in any other jurisdiction.

- 9 -

D. Failure on the part of Fannie Mae to insist upon strict compliance with any of the terms hereof shall not be deemed a waiver, nor will any waiver hereunder at any time be deemed a waiver at any other time. No waiver will be valid unless in writing and signed by an authorized officer of Fannie Mae. No failure by Fannie Mae to exercise any right, remedy, or power hereunder will operate as a waiver thereof. The rights, remedies, and powers provided herein are cumulative and not exhaustive of any rights, remedies, and powers provided by law.

E. The Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest.

F. The Commitment and the Assignment and Assumption Agreement (if applicable) may be executed in two or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.

G. The Commitment, together with the Financial Instrument, the Annual Certifications, the Assignment and Assumption Agreement (if applicable) and the Program Documentation, constitutes the entire agreement of the parties with respect to the subject matter hereof. In the event of a conflict between any of the foregoing documents and the Program Documentation, the Program Documentation shall prevail. In the event of a conflict between the Program Guidelines and the Supplemental Directives, the Program Guidelines shall prevail.

H. Any provisions of the Agreement (including all documents incorporated by reference thereto) that contemplate their continuing effectiveness, including, but not limited to, Sections 4, 5 B., 6 F., 6 G., 9, 11 and 12 of the Commitment, and Sections 2, 3, 5, 7, 8, 9 and 10 of the Financial Instrument, and any other provisions (or portions thereof) in the Agreement that relate to, or may impact, the ability of Fannie Mae and Freddie Mac to fulfill their responsibilities as agents of the United States in connection with the Program, shall survive the expiration or termination of the Agreement.

**12. Defined Terms; Incorporation by Reference**

A. All references to the "Agreement" necessarily include, in all instances, the Commitment and all documents incorporated into the Commitment by reference, whether or not so noted contextually, and all amendments and modifications thereto. Specific references throughout the Agreement to individual documents that are incorporated by reference into the Commitment are not inclusive of any other documents that are incorporated by reference, unless so noted contextually.

B. The term "Effective Date" means the date on which Fannie Mae transmits a copy of the fully executed Commitment and Financial Instrument to Treasury and Servicer with a completed cover sheet, in the form attached hereto as Exhibit D (the "Cover Sheet"). The Commitment and Financial Instrument and accompanying Cover Sheet will be faxed, emailed, or made available through other electronic means to Treasury and Servicer in accordance with Section 9.

C. The Program Documentation and Exhibit A – Form of Financial Instrument, Exhibit B – Form of Annual Certification, Exhibit C – Form of Assignment and Assumption Agreement and Exhibit D – Form of Cover Sheet (in each case, in form and, upon completion, in substance), including all amendments and modifications thereto, are incorporated into this Commitment by this reference and given the same force and effect as though fully set forth herein.

[SIGNATURE PAGE FOLLOWS; REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 10 -

In Witness Whereof, Servicer and Fannie Mae by their duly authorized officials hereby execute and deliver this Commitment to Purchase Financial Instrument and Servicer Participation Agreement as of the Effective Date.

SERVICER: CitiMortgage, Inc.

By: _____
Name: _Pnug R. Ewie_
Title: _SVP_
Date: _April 13, 2009_

FANNIE MAE, solely as Financial Agent of the United States

By: _____
Name: _Leslie Peeler_
Title: _Vice President_
Date: _April 13, 2009_

**EXHIBITS**

Exhibit A    Form of Financial Instrument

Exhibit B    Form of Annual Certification

Exhibit C    Form of Assignment and Assumption Agreement

Exhibit D    Form of Cover Sheet

- 11 -

## EXHIBIT A

### FORM OF FINANCIAL INSTRUMENT

## FINANCIAL INSTRUMENT

This Financial Instrument is delivered as provided in Section 1 of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). This Financial Instrument is effective as of the Effective Date. All of the capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Commitment.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Servicer agrees as follows:

1.   Purchase Price Consideration; Services. This Financial Instrument is being purchased by Fannie Mae pursuant to Section 4 of the Commitment in consideration for the payment by Fannie Mae, in its capacity as a financial agent of the United States, of various payments detailed in the Program Documentation and referred to collectively in the Commitment as the "Purchase Price." The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of this Financial Instrument and the Commitment by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement. Servicer shall perform all Services in consideration for the Purchase Price in accordance with the terms and conditions of the Agreement, to the reasonable satisfaction of Fannie Mae and Freddie Mac.

2.   Authority and Agreement to Participate in Program. Subject to the limitations set forth in Section 2 of the Agreement, Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority and to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any loan modification under the Program.

3.   Audits, Reporting and Data Retention.

  (a)   Freddie Mac, the Federal Housing Finance Agency and other parties designated by the Treasury or applicable law shall have the right during normal business hours to conduct unannounced, informal onsite visits and to conduct formal onsite and offsite physical, personnel and information technology testing, security reviews, and audits of Servicer and to examine all books, records and data related to the Services provided and Purchase Price received in connection with the Program on thirty (30) days' prior written notice.

  (b)   Servicer will collect, record, retain and provide to Treasury, Fannie Mae and Freddie Mac all data, information and documentation relating to the Program and borrowers, loans and loan modifications implemented, or potentially eligible for modification, under the Program and any trials conducted in connection with the Program, as required by the Program Documentation. All such data, information and documentation must be provided to the Treasury, Fannie Mae and Freddie Mac as, when and in the manner specified in the Program Documentation. In addition, Servicer shall provide copies of executed contracts and tapes of loan pools related to the Program for review upon request.

  (c)   Servicer shall promptly take corrective and remedial actions associated with reporting and reviews as directed by Fannie Mae or Freddie Mac and provide to Fannie Mae and Freddie Mac such evidence of the effective implementation of corrective and remedial actions as Fannie Mae and Freddie Mac shall reasonably require. Freddie Mac may conduct additional reviews based on its findings and the corrective actions taken by Servicer.

- 1 -

(d)  In addition to any other obligation to retain financial and accounting records that may be imposed by Federal or state law, Servicer shall retain all information described in Section 3(b), and all data, books, reports, documents, audit logs and records, including electronic records, related to the performance of Services in connection with the Program. In addition, Servicer shall maintain a copy of all computer systems and application software necessary to review and analyze these electronic records. Unless otherwise directed by Fannie Mae or Freddie Mac, Servicer shall retain these records for at least 7 years from the date the data or record was created, or for such longer period as may be required pursuant to applicable law. Fannie Mae or Freddie Mac may also notify Servicer from time to time of any additional record retention requirements resulting from litigation and regulatory investigations in which the Treasury or any agents of the United States may have an interest, and Servicer agrees to comply with these litigation and regulatory investigations requirements.

4.   Internal Control Program.

(a)  Servicer shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to: (i) ensure effective delivery of Services in connection with the Program and compliance with the Program Documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws. The internal control program must include documentation of the control objectives for Program activities, the associated control techniques, and mechanisms for testing and validating the controls.

(b)  Servicer shall provide Freddie Mac with access to all internal control reviews and reports that relate to Services under the Program performed by Servicer and its independent auditing firm to enable Freddie Mac to fulfill its duties as a compliance agent of the United States; a copy of the reviews and reports will be provided to Fannie Mae for record keeping and other administrative purposes.

5.   Representations, Warranties and Covenants.  Servicer makes the following representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury, the truth and accuracy of which are continuing obligations of Servicer. In the event that any of the representations, warranties, or covenants made herein cease to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

(a)  Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer has full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

(b)  Servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights.  Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound,

- 2 -

provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith.

(c)   Servicer covenants that: (i) it will perform its obligations in accordance with the Agreement and will promptly provide such performance reporting as Fannie Mae may reasonably require; (ii) all mortgage modifications and all trial period modifications will be offered to borrowers, fully documented and serviced in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that is relied upon by Fannie Mae or Freddie Mac in calculating the Purchase Price or in performing any compliance review will be true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

(d)   Servicer covenants that it will: (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation may require changes to, or the augmentation of, its systems, staffing and procedures, and covenants and agrees to take all actions necessary to ensure it has the capacity to implement the Program in accordance with the Agreement.

(e)   Servicer covenants that it will comply with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

(f)   Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

(g)   Servicer covenants to disclose to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

(h)   Servicer covenants that it will timely inform Fannie Mae and Freddie Mac of any anticipated Event of Default.

- 3 -

(i) Servicer acknowledges that Fannie Mae or Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer covenants that it will respond promptly and accurately to all search requests made by Fannie Mae or Freddie Mac, comply with any related procedures which Fannie Mae or Freddie Mac may establish, and provide related training to employees and contractors. In connection with Privacy Act inquiries, Servicer covenants that it will provide updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

(j) Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer covenants that it will provide such additional customer service call support as Fannie Mae reasonably determines is necessary to support the Program.

(k) Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer covenants that it will fully and promptly cooperate with Fannie Mae's inquiries about loan modification fraud and legal compliance and comply with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac may require. Servicer covenants that it will develop and implement an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of this Financial Instrument and acknowledges that the internal control program will be monitored, as provided in such Section.

(l) Servicer shall sign and deliver an Annual Certification to Fannie Mae and Freddie Mac beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term, in the form attached as Exhibit B to the Agreement.

6. Use of Contractors. Servicer is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Program. Servicer shall remove and replace any contractor that fails to perform. Servicer shall ensure that all of its contractors comply with the terms and provisions of the Agreement. Servicer shall be responsible for the acts or omissions of its contractors as if the acts or omissions were by the Servicer.

7. Data Rights.

(a) For purposes of this Section, the following definitions apply:

(i) "Data" means any recorded information, regardless of form or the media on which it may be recorded, regarding any of the Services provided in connection with the Program.

(ii) "Limited Rights" means non-exclusive rights to, without limitation, use, copy, maintain, modify, enhance, disclose, reproduce, prepare derivative works, and distribute, in any manner, for any purpose related to the administration, activities, review, or audit of, or public reporting regarding, the Program and to permit others to do so in connection therewith.

- 4 -

(iii)  "NPI" means nonpublic personal information, as defined under the GLB.

(iv)  "GLB" means the Gramm-Leach-Bliley Act, 15 U.S.C. 6801-6809.

(b)  Subject to Section 7(c) below, Treasury, Fannie Mae and Freddie Mac shall have Limited Rights, with respect to all Data produced, developed, or obtained by Servicer or a contractor of Servicer in connection with the Program, provided, however, that NPI will not be transferred by Fannie Mae in violation of the GLB and, provided, further, that Servicer acknowledges and agrees that any use of NPI by, the distribution of NPI to, or the transfer of NPI among, Federal, state and local government organizations and agencies does not constitute a violation of the GLB for purposes of the Agreement. If requested, such Data shall be made available to the Treasury, Fannie Mae, or Freddie Mac upon request, or as and when directed by the Program Documentation, in industry standard useable format.

(c)  Servicer expressly consents to the publication of its name as a participant in the Program, and the use and publication of Servicer's Data, subject to applicable state and federal laws regarding confidentiality, in any form and on any media utilized by Treasury, Fannie Mae or Freddie Mac, including, but not limited to, on any website or webpage hosted by Treasury, Fannie Mae, or Freddie Mac, in connection with the Program, provided that no Data placed in the public domain will: (i) contain the name, social security number, or street address of any borrower or other information that would allow the borrower to be identified; or, (ii) if presented in a form that links the Servicer with the Data, include information other than program performance and participation related statistics such as the number of modifications, performance of modifications, characteristics of the modified loans, or program compensation or fees, with any information about any borrower limited to creditworthiness characteristics such as debt, income, and credit score. In any Data provided to an enforcement or supervisory agency with jurisdiction over the Servicer, these limitations on borrower information do not apply.

8.    <u>Publicity and Disclosure.</u>

(a)  Servicer shall not make use of any Treasury name, symbol, emblem, program name, or product name, in any advertising, signage, promotional material, press release, Web page, publication, or media interview, without the prior written consent of the Treasury.

(b)  Servicer shall not publish, or cause to have published, or make public use of Fannie Mae's name, logos, trademarks, or any information about its relationship with Fannie Mae without the prior written permission of Fannie Mae, which permission may be withdrawn at any time in Fannie Mae's sole discretion.

(c)  Servicer shall not publish, or cause to have published, or make public use of Freddie Mac's name (i.e., "Freddie Mac" or "Federal Home Loan Mortgage Corporation"), logos, trademarks, or any information about its relationship with Freddie Mac without the prior written permission of Freddie Mac, which permission may be withdrawn at any time in Freddie Mac's sole discretion.

9.    <u>Limitation of Liability.</u> IN NO EVENT SHALL FANNIE MAE, THE TREASURY, OR FREDDIE MAC, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR AFFILIATES BE LIABLE TO SERVICER WITH RESPECT TO THE PROGRAM OR THE AGREEMENT, OR FOR ANY

- 5 -

ACT OR OMISSION OCCURRING IN CONNECTION WITH THE FOREGOING, FOR ANY DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO DIRECT DAMAGES, INDIRECT DAMAGES, LOST PROFITS, LOSS OF BUSINESS, OR OTHER INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY NATURE OR UNDER ANY LEGAL THEORY WHATSOEVER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER OR NOT THE DAMAGES WERE REASONABLY FORESEEABLE; PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT LIMIT FANNIE MAE'S OBLIGATION TO REMIT PURCHASE PRICE PAYMENTS TO SERVICER IN ITS CAPACITY AS FINANCIAL AGENT OF THE UNITED STATES IN ACCORDANCE WITH THE AGREEMENT.

10.  <u>Indemnification</u>.  Servicer shall indemnify, hold harmless, and pay for the defense of Fannie Mae, the Treasury and Freddie Mac, and their respective officers, directors, employees, agents and affiliates against all claims, liabilities, costs, damages, judgments, suits, actions, losses and expenses, including reasonable attorneys' fees and costs of suit, arising out of or resulting from: (a) Servicer's breach of Section 5 (Representations, Warranties and Covenants) of this Financial Instrument; (b) Servicer's negligence, willful misconduct or failure to perform its obligations under the Agreement; or (c) any injuries to persons (including death) or damages to property caused by the negligent or willful acts or omissions of Servicer or its contractors. Servicer shall not settle any suit or claim regarding any of the foregoing without Fannie Mae's prior written consent if such settlement would be adverse to Fannie Mae's interest, or the interests of the Treasury or Freddie Mac. Servicer agrees to pay or reimburse all costs that may be incurred by Fannie Mae and Freddie Mac in enforcing this indemnity, including attorneys' fees.

IN WITNESS WHEREOF, Servicer hereby executes this Financial Instrument on the date set forth below.

CitiMortgage, Inc.:

_____     April 13, 2009
Paul R. Ince                                            Date
Chief Financial Officer

- 6 -

- 106 -

**EXHIBIT B**

**FORM OF ANNUAL CERTIFICATION**

## ANNUAL CERTIFICATION

This Annual Certification is delivered as provided in Section 1.B. of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), effective as of [INSERT], by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). All terms used, but not defined herein, shall have the meanings ascribed to them in the Commitment.

Servicer hereby certifies, as of [INSERT DATE ON WHICH CERTIFICATION IS GIVEN], that:

1.      Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer had full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

2.      Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made all governmental approvals or registrations required under law and has obtained all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement has not conflicted with, or been prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, except to the extent of any contractual limitations under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and has promptly notified Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debts or obligations that are being contested in good faith.

3.      (i) Servicer has performed its obligations in accordance with the Agreement and has promptly provided such per formance reporting as Fannie Mae and Freddie Mac have reasonably required; (ii) all mortgage modifications and all trial period modifications have been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that was relied upon by Fannie Mae and Freddie Mac in calculating the Purchase Price and in performing any compliance review, was true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

4.      Servicer has: (i) performed the Services required under the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) used qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation required changes to, or the augmentation of, its systems, staffing and procedures; Servicer took all actions necessary to ensure that it had the capacity to implement the Program in accordance with the Agreement.

5.      Servicer has complied with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

6.      Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer has disclosed to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

- 2 -

7.      Servicer has disclosed to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

8.      Servicer acknowledges that Fannie Mae and Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer has responded promptly and accurately to all search requests made by Fannie Mae and Freddie Mac, complied with any related procedures which Fannie Mae and Freddie Mac have established, and provided related training to employees and contractors.  In connection with Privacy Act inquiries, Servicer has provided updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

9.      Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer.  Servicer has provided such additional customer service call support as Fannie Mae has reasonably requested to support the Program.

10.      Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws.  Servicer has fully and promptly cooperated with Fannie Mae's inquiries about loan modification fraud and legal compliance and has complied with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac have required. Servicer has developed and implemented an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of the Financial Instrument.

In the event that any of the certifications made herein are discovered not to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

[INSERT FULL LEGAL NAME OF SERVICER]:

[Name of Authorized Official]                                      Date
[Title of Authorized Official]

-3-

<u>EXHIBIT C</u>

<u>FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") is entered into as of [INSERT DATE] by and between [INSERT FULL LEGAL NAME OF ASSIGNOR] ("Assignor") and [INSERT FULL LEGAL NAME OF ASSIGNEE] ("Assignee"). All terms used, but not defined, herein shall have the meanings ascribed to them in the Underlying Agreement (defined below).

WHEREAS, Assignor and Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), are parties to a Commitment to Purchase Financial Instrument and Servicer Participation Agreement, a complete copy of which (including all exhibits, amendments and modifications thereto) is attached hereto and incorporated herein by this reference (the "Underlying Agreement");

WHEREAS, Assignor has agreed to assign to Assignee: (i) all of its rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on the schedule attached hereto as Schedule 1 ("Schedule 1") and/or (ii) certain other rights and obligations under the Underlying Agreement that are identified on Schedule 1; and

WHEREAS, Assignee has agreed to assume the mortgage loans and other rights and obligations under the Underlying Agreement identified on Schedule 1.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignment. Assignor hereby assigns to Assignee all of Assignor's rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

2. Assumption. Assignee hereby accepts the foregoing assignment and assumes all of the rights and obligations of Assignor under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

3. Effective Date. The date on which the assignment and assumption of rights and obligations under the Underlying Agreement is effective is [INSERT EFFECTIVE DATE OF ASSIGNMENT/ASSUMPTION].

4. Successors. All future transfers and assignments of the mortgage loans, rights and obligations transferred and assigned hereby are subject to the transfer and assignment provisions of the Underlying Agreement. This Assignment and Assumption Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of the parties hereto.

5. Counterparts. This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, but all of which together constitute one and the same instrument.

- 1 -

IN WITNESS WHEREOF, Assignor and Assignee, by their duly authorized officials, hereby execute and deliver this Assignment and Assumption Agreement, together with Schedule 1, effective as of the date set forth in Section 3 above.

ASSIGNOR: [INSERT FULL LEGAL NAME OF ASSIGNOR]     ASSIGNEE: [INSERT FULL LEGAL NAME OF ASSIGNEE]

By:_____     By:_____
Name:_____     Name:_____
Title:_____     Title:_____
Date:_____     Date:_____

- 2 -

- 112 -

## SCHEDULE 1

### To

### ASSIGNMENT AND ASSUMPTION AGREEMENT

- 3 -

**EXHIBIT D**

**FORM OF COVER SHEET**

**2**

**HELPING YOU STAY IN YOUR HOME.**

 MAKING HOME AFFORDABLE

*You may be able to make your payments more affordable.*
*Act now to get the help you need!*



June 18, 2009

PEDRO BETANCOURT
REDACTED

Loan #:               REDACTED
Property Address:

Dear PEDRO BETANCOURT,

**You may qualify for a Home Affordable Modification Trial Period Plan – a way to make your payment more affordable.**

We have enclosed a customized Home Affordable Modification Trial Period Plan (*"Trial Period Plan"*). If you qualify under the federal government's Home Affordable Modification Program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure.

## STEP 1  PROVIDE THE INFO WE NEED TO HELP YOU

Detailed instructions on what you need to do to take advantage of this offer are set forth on the enclosed document entitled "Complete Your Checklist." Generally, you will need to:

- *Explain the financial hardship that makes it difficult for you to pay your mortgage loan using the Hardship Affidavit (enclosed).*
- *Submit the required documentation of your income.*
- *Make timely monthly trial period payments.*

The monthly trial period payments are based on the income information that you previously provided to us. They are also our estimate of what your payment will be IF we are able to modify your loan under the terms of the program. If your income documentation does not support the income amount that you previously provided in our discussions, two scenarios can occur:

1) Your monthly payment under the Trial Period Plan may change
2) You may not qualify for this loan modification program

If you do not qualify for a loan modification, we will work with you to explore other options available to help you keep your home or ease your transition to a new home.

## STEP 2  LET US KNOW THAT YOU ACCEPT THIS OFFER

Please let us know no later than 7/8/2009 that you accept the Trial Period Plan. Now is the time to act. We are ready to help you. Please take the steps outlined on the enclosed document "Complete Your Checklist." If you have any questions, please contact us at 1-866-272-4749.

Sincerely,
CitiMortgage Inc.

The *Making Home Affordable* program was created to help millions of homeowners refinance or modify their mortgages. As part of this program, we – your mortgage servicer – and the Federal Government are working to offer you options to help you stay in your home.

Attachments:   Complete Your Checklist, Important Program Info, Frequently Asked Questions, Two copies of the Trial Period Plan, Hardship Affidavit, and IRS Form 4506-T

C1SL-808-0028

**COMPLETE YOUR CHECKLIST** [Here is the information you need to help you modify your mortgage payments]

## Act Now!

To accept this offer, and see if you qualify for a Home Affordable Modification, send the 5 items listed below to CitiMortgage Inc., HAM Program, Mail Stop 0008, 5280 Corporate Drive, Mail Frederick, MD 21737, no later than 7/8/2009. Use the return envelope provided for your convenience.

☑ 1. Two copies of the enclosed Trial Period Plan signed by all borrowers.

☑ 2. Your first month's trial period payment in the amount of $2275.4.

☑ 3. The enclosed Hardship Affidavit completed and signed by all borrowers (no notary required).

☑ 4. A signed and dated copy of the IRS Form 4506-T (Request for Transcript of Tax Return) for each borrower (borrowers who filed their tax returns jointly may send in one IRS Form 4506-T signed and dated by both of the joint filers), and

☑ 5. Documentation to verify all of the income of each borrower (including any alimony or child support that you choose to rely upon to qualify). This documentation should include:

    For each borrower who is a salaried employee:
    ☐ Copy of the most recent filed federal tax return with all schedules; and
    ☐ Copy of the two most recent pay stubs.

    For each borrower who is self-employed:
    ☐ Copy of the most recent filed federal tax return with all schedules, and
    ☐ Copy of the most recent quarterly or year-to-date profit/loss statement.

    For each borrower who has income such as social security, disability or death benefits, pension, public assistance, or unemployment:
    ☐ Copy of most recent federal tax return with all schedules and W-2 or copies of two most recent bank statements.
    ☐ Copy of benefits statement or letter from the provider that states the amount, frequency and duration of the benefit. Social security, disability, death or pension benefits must continue for at least 3 years to be considered qualifying income under this program. Public assistance or unemployment benefits must continue for at least 9 months to be considered qualifying income under this program.

    For each borrower who is relying on alimony or child support as qualifying income:
    ☐ Copy of divorce decree, separation agreement or other written agreement or decree that states the amount of the alimony or child support and period of time over which it will be received. Payments must continue for at least 3 years to be considered qualifying income under this program.
    ☐ Proof of full, regular and timely payments; for example deposit slips, bank statements, court verification or filed federal tax return with all schedules.

    For each borrower who has rental income:
    ☐ Copies of most recent two years filed federal tax returns with all schedules, including Schedule E— Supplement Income and Loss. Rental income for qualifying purposes will be 75% of the gross rent.

If you have other types of income, cannot locate required documents, or have questions about the documentation required, please contact us at 1-866-413-4580.

You must send in both signed copies of the Trial Period Plan, all required income documentation, and your first trial period payment by this date 7/8/2009. If you cannot provide this documentation within the time frame provided, please contact us to request an extension of time to gather your documents.

Keep a copy of all documents for your records. Don't send original income documentation as copies are acceptable.

Your remaining trial period payments in the amount of $2275.4 per month will be due on or before 8/8/2009, 9/8/2009, NA. These payments should be sent instead of, not in addition to, your normal monthly mortgage payment. If the trial period payments are made in amounts different from the amount stated your loan may not be modified.

C1SL-009-02-8

If you cannot afford the trial period payments shown above, but want to remain in your home, or if you want to leave your home and avoid foreclosure, please call us at 1-866-272-4749. We may be able to help you.

**IMPORTANT PROGRAM INFO**

NO FEES. There are no fees under the Home Affordable Modification Program.

TRIAL PERIOD PLAN/MODIFICATION AGREEMENT. The Trial Period Plan is the first step. Once we are able to confirm your income and eligibility for the program, we will finalize your modified loan terms and send you a loan modification agreement ("Modification Agreement"), which will reflect the terms of your modified loan. In addition to successfully completing the trial period, you will need to sign and promptly return to us both copies of the Modification Agreement or your loan can not be modified.

NEW PRINCIPAL BALANCE. Past due amounts as of the end of the trial period, including unpaid interest, real estate taxes, insurance premiums and certain assessments paid on your behalf to a third party, will be added to your mortgage loan balance (the "Past Due Arrearage Amount"). If you fulfill the terms of the trial period including, but not limited to, making the trial period payments, we will waive ALL unpaid late charges at the end of the trial period.

ESTIMATED MONTHLY PAYMENT. At this time, we are not able to calculate precisely the Past Due Arrearage Amount or the amount of the modified loan payment that will be due after successful completion of the trial period. However, based on information we currently have, your trial period payment should be close to your modified loan payment. As we near the end of the trial period, we will calculate any past due amount to determine your new permanent monthly payment and other modified loan terms.

ESCROW ACCOUNT. The terms of your Trial Period Plan and your Modification Agreement will require the servicer to set aside a portion of your new monthly payment in an escrow account for payment of your property taxes, insurance premiums and other required fees. Your current loan may also require escrows. If it does not, the previous waiver of escrows is cancelled under your Trial Period Plan *CitiMortgage, Inc.* will draw on this account to pay your real estate taxes and insurance premiums as they come due. Please note that your escrow payment amount will adjust if your taxes, insurance premiums and/or assessment amounts change, so the amount of your monthly payment that the servicer must place in escrow will also adjust as permitted by law. This means that your monthly payment may change. Your initial monthly escrow payment will be $594.

ESCROW SHORTAGE. Due to the timing of your tax and insurance payments, we have estimated that there may be a shortage of funds in your escrow account. In the event there is an escrow shortage, you may either pay it over a five year (60 months) period or pay it in a lump sum. The estimated monthly payment stated above includes an amount to pay the escrow shortage over a five year period. If you wish to pay the total estimated shortage in a lump sum, please contact us.

BORROWER INCENTIVE. If your monthly mortgage payment (principal, interest, property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees, as applicable, but excluding mortgage insurance) is reduced through the Home Affordable Modification Program by six percent or more and if you make your monthly mortgage payments on time, you will accrue a monthly benefit equal to the lesser of: (i) $83.33 or (ii) one-half of the reduction in your monthly mortgage payment. As long as your mortgage loan does not become 90 days delinquent, we will apply your accrued monthly benefit to your mortgage loan and reduce your principal balance after each of the first through fifth anniversaries of the month in which the Trial Period Plan is executed. If your modified mortgage loan ever becomes 90 days delinquent, you will lose all accrued but unapplied principal reduction benefits and will no longer be eligible to accrue additional principal reduction benefits even if the mortgage loan is later brought current.

CREDIT COUNSELING. If you have very high levels of debt you will be required to obtain credit counseling under the Home Affordable Modification Program.

CREDIT REPORTING. During the trial period, we may report your loan as delinquent to the credit reporting agencies even if you make your trial period payments on time. However, after your loan is modified, we will only report the loan as delinquent if the modified payment is not received in a timely manner.

C1SL-800-02-8

**FREQUENTLY ASKED QUESTIONS**

Q. How long will it take to process my modification request and determine if I qualify for the program?

It may take up to 30-45 days for us to receive and review your documents. We will process your modification request as quickly as possible. Please note, however, that your modification will not be effective unless you meet all of the applicable conditions, including making all trial period payments.

Q. What if my trial period payment is less than the payment I currently owe on my loan?

We will add the difference between the monthly payment that you currently owe on your loan and the trial period payment to your loan balance and allow you to pay it over the remainder of the modified loan term.

Q. What do you do with my first trial period payment if I do not qualify for the program?

Your first trial payment will be applied to your existing loan in accordance with the terms of your loan documents. If you don't qualify for the program, we will help you evaluate other options to help you keep your home or ease your transition to a new home.

Q. Will a foreclosure occur if I participate in the Home Affordable Modification Program?

As long as you comply with the terms of the Trial Period Plan, we will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started. If you fail to comply with the terms of the Trial Period Plan and do not make other arrangements, your loan will be enforced according to its original terms, which could include foreclosure.

Q. What happens to my trial period payments if I do not comply with the terms of the Trial Period Plan?

Your trial period payments will be applied to your existing loan according to the terms of your loan documents.

Q. If I get a Home Affordable Modification, can my modified loan terms ever revert to the original loan terms?

No. This is one of the advantages of the Home Affordable Modification Program. Once your loan is modified, the new terms stay in place for the remainder of your loan.

Q. Do all borrowers have to sign the Trial Period Plan and other documents?

Unless a borrower or co-borrower is deceased, all borrowers who signed the original loan documents or their duly authorized representative(s) must sign the Trial Period Plan, the Modification Agreement and all other required modification documents. Contact your servicer if it would be difficult or impossible for you to comply with this requirement.

Q. Could my trial period payment be more than my current payment?

Yes. For example, if your current payment does not include an escrow payment and you are now required to make monthly escrow payments, your trial period payment could be higher than your current payment. Note, however, that the increase in your payment under these circumstances would be offset by other tax and insurance bills you would no longer have to pay directly as we will pay those for you out of your escrow account.

C1SL-309-02-8



**3**

# HELPING YOU STAY IN YOUR HOME.

You may be able to make your payments more affordable.
**Act now to get the help you need!**

**Investor Loan #:** ▮▮▮▮▮▮▮▮

## HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN
### (Step One of Two-Step Documentation Process)

Trial Period Plan Effective Date (Beginning of Trial Period):   08  |  08  |  09

Borrower ("I"):   PEDRO BETANCOURT

Lender ("Lender"):   CitiMortgage, Inc.

Date of first lien Security Instrument ("Mortgage") and Note ("Note"):   07 | 20 | 07

Loan Number:   ▮▮▮▮▮▮▮

Property Address ("Property"):   ▮▮▮▮▮▮▮▮▮

City:   AMERICAN CANYON      State:   CA      Zip:   94503

If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Plan and not defined have the meaning given to them in the Loan Documents.

If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income (except that I understand that I am not required to disclose any child support or alimony unless I wish to have such income considered) to determine whether I qualify for the offer described in this Plan (the "Offer"). I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

1. **My Representations.**  I certify, represent to Lender and agree:

   A.  I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

   B.  I live in the Property as my principal residence, and the Property has not been condemned;

   C.  There has been no change in the ownership of the Property since I signed the Loan Documents;

   D.  I am providing or already have provided documentation for all income that I receive (and I understand that I am not required to disclose any child support or alimony that I receive, unless I wish to have such income considered to qualify for the Offer);

   E.  Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct; and

   F.  If Lender requires me to obtain credit counseling, I will do so.

   "If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I". For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

   *Citi never sleeps*

   citi

Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3156   3/09 (rev. 3/09) HAMP_MOD_00 (rev 4/29/09)

**Trial Period Plan**

2.   The Trial Period Plan. On or before each of the following due dates, I will pay the Lender the amount set forth below ("Trial Period Payment"), which includes payment for Escrow Items, including real estate taxes, insurance premiums and other fees, if any, of U.S. $ 2275.4

| Trial Period Payment # | Trial Period Payment | Due Date On or Before |
|---|---|---|
| 1 | $ 2275.4 | 07 \| 08 \| 09 |
| 2 | $ 2275.4 | 08 \| 00 \| 09 |
| 3 | $ 2275.4 | 09 \| 08 \| 09 |
| 4 | $ NA | NA \| NA \| NA |

The Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which will be finalized in accordance with Section 3 below.

During the period (the "Trial Period") commencing on the Trial Period Effective Date and ending on the earlier of (i) the first day of the month following the month in which the last Trial Period Payment is due (the "Modification Effective Date") or (ii) termination of this Plan, I understand and acknowledge that:

A.   TIME IS OF THE ESSENCE under this Plan;

B.   Except as set forth in Section 2.C. below, the Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan, but any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended if this Plan terminates, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action, all rights to such notices being hereby waived to the extent permitted by applicable law;

C.   If my property is located in Georgia, Hawaii, Missouri, or Virginia and a foreclosure sale is currently scheduled, the foreclosure sale will not be suspended and the Lender may foreclose if I have not made each and every Trial Period Payment that is due before the scheduled foreclosure sale. If a foreclosure sale occurs pursuant to this Section 2.C., this agreement shall be deemed terminated;

D.   The Lender will hold the payments received during the Trial Period in a non-interest bearing account until they total an amount that is enough to pay my oldest delinquent monthly payment on my loan in full. If there is any remaining money after such payment is applied, such remaining funds will be held by the Lender and not posted to my account until they total an amount that is enough to pay the next oldest delinquent monthly payment in full;

E.   When the Lender accepts and posts a payment during the Trial Period it will be without prejudice to, and will not be deemed a waiver of, the acceleration of the loan or foreclosure action and related activities and shall not constitute a cure of my default under the Loan Documents unless such payments are sufficient to completely cure my entire default under the Loan Documents;

F.   If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate. In this event, the Lender will have all of the rights and remedies provided by the Loan Documents, and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and shall not be refunded to me; and

G.   I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan. If under the Lender's procedures a title endorsement or subordination agreements are required to ensure that the modified mortgage Loan retains its first lien position and is fully enforceable, I understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents or execute the Modification Agreement if the Lender has not received acceptable title endorsement and/or subordination agreements from other lien holders, as Lender determines necessary.

citi

**Trial Period Plan**

3. **The Modification.** I understand that once Lender is able to determine the final amounts of unpaid interest and any other delinquent amounts (except late charges) to be added to my loan balance and after deducting from my loan balance any remaining money held at the end of the Trial Period under Section 2.D. above, the Lender will determine the new payment amount. If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date. If the Loan Documents provide that the note and mortgage may be assumed by a transferee of an interest in the property, the Modification Agreement will provide that, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. Upon execution of a Modification Agreement by the Lender and me, this Plan shall terminate and the Loan Documents, as modified by the Modification Agreement, shall govern the terms between the Lender and me for the remaining term of the loan.

4. **Additional Agreements.** I agree to the following:

   A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Plan, unless a borrower or co-borrower is deceased or the Lender has waived this requirement in writing.

   B. To comply, except to the extent that they are modified by this Plan, with all covenants, agreements, and requirements of Loan Documents, including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my loan.

   C. That this Plan constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my Escrow Account. If the Loan Documents do not currently have Escrow Account provisions, such Escrow Account provisions, including such provisions as determined necessary to conform the Loan Documents to industry standards, shall be added in the Modification Agreement.

   D. That all terms and provisions of the Loan Documents remain in full force and effect; nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents. The Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Documents.

   E. Intentionally blank.

   F. That Lender will collect and record personal information such as my name, address, telephone number, social security number, credit score, income, payment history, and information about account balances and activity. I understand and consent to the disclosure of my personal information by Lender to the U.S. Department of Treasury, Fannie Mae and Freddie Mac in connection with the Home Affordable Modification program.

In Witness Whereof, the Lender and I have executed this Plan.

_____   _____ (Seal)
Lender                             Borrower

                                   07/02/09
By _____   _____
                                   Date

                                   _____ (Seal)
Date _____   Borrower

                                   07/03/09
                                   _____
                                   Date

Page 3 of 3                                                    citi

- 121 -

## DECLARATION OF SERVICE BY CM/ECF AND/OR MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, employed in the County of Los Angeles, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is One California Plaza, 300 South Grand Avenue, Suite 3900, Los Angeles, California 90071-3149.

2.     Declarant hereby certifies that on January 19, 2012, declarant served the CONSOLIDATED AMENDED CLASS ACTION COMPLAINT by electronically filing the foregoing document listed above by using the Case Management/ Electronic Case filing system.

3.     Declarant further certifies:

☐     All participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system

☒     Participants in the case who are registered CM/ECF users will be served by the court's CM/ECF system.   Participants in the case that are not registered CM/ECF users will be served by First-Class Mail, postage pre-paid or have dispatched to a third-party commercial carrier for delivery to the non-CM/ECF participants.

4.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of January, 2011, at Los Angeles, California.

ELIZABETH VILLALOBOS LOPEZ

- 93 -

## CitiMortgage

Case No. 11-ml-2274 DSF (PLAx)
MDL Case No. 2274

| | |
|---|---|
| JEFF S. WESTERMAN<br>DAVID AZAR<br>CHRISTIAN KEENEY<br>MILBERG LLP<br>One California Plaza<br>300 S. Grand Avenue, Suite 3900<br>Los Angeles, CA 90071<br>(213) 617-1200<br>(213) 617-1975 - facsimile<br>jwesterman@milberg.com<br>dazar@milberg.com<br>ckeeney@milberg.com | **Counsel for Plaintiffs: Beverly King, Nancy Glennon, Hanna Bernard, Carla Chui, Maurizio Verdini, Maria Betancourt, Pedro Betancourt, and Elizabeth Daniel**<br>C.D. California, No. 2: 10-cv-03792-DSF-PLA |
| Andrei V. Rado<br>Jessica J. Sleater<br>Jerome M. Congress<br>MILBERG LLP<br>One Pennsylvania Plaza, 49th Floor<br>New York, NY 10119<br>(212) 594-5300<br>(212) 868-1229 - facsimile<br>arado@milberg.com<br>jsleater@milberg.com<br>jcongress@milberg.com | |
| Rosemary M. Rivas<br>Danielle A. Stoumbos<br>FINKELSTEIN THOMPSON LLP<br>100 Bush Street, Suite 1450<br>San Francisco, California 94104<br>(415) 398-8700<br>(415) 398-8704 - facsimile<br>rrivas@finkelsteinthompson.com<br>dstoumbos@finkelsteinthompson.com | **Counsel for Hanna Bernard, Carla Chui, Maurizio Cerdini, and Elizabeth Daniel** |
| Tracy D. Rezvani<br>FINKELSTEIN THOMPSON LLP<br>1050 30th St. NW<br>Washington DC 20007<br>(202) 337-8000<br>(202) 337-8090 - facsimile<br>trezvani@finkelsteinthompson.com | |

- 94 -

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| Andrew J. Garcia<br>Carlin J. Phillips<br>PHILLIPS & GARCIA, P.C.<br>13 Ventura Drive<br>Dartmouth, MA 02747<br>(508) 998-0800<br>(508) 998-0919 – facsimile<br>agarcia@phillipsgarcia.com<br>cphillips@phillipsgarcia.com | |
| James C. Sturdevant<br>Whitney Huston<br>THE STURDEVANT LAW FIRM<br>354 Pine Street, 4th Floor<br>San Francisco, CA 94104<br>(415) 477-2410<br>(415) 477-2420 - facsimile<br>jsturdevant@sturdevantlaw.com<br>whuston@sturdevantlaw.com | |
| Maeve Elise Brown<br>Elizabeth S. Letcher<br>Noah Zinner<br>Cynthia Singerman<br>HOUSING AND ECONOMIC RIGHTS<br>ADVOCATES<br>1814 Franklin Street, Suite 1040<br>Oakland, CA 94612<br>(510) 271-8443<br>(510) 868-4521- facsimile<br>melisebrown@heraca.org<br>eletcher@heraca.org<br>csingerman @heraca.org | |
| Gene Joseph Stonebarger<br>STONEBARGER LAW<br>75 Iron Point Circle, Suite 145<br>Folsom, CA 95630<br>(916) 235-7141<br>(916) 235-7141 - facsimile<br>gstonebarger@stonebargerlaw .com | **Counsel for Plaintiff: Balbir Singh**<br>E.D. California, No. 2: 11-cv-00793-KJM-GGH |
| Mark Richard Miller<br>WEXLER WALLACE LLP<br>55 W. Monroe Street *3300<br>Chicago, IL 60603<br>(312) 346-2222<br>(312) 346-0022 - facsimile<br>rnrm@wexlerwallace.com | **Counsel for Plaintiffs: Leslie Barry, John Petrides, and Maria Petrides**<br>N.D. Illinois, No. 1: 11-cv-02918 |
| Sherrie R. Savett<br>Russell D. Paul<br>Eric Lechtzin<br>BERGER & MONTAGUE, PC | |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| 1622 Locust Street<br>Philadelphia, PA 19103<br>(215) 875-3000<br>(215) 875-5715 - facsimile<br>ssavett@bm.net<br>rpaul@bm.net<br>elechtzin@bm.net | |
| Mark J. Tamblyn<br>WEXLER WALLACE LLP<br>455 Capitol Mall, Suite 231<br>Sacramento, CA 95814<br>(916) 492-1100<br>(916) 492-1124<br>mjt@wexlerwallace.com | |
| Alexandra C. Warren<br>Brendan S. Thompson<br>Charles J. LaDuca<br>Matthew L. Wiener<br>CUNEO GILBERT & LADUCA LLP<br>507 C Street NE<br>Washington DC 20002<br>(202) 789-3960<br>(202) 789-1813 - facsimile<br>awarren@cuneolaw.com<br>brendant@cuneolaw.com<br>charles@cuneolaw.com<br>wiener_matthew@yahoo.com | **Counsel for Plaintiff: Brian Costigan**<br>S.D. New York, No. 1:10-cv-08776-SAS |
| Preetpal Grewal<br>CUNEO GILBERT & LADUCA LLP<br>Rockefeller Center<br>620 Fifth Avenue<br>New York, NY 10020<br>(202) 789-3960<br>(202) 789-1813 - facsimile<br>pgrewal@cuenolaw.com | |
| Gerald W. Crawford<br>Nicholas J. Mauro<br>CRAWFORD QUILTY & MAURO LAW FIRM<br>1701 Ruan Center<br>666 Grand Avenue<br>Des Moines, IA 50309<br>(515) 245-5420<br>(515) 245-5421- facsimile<br>crawford@crawfordlawfirm.com<br>mauro@crawfordlawfirm.com | |
| Robert Shelquist<br>LOCKRIDGE GRINDAL & NAUEN PLLP<br>100 Washington Ave S., Suite 2200 | |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| Minneapolis, MN 55401<br>(612) 339-6900<br>Facsimile:  (612) 339-0981<br>Email: rkshelquist@locklaw.com | |
| Lawrence J Friscia<br>FRISCIA & ASSOCIATES LLC 17<br>Academy Street, Penthouse<br>Newark, NJ 07102<br>Telephone: (973) 500-8024<br>Facsimile:  (888) 809-3747<br>Email: lawrence.friscia@friscialaw.com | |
| David Ian Greenberger<br>Matthew James McDonald<br>LIDDLE & ROBINSON LLP<br>800 Third Avenue, 8th Floor<br>New York, NY 10022<br>Telephone: (212) 687-8500<br>Facsimile:  (212) 687-1505<br>Email: dgreenberger@liddlerobinson.com<br>mmcdonald@liddlerobinson.com | |
| Gary Klein<br>Shennan Kavanagh<br>Kevin Costello<br>John McGowan<br>Marjorie Charney<br>KLEIN KAVANAGH COSTELLO, LLP<br>85 Merrimac Street, 4th Floor<br>Boston, Massachusetts 02114<br>p. 617.357.5500<br>f. 617.357.5030<br>Emails: klein@kkcllp.com<br>kavanagh@kkcllp.com<br>costello@kkcllp.com<br>mcgowan@kkcllp.com | **Counsel for Plaintiffs: Davidson Calfee, Robert Gatti, Daniel Korzep, and Karen Grover**<br>D. Massachusetts, No. 1:10-cv-12051-WGY |
| Charles M. Delbaum<br>Stuart T. Rossman<br>NATIONAL CONSUMER LAW CENTER<br>7 Winthrop Square, 4th Floor<br>Boston, MA 02110<br>Telephone: (617) 542-8010<br>Facsimile:  (617) 542-8033<br>Email: cdelbaum@nclc.org<br>srossman @nclc.org | |
| Lisa J. Rodriguez<br>Nicole M. Acchione<br>TRUJILLO, RODRIGUEZ & RICHARDS, LLP<br>258 Kings Highway East<br>Haddonfield, NJ 08033 | **Counsel for Plaintiffs: Juan Silva, Elizabeth Silva Farias**<br>D. New Jersey, No. 2: 11-cv-01432-WHW-CCC<br><br>**And for Plaintiff: Jo Ann** |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| Telephone: (856) 795-9002<br>Email: lisa@trrlaw.com<br>nacchione@trrlaw.com | **Gastineau**<br>D. New Jersey, No. 3: 11-cv-02773-AET-TJB |
| Sherrie R. Savett<br>Russell D. Paul<br>Eric Lechtzin<br>BERGER & MONTAGUE, PC<br>1622 Locust Street<br>Philadelphia, PA 19103<br>Telephone: (215) 875-3000<br>Facsimile:  (215) 875-5715<br>Email: ssavett@bm.net<br>rpaul@bm.net<br>elechtzin@bm.net | **Counsel for Plaintiff: William T. Whiting**<br>E.D. Pennsylvania, No. 2: 11-cv-02318-ER<br><br>**And for Plaintiffs: David G. DeRosa, Erin N. Logan, Janie L. Glover, Minnie Glover, James A. Garcia, Jennifer Garcia, Renee Johnson, and Stephen B. Johnson**<br>E.D. Pennsylvania, No. 2: 11-cv-02914-ER |
| R. Bruce Allensworth<br>Brian M. Forbes<br>Robert W. Sparkes, III<br>K&L GATES LLP<br>State Street Financial Center<br>One Lincoln Street<br>Boston, MA 02111<br>Telephone: (617) 261-3100<br>Facsimile:  (617) 261-3175<br>Email: bruce.allensworth@klgates.com<br>brian.m.forbes@klgates.com<br>robert.sparkes@klgates.com | **Counsel for CitiMortgage, Inc.** |
| John Nadolenco<br>Elizabeth D. Mann<br>Steven E. Rich<br>MAYER BROWN LLP<br>350 South Grand Avenue, 25th Floor<br>Los Angeles, CA 90071-1503<br>Telephone: (213) 229-9500<br>Facsimile: (213) 625-0248<br>Email: nadolenco@mayerbrown.com<br>emann@mayerbrown.com<br>srich@mayerbrown.com | **Counsel for CitiMortgage, Inc.** |
| Lucia Nale (Pro Hac Vice)<br>Debra Bogo-Ernst (Pro Hac Vice)<br>Stephen J. Kane (Pro Hac Vice)<br>MAYER BROWN LLP<br>71 S. Wacker Drive<br>Chicago, IL 60606<br>Telephone: (312) 782-0600<br>Facsimile:  (312) 701-7711<br>Email: lnale@mayerbrown.com<br>dernst@mayerbrown.com<br>skane@mayerbrown.com | **Counsel for CitiMortgage, Inc.** |
| Marc C. Singer | |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1  SAIBER LLC
   18 Columbia Turnpike, Suite 200
2  Florham Park, NJ 07932

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT