1
2
3
4
5

**MILBERG LLP**
DAVID E. AZAR (SBN 218319)
dazar@milberg.com
NICOLE DUCKETT (SBN 198168)
ndfricke@milberg.com
300 South Grand, Suite 3900
Los Angeles, California 90071
Telephone:  (213) 617-1200
Facsimile:  (213) 617-1975

6
7
8
9
10
11
12

**MILBERG LLP**
ARIANA J. TADLER
atadler@milberg.com
1 Pennsylvania Plaza
New York, NY 10119
Telephone:  (212) 594-5300
Facsimile:  (213) 868-1229

**KLEIN KAVANAGH COSTELLO, LLP**
GARY KLEIN
SHENNAN KAVANAGH
KEVIN COSTELLO
85 Merrimac Street, 4th Floor
Boston, Massachusetts 02114
Telephone: (617) 357-5500
Facsimile:  (617) 357-5030
klein@kkcllp.com
kavanagh@kkcllp.com
costello@kkcllp.com

13   *Interim Lead Class Counsel*

14   [Additional Counsel on Signature Page]

15
16
17

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| IN RE: CITIMORTGAGE, INC. HOME AFFORDABLE MODIFICATION PROGRAM ("HAMP") LITIGATION | Case No. 11-ml-2274 DSF (PLAx) |
| This document relates to: | PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE TESTIMONY OF ANGELA E. WATSON |
| Beverly King, et al. v. CitiMortgage, Inc., CV 10-3792 DSF (PLAx) | |
| Balbir Singh v. CitiMortgage, Inc., CV 11-8322 DSF (PLAx) | DATE:        September 16, 2013 |
| Leslie Barry, et al. v. CitiMortgage, Inc., CV 11-8323 DSF (PLAx) | TIME:        1:30 pm  CRTRM.:    840 |
| Davidson Calfee, et al. v. CitiMortgage, Inc., CV 11-8324 DSF (PLAx) | JUDGE:      Hon. Dale S. Fischer  MAGISTRATE  JUDGE:      Hon. Paul L. Abrams |

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO STRIKE TESTIMONY OF ANGELA E. WATSON

DOCS\664823v1

1   Juan Silva, et al. v. CitiMortgage, Inc.,       )
2         CV 11-8325 DSF (PLAx)                      )
    Jo Ann Gastineau v. CitiMortgage, Inc.,          )
3         CV 11-8326 DSF (PLAx)                      )
    William T. Whiting v. CitiMortgage, Inc.,        )
4         CV 11-8327 DSF (PLAx)                      )
5   David G. DeRosa, et al. v. CitiMortgage          )
    Inc.,                                            )
6         CV 11-8328 DSF (PLAx)                      )
7   Robert Coons, et al. v. CitiMortgage Inc.,       )
8         CV 11-01655 DSF (PLAx)                     )
9   Joaquin Sequeira, et al. v. CitiMortgage         )
    Inc.                                             )
10        CV 11- 9179 DSF(PLAx)                      )

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO STRIKE TESTIMONY OF ANGELA E. WATSON

DOCS\664823v1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................1

II. BACKGROUND ......................................................................................2

  A. Plaintiffs' Theory Of The Case ...................................................2

  B. Ms. Watson's Background ...........................................................3

  C. Scope of the Report ......................................................................4

III. LEGAL STANDARD ..............................................................................5

IV. ARGUMENT ............................................................................................7

  A. Ms. Watson is Not Qualified to Testify as an Expert .................7

  B. Ms. Watson's Methods Are Irrelevant, Unreliable, Unsubstantiated, and Unduly Prejudicial ....................................8

    1. Ms. Watson's Opinions as to Eligibility and "The General Industry" are Irrelevant ..........................................8

    2. Ms. Watson's Opinion on the Appropriateness of Citi's Underwriting Delay Lacks a Sufficient Foundation in Facts, Data, or Experience. ..............................................10

    3. Ms. Watson's Evaluations of Plaintiffs' HAMP Eligibility are Imprecise and Biased ....................................11

V. CONCLUSION ......................................................................................15

DOCS\664823v1

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Cabrera v. Cordis Corp.,*
134 F.3d 1418 (9th Cir. 1998) ......................................................11

*Claar v. Burlington Northern R. Co.,*
29 F.3d 499 (9th Cir. 1994) ..........................................................11

*Daubert v. Merrell Dow Pharm. Inc.,*
509 U.S. 579 (1993)...................................................................6, 8

*Daubert v. Merrell Dow Pharms. Inc.,*
43 F.3d 1311 (9th Cir. 1995), *cert. denied* 516 U.S. 869 (1995) (*"Daubert II"*)......................................................................................6, 9

*Gallagher v. Southern Source Packaging, LLC,*
568 F. Supp. 2d 624 (E.D.N.C. 2008) ..........................................7

*General Electric Co. v. Joiner,*
522 U.S. 136 (1997).................................................................6, 10

*Guidroz-Brault v. Missouri Pacific R. Co.,*
254 F.3d 825 (9th Cir. 2001) ......................................................6, 7

*Keegan v. American Honda Motor Co., Inc.,*
284 F.R.D. 504 (C.D. Cal. 2012)...................................................5

*Kumho Tire Co. v. Carmichael,*
526 US 137 (1999).................................................................6, 15

*LuMetta v. United States Robotics, Inc.,*
824 F.2d 768 (9th Cir. 1987)......................................................5, 8

*Nationwide Transp. Fin. v. Cass Info. Sys.,*
523 F.3d 1275 (9th Cir. 1993) .....................................................10

*Primiano v. Cook,*
598 F.3d 558 (9th Cir. 2010) ........................................................6

*Rogers v. Raymark Industries, Inc.*,
   922 F.2d 1426 (9th Cir. 1991) ..................................................................7, 9

*U.S. v. 99.66 Acres of Land*,
   970 F.2d 651 (9th Cir. 1992) .......................................................................5, 8

*U.S. v. Kahn*,
   711 F.Supp.2d 9 (D.D.C. 2010)...................................................................5, 8

**RULES**

Federal Rule of Evidence 104(a) ............................................................... 2, 5, 15

Federal Rule of Evidence 702 ................................................................. 5, 6, 7, 8

Federal Rules of Evidence 403 .................................................................2, 15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO STRIKE TESTIMONY OF ANGELA E. WATSON

DOCS\664823v1

## I.    INTRODUCTION

On May 28, 2013, Defendant CitiMortgage submitted the "Expert Report" of Angela E. Watson, a salesperson for the consulting firm Cross Check Compliance.  *See* Expert Report of Angela E. Watson ("Report") at ¶ 1, Docket No. 347.1;[1] Ex. 1 at 30:13-15.[2]  Defendant relies on the Report to support its contentions that (1) HAMP rules varied over time and by investor, (2) Citi's HAMP servicing was comparable to its peers, (3) Citi's decision-making processes were not uniform for all Plaintiffs, and (4) the modification effective date ("MED") was not a deadline for denying or approving a HAMP modification.  *See* Mem. in Opp'n to Pls.' Mot. for Class Certification ("Opp.") at 4-5, 7-8, 12-13, 20-21, Docket No. 345.

Ms. Watson is not qualified to testify as an expert on these issues.  She is a 32-year old salesperson for a consulting company, who now asserts that a one-year stint in a Fannie Mae call center provided her with expert knowledge of HAMP. Ex. 1 at 10:19-10:20, 116:16-116:18.  Yet, she has no education or formal training in mortgage servicing or HAMP.  *Id.* at 10:21-16:11.  She has never published anything concerning the mortgage industry.  *Id.* at 10.  She has never spoken at any seminars on issues in the mortgage industry.  *Id.*  She has never before offered an expert report or opinion.  *Id.*  Prior to working at Fannie Mae, she worked in a non-management position for the now-bankrupt Thornburg Mortgage, whose directors are under investigation by the Securities and Exchange Commission.  Press Release, SEC, "SEC Charges Three Mortgage Executive With Fraudulent Accounting Maneuvers in Midst of Financial Crisis" (March 13, 2012) *available at* http://www.sec.gov/news/press/2012/2012-42.htm.  After Fannie Mae, she worked

---

[1] References herein to "Docket No." refer to this MDL, Case No. 11-ml-2274 (C.D. Cal.).

[2] References herein to "Ex." refer to the Exhibits attached to the Declaration of David Azar, which is filed contemporaneously.

- 1 -

for a few months in Bank of America's Government Sponsored Entity Exam Management Department, during a time in which Bank of America was sanctioned by Treasury for its poor HAMP performance.   Press Release, Dept. of the Treasury, "Obama Administration Releases May Housing Scorecard Featuring New Making Home Affordable Servicer Assessments, Regional Spotlight on Phoenix Housing Data" (June 9, 2011) *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1205.aspx.   While at Bank of America, her HAMP-related work consisted of reviewing a single Fannie Mae audit of Bank of America's loss mitigation practices. Ex. 1 at 74:04-74:09.

Even if she were qualified to testify as an expert, her report consists wholly of irrelevant, unsupported, and inadequate information.  Among other things, Ms. Watson testified that she did not consider the TPP Agreement (defined below) as the basis for Plaintiffs' claims, and her testimony is founded, contrary to basic contract principles, on the faulty assumption that the TPP Agreement has no relevance to establishing the time deadline for Citi's performance.  This makes her testimony irrelevant to the legal questions at issue.

Even if the Court were to find Ms. Watson's opinion relevant, her self-serving and biased methods of evaluating plaintiffs' HAMP eligibility are too unreliable to be admissible.  At best, her report's imprecise methods highlight the problems Citi caused with its underwriting delays.  For these reasons, Plaintiffs seek to strike the report under Rules 104(a), 702, and 403. Ms. Watson is unqualified; and her report is irrelevant and unreliable.

## II.    BACKGROUND

### A.    Plaintiffs' Theory Of The Case

In this Multi-District Litigation, Plaintiffs seek to enforce their Trial Period Plan ("TPP") Agreements, which are enforceable contracts they made with Citi. Mem. in Support of Pls.' Mot. for Class Certification and Appointment of Class

- 2 -

1   Counsel ("Mot") at 1, Docket No. 316.  As stated in their Memoranda in Support
2   of Class Certification, "[t]he central common question is whether Citi breached
3   TPPs by failing to act within the Trial Period expressly set forth in each
4   agreement." *Id.* at 1.  The TPP agreement is a contract of finite duration, which
5   requires Citi to provide the borrower with either a permanent HAMP modification
6   or a written notice that the borrower does not qualify, before the MED specified in
7   the TPP. *Id.* at 3.  Treasury directed servicers to timely deny those borrowers who
8   did not satisfy their obligations.  Azar Decl. Ex. 13 at 4, 14 at 6, 15 at 1, Docket
9   No. 317.3.  Citi delayed underwriting to the point that the required borrower
10  documents frequently became stale and required borrowers to submit updated
11  documentation.  Mot at 4-5.  This problem was further exacerbated by rampant
12  document processing problems. *Id.* at 5.  The central issues in this action revolve
13  around Citi's obligation to make an underwriting decision before a borrower's
14  MED, which was prevented by its delayed underwriting and unresolved document
15  processing problems.

16  **B.    Ms. Watson's Background**

17      Ms. Watson works in sales for CrossCheck Compliance, a consulting firm.
18  Report ¶ 1.  The curriculum vitae she submitted with her report states, among other
19  things, that she was "a key member of the National Servicing Organization at
20  Fannie Mae."  Report, Attachment 2, at 106.  That statement, which refers to an
21  experience that Ms. Watson conceded to be a one-year stint in a Fannie Mae call
22  center with over 20 other Portfolio Managers, is an overstatement of her role and
23  credentials.  Ex. 1 at 80:16-81:06, 83:19-84:02.  Ms. Watson, along with the other
24  Portfolio Managers, answered questions from servicers about Fannie Mae general
25  servicing guidelines not limited to HAMP-related issues.  Ex. 1 at 79:16-81:06.
26  Although that is Ms. Watson's most significant HAMP-related experience, it did
27  not include any evaluation of whether servicers acted according to guidelines about

28

- 3 -

DOCS\664823v1

time frames for action under HAMP, whether they were complying with their agreements with customers, or whether they were meeting their obligations to homeowners. Ex. 1 at 87:06-87:24. She concedes in her report that her HAMP knowledge is limited to "Fannie Mae HAMP announcements and related guidance." Report ¶ 3.

After this brief stint, Ms. Watson transferred to a different Fannie Mae job, which had nothing to do with servicers' compliance with HAMP guidelines. Ex. 1 at 88:04-91:09, 92:09-12. At this later job, she assisted in issuing repurchase demands due to servicers not following Fannie Mae guidelines, including situations where the servicer's foreclosure process took too long. *Id.*

Aside from answering telephone inquiries in a Fannie Mae call center, Ms. Watson's experience with HAMP is coincidental and cursory: She reviewed one Fannie Mae loss mitigation audit of Bank of America that contained a HAMP-related portion and she reviewed less than ten loan portfolios, which were not specific to HAMP, to evaluate an undisclosed servicer's liability to its investors. Ex. 1 at 32:08-12, 34:05-16. She currently works for Cross Check Compliance as a Director of Business Development, which she acknowledges to be a sales job. Ex. 1 at 30:13-15. Indeed, she has recently described herself in a public profile as a salesperson. Ex. 2.

## C.   Scope of the Report

Ms. Watson's Report states that she was asked to provide her opinion on (1) servicer performance, (2) "the general industry practice regarding the modification effective date contained in HAMP Trial Period Plans ('TPPs')," and (3) every plaintiff's individual loan file to determine whether Citi's ultimate underwriting decision was justified. Report ¶ 5. Notably, Defendant does not rely on any of Ms. Watson's opinions regarding Plaintiffs' eligibility in its Opposition to Plaintiffs' Motion for Class Certification. It merely uses Ms. Watson's report as a

- 4 -

DOCS\664823v1

1   conduit to communicate irrelevant and disputed facts based on a biased reading of

2   documents of Ms. Watson's choosing.  *See e.g.*, Opp, § III at 7–8.  Based on a

3   selective review and often absurd reading of Plaintiffs' files, Ms. Watson always

4   finds Citi's actions to have been both timely and correct.  Report ¶ 63.  Even if

5   relevant, these documents, of course, speak for themselves and, therefore, Ms.

6   Watson's report is offered for an improper purpose.

7   **III.   LEGAL STANDARD**

8            Under Federal Rule of Evidence 702, "a witness who is qualified by

9   knowledge, skill, experience, training, or education may testify in the form of an

10  opinion or otherwise if: (a) the expert's scientific, technical, or other specialized

11  knowledge will help the trier of fact to understand the evidence or to determine a

12  fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony

13  is the product of reliable principles and methods; and (d) the expert has reliably

14  applied the principles and methods to the facts of the case."  The burden of

15  showing admissibility is on the proponent of the expert testimony.  *Keegan v.*

16  *American Honda Motor Co., Inc.*, 284 F.R.D. 504, 515 (C.D. Cal. 2012).

17           When determining whether Ms. Watson's expert report is admissible, "[t]he

18  court must decide any preliminary question about whether a witness is qualified."

19  Fed. R. Evid. 104(a).   An expert must be qualified "by knowledge, skill,

20  experience, training, or education" in order to "testify in the form of an opinion or

21  otherwise." FRE 702.  Where the witness lacks formal training and has limited

22  experience with the topic on which she is testifying, the Court has the discretion to

23  exclude her testimony.  *LuMetta v. United States Robotics, Inc.*, 824 F.2d 768, 771

24  (9th Cir. 1987).  Even a witness with extensive experience may be excluded if that

25  experience does not relate to the topic of her testimony.  *U.S. v. 99.66 Acres of*

26  *Land*, 970 F.2d 651, 656 (9th Cir. 1992) (affirming district court's exclusion of

27  testimony by accountant with no training or practice as an appraiser); *U.S. v. Kahn*,

28

- 5 -

1   711 F.Supp.2d 9, 12 (D.D.C. 2010) (witness with experience and knowledge

2   regarding fictitious notes was not qualified to testify regarding how the IRS

3   identifies fraudulent documents).

4        *Daubert* articulated factors to guide a court's determination of whether

5   expert testimony is admissible, including the reliability of the testimony, the

6   relevancy of the testimony, and the risk of unfair prejudice.  *Daubert v. Merrell*

7   *Dow Pharm. Inc.*, 509 U.S. 579, 590-591, 598 (1993).  The objective of this

8   analysis "is to ensure the reliability and relevancy of expert testimony.  It is to

9   make certain that an expert, whether basing testimony upon professional studies or

10  personal experience, employs in the courtroom the same level of intellectual rigor

11  that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co.*

12  *v. Carmichael*, 526 US 137, 152 (1999).

13       The reliability inquiry questions whether the testimony is "supported by

14  appropriate validation."  *Daubert* 509 U.S. at 590.  Expert testimony must be

15  "properly grounded, well-reasoned, and not speculative." Fed. R. Evid. 702

16  (Advisory Committee's Notes).  It is not enough to be "presented with only the

17  experts' qualifications, their conclusions and their assurances of reliability."

18  *Daubert v. Merrell Dow Pharms. Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995), *cert.*

19  *denied* 516 U.S. 869 (1995) ("*Daubert II*").  The court need not admit opinion that

20  is "connected to existing data only by the *ipse dixit* of the expert," and "may

21  conclude that there is simply too great an analytical gap" between data and

22  opinion.  *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also*

23  *Guidroz-Brault v. Missouri Pacific R. Co.*, 254 F.3d 825, 830-831 (9th Cir. 2001)

24  (excluding experts' opinions that were based on assumed facts not in the record).

25       The proposed expert testimony must be "relevant to the task at hand,"

26  meaning that it "logically advances a material aspect of the proposing party's case."

27  *Daubert II*, 43 F.3d at 1315.  "What is relevant depends on what must be proved."

28

- 6 -

DOCS\664823v1

1   *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010).   A report that does not

2   address the issues at hand should be stricken.   *Guidroz-Brault*, 254 F.3d at 830

3   (engineer's testimony "to establish a fact never really in dispute" was properly

4   excluded); *Gallagher v. Southern Source Packaging, LLC*, 568 F. Supp. 2d 624,

5   634 (E.D.N.C. 2008) (striking expert report after he repeatedly stated that he had

6   no opinion regarding the primary issue in the case).

7      Further, the court "may still exclude testimony under Rule 403" if it risks

8   confusing the issues. *Rogers v. Raymark Industries, Inc.*, 922 F.2d 1426, 1430 (9th

9   Cir. 1991).   Federal Rule of Evidence 403 states, "[t]he court may exclude relevant

10   evidence if its probative value is substantially outweighed by a danger of one or

11   more of the following: unfair prejudice, confusing the issues, misleading the jury,

12   undue delay, wasting time, or needlessly presenting cumulative evidence."   It is

13   particularly appropriate for the court to carefully "weigh the potential for confusion

14   in the balance when expert testimony is proffered," to avoid undue focus "on the

15   expert's issues to the detriment of issues that are in fact controlling." *Rogers*, 922

16   F.2d at 1431.

17   **IV.   ARGUMENT**

18      **A.   Ms. Watson is Not Qualified to Testify as an Expert**

19      Ms. Watson's brief and narrow exposure to HAMP does not give her the

20   "knowledge, skill, experience, training, or education" to opine on either "the

21   general industry practice regarding the modification effective date contained in

22   HAMP Trial Period Plans ('TPPs')" or Plaintiffs' eligibility for HAMP.   Fed. R.

23   Evid. 702; Report ¶ 5.   If she has specialized knowledge regarding *any* servicer's

24   practice regarding the MED, she has not disclosed it.   Even her experience at

25   Fannie Mae is irrelevant to this issue, given that she did not evaluate whether

26   servicers complied with HAMP timelines or advise servicers of their obligations to

27   borrowers.   Ex. 1 at 87:06-24.   She has coincidental exposure to a HAMP-related

28

- 7 -

DOCS\664823v1

portion of a Bank of America audit by Fannie Mae and cursory experience with evaluating a handful of loans for servicer liability to its investors.  Like the witnesses deemed unqualified to testify as experts in *LuMetta*, anything beyond a cursory examination of Ms. Watson's stated experience reveals little relevant experience, and her background falls far short of meeting Rule 702's threshold requirement of "knowledge, skill, experience, training, or education" related to the topic of her testimony.  *LuMetta*, 824 F.2d at 771; *see also U.S. v. 99.66 Acres of Land*, 970 F.2d at 656; *U.S. v. Kahn*, 711 F. Supp. 2d at 12.

Finally, Ms. Watson's lack of HAMP expertise is not mitigated or enhanced by other relevant work or life experience.  She has never published an article, has never testified as an expert, and has never held a management position in any context. Ex. 1 at 10.

Given the dearth of Ms. Watson's education, training, and given that her solitary year of relevant experience is limited to applying Fannie Mae servicing guidelines that were not limited to HAMP and unrelated to the timeliness of underwriting, her opinions should not be relied on by the Court, and should be stricken from the record.

## B.    Ms. Watson's Methods Are Irrelevant, Unreliable, Unsubstantiated, and Unduly Prejudicial

Ms. Watson's lack of relevant experience is reflected in her work product. Her methods are so unreliable, unsupported, and biased that they are not admissible under Rule 702 and the standards articulated in *Daubert*.  Even more importantly, her work is aimed at a question that is not at issue and is therefore irrelevant.

### 1.    Ms. Watson's Opinions as to Eligibility and "The General Industry" are Irrelevant

Ms. Watson's opinions regarding borrower eligibility do not assist the Court in determining a fact in issue because they ignore Plaintiffs' theory of the case.

- 8 -

1    Plaintiffs do not argue for the purposes of class certification that all plaintiffs and

2    putative class members are substantively eligible for permanent HAMP

3    modifications under HAMP. Rather, plaintiffs assert that all class members

4    suffered a common injury when Citi breached the TPP Agreement by failing to

5    render a decision at the close of the contractually defined Trial Period. Mot. at 1-3.

6    Ms. Watson's report confuses substantive eligibility for permanent modification

7    under HAMP with entitlement to damages for breach of contract. Her self-serving

8    methods, which assumes that Citi could unilaterally extend the Trial Period either

9    by oral statement or entirely without notice, discussed in Section IV(B)(3), serves

10   only to distract the court from Plaintiffs' theory. *See Daubert II*, 43 F.3d at 1315;

11   *Rogers*, 922 F.2d at 1430.

12         Similarly irrelevant to the issues in this case, Ms. Watson chose to ignore the

13   actual contract in this breach of contract action, and instead focused on how the

14   "general industry" treated that contract. *See* Ex. 1 at 145:02-03 (she "was not

15   asked to look at timeliness or the specific definition of the date in the TPP"),

16   52:25-153:07 (it is not within the scope of her report to "have any opinion about

17   whether or not the trial period is defined in the TPP documents."). Whether or not

18   other servicers extended borrower Trial Periods is irrelevant to whether Citi

19   breached its obligations to its borrowers when it delayed underwriting or otherwise

20   failed to render a decision by the MED stated in borrowers' TPP Agreements.

21   Report ¶ 27, 29.   Moreover, despite having every Plaintiff's loan file at her

22   disposal, she refused to evaluate whether Citi actually worked in a timely way with

23   each plaintiff to obtain the necessary documents, stating that it was outside the

24   scope of her report. Ex. 1 at 169:11-13 ("looking at borrower notices was not part

25   of the scope of my engagement"); *see also* Ex. 1 at 162:23-163:05 (not in the scope

26   of her report to "look at the communication, whether it was appropriate between

27   CitiMortgage and the borrower").

28

- 9 -

### 2. Ms. Watson's Opinion on the Appropriateness of Citi's Underwriting Delay Lacks a Sufficient Foundation in Facts, Data, or Experience.

Ms. Watson's opinion that "Citi acted appropriately in granting TPP extensions based on applicable guidelines" is misplaced and defies logic. Report ¶ 28. She fails to support her position with any of the facts available at her fingertips and leaves gaping holes in her analysis. For example, in her report, she states that HAMP guidelines do not state "that a final HAMP underwriting decision must happen by the MED." Report ¶27. This is not true. *See* Mot. at 3. When pressed at her deposition, she admitted that this statement is not accurate. Ex. 1 at 155:23-157:07.

She also stated that one reason servicers extended the Trial Period was because of "a delay in the gathering of documents," yet fails to cite *any* authority for allowing such extensions. Report ¶ 27. She failed to articulate the purported guideline that allowed Citi to unilaterally extend Ms. Grover's and Mr. Petrides' TPPs for at least five months after their MEDs without *once* communicating with them regarding documents it may have needed to complete its review. Declaration of David Azar Decl. Ex. 8 at 24:20-242:03, Docket No. 317.2; Ex 5 at 83:14-87:25. In the 65 pages of the report devoted to evaluating individual Plaintiffs' files, she failed to state specifically how any alleged TPP extensions were justified or documented. Here, the analytical chasm between data and her opinion "is simply too great" for this testimony to assist the Court in its ultimate determination. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Finally, the question of whether a particular extension is legally appropriate such that it generates a valid defense to breach of contract is a question for the Court and not for expert testimony. *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1275, 1287 (9th Cir. 1993).

DOCS\664823v1

Another example of her unfounded and vague assertions regarding the length of the Trial Period is that "Fannie Mae encouraged servicers to work with borrowers to obtain documentation, rather than deny borrowers by the MED." Report ¶ 35. Ms. Watson's report offers absolutely no support—evidentiary or otherwise—for this statement. She cites no guidance, formal or informal, official communication or public statement of any kind from Fannie Mae in support of this statement—which is directly contradictory to published HAMP guidance. *See* Mot. at 3; Azar Decl. Ex 13 at 4, 14 at 6, 15 at 1, Docket No. 317.3. Instead, she asks the Court to accept her testimony based on her brief experience at Fannie Mae; she offers neither an explanation nor an example of how or when Fannie Mae encouraged servicers in this regard. The Ninth Circuit has excluded testimony by witnesses who, like Ms. Watson, did not explain how they reached their conclusions, show peer-reviewed support for their conclusions, or failed to review the appropriate literature before forming their opinions. *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422 (9th Cir. 1998); *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502-503 (9th Cir. 1994).

### 3. Ms. Watson's Evaluations of Plaintiffs' HAMP Eligibility are Imprecise and Biased

Even if the Court were to find Ms. Watson's eligibility analysis relevant, it cannot be trusted as reliable because she designed her method to produce only results that justify Citi's ultimate underwriting decisions. *Clarr v. Burlington Northern R. Co.*, 29 F.3d 499, 502-503 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method."). Ms. Watson's method repeats the same mistake Citi made when it delayed Plaintiffs' underwriting: She purports to have reviewed each Plaintiff according to documents Citi had at the time it underwrote the loan. Ex. 1 at 210:07-11. Delayed underwriting, however, is inconsistent with the primary purpose of having a trial period at all, *i.e.*, to provide a finite underwriting period

- 11 -

for Citi. Underwriting is, by necessity, a snapshot of the borrower's qualifications, not a moving picture, because its purpose is to predict the borrower's ability to make future payments as of a given point in time. To the extent that Ms. Watson takes a snapshot of borrowers' eligibility at the time Citi underwrote the loan, the delay has already caused changes in a borrower's eligibility. To the extent that Ms. Watson neglects her own method and picks and chooses documents that further Citi's interests—regardless of whether they are pertinent to a HAMP evaluation or even available to underwriters at the time Citi evaluated that borrower—she has ignored the fact that underwriting requires a snapshot of a borrower's eligibility, not a moving picture.

Although Ms. Watson purports to use HAMP guidelines to evaluate Plaintiffs' eligibility, she cites reasons for denying borrowers that are unrelated to HAMP guidelines. For example, Ms. Watson states, "the market value of the Glovers' property during the time period under review fluctuated between $125,000 and $143,000. The balance on the CitiMortgage first lien note was approximately $90,067.65, and there is a second lien note for $10,000. Thus, the Glovers could have paid off their loan by selling the property." Report ¶ 129. Only when she was specifically questioned about this reasoning at her deposition did she acknowledge that there is no HAMP rule preventing borrowers from qualifying because they had other options. Ex. 1 at 201:24-203:07. Indeed, Ms. Watson's opinion ignores the NPV test, which is designed to generate more precisely whether a modification, even if there is equity, would benefit or harm the investor in the loan. Azar Decl. Ex. 3 at 4, Docket No. 317.1.

Ms. Watson's purported method of evaluating borrowers with documents available to Citi when it underwrote the loan, rather than with the documents provided to Citi within the Trial Period, is designed to create a *post hoc* justification for Citi's ultimate underwriting decisions. Many Plaintiffs' financial

- 12 -

DOCS\664823v1

1    situations changed significantly between the time they started their Trial Periods

2    and when their documents were finally evaluated.  For example, Ms. Grover's

3    unemployment benefits were active and slated to continue for the requisite period

4    when she first submitted her benefits notice in September 2009, but by the time

5    Citi evaluated her documents in June 2010, her benefits were set to expire.  Ex. 4 at

6    183:23-187:05.  Ms. Watson used the imminent expiration as a basis to opine that

7    Citi correctly denied Ms. Grover a permanent modification, which is absurd and

8    inconsistent with HAMP guidelines.  Evaluating the documents as of the date of

9    underwriting rather than as of the date of submission created a ridiculous Catch-22,

10   particularly when underwriting did not begin—due to Citi's own delay—until nine

11   months after the TPP commenced.

12        Ms. Watson picks and chooses documents that will justify Citi's

13   underwriting decision, regardless of when they were available to underwriters.  For

14   example, she used Mr. Whiting's entire 2010 profit and loss statement to determine

15   that he "was not eligible for a HAMP modification because his income was

16   insufficient," but Citi had denied his HAMP modification halfway through 2010, in

17   August.    Report ¶ 195.    Although Mr. Whiting initially submitted income

18   documentation in November 2009, he submitted a "profit and loss statement for the

19   period of January–December 2010" a year later, to qualify for a non-HAMP

20   modification.  *Id.*  Ms. Watson calculated his income based on that document,

21   using profits and losses that occurred *after* Citi's denial.  *Id.* at ¶ 198, 200,

22   Attachment 7 at p. 112.  This anachronistic underwriting indicates either sloppiness

23   or bias—neither of which is acceptable.

24        Ms. Watson also selectively and inconsistently evaluated the documents in

25   order to provide convenient opinions that suit Citi's interests.  For example, Ms.

26   Grover's first submission of documents, in September 2009, included her bank

27   statement.  Ms. Watson stated, "[n]one of the bank statements Grover submitted

28

- 13 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO STRIKE TESTIMONY OF ANGELA E. WATSON

with the TPP package contained all pages of each statement . . . As a result, the TPP package was incomplete and Grover's HAMP application could not be forwarded to underwriting." Report ¶ 133. Yet, she also opined, "Grover was ineligible for HAMP based on the bank statements that Grover provided with the TPP" because they showed that her liquid asset ratio was higher than Treasury guidelines. *Id.* at ¶ 132. Moreover, Ms. Watson had already stated that Ms. Grover submitted those documents in September 2009, and that Citi did not review Ms. Grover's TPP package until 9 months later, in May 2010. *Id.* at ¶ 134. Put simply, she cannot have it both ways. Either the documents must be evaluated as of when they were submitted, or as of the date of underwriting, but not both.

Finally, Ms. Watson asserts self-serving limits to the scope of her inquiry in a way that demonstrates her bias. For example, she repeatedly stated that the scope of the report was "to look at the ultimate underwriting eligibility and looking at borrower notices was not part of the scope of my engagement." Ex. 1 at 169:11-13, 162:23-163:05 (not in the scope of her report to "look at the communication, whether it was appropriate between CitiMortgage and the borrower"). She therefore does not consider that Citi's failure to request a particular document is relevant to whether Citi could properly deny a borrower based on the absence of that document. Yet, Ms. Watson uses the presence of document requests, even when made untimely, when she believes the requests favor Citi's position. Report ¶¶ 116, 192, 83.

Moreover, she highlights circumstances where Plaintiffs' documents are incomplete, without acknowledging Citi's failure to timely request those documents from Plaintiffs. For example, Ms. Watson emphasizes that Mr. Petrides' documents were incomplete seven months after his TPP began. Report ¶ 157. Yet she failed to identify the fact that Citi's first correspondence with Mr. Petrides after he submitted his documentation was a denial letter, which denied

- 14 -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO STRIKE TESTIMONY OF ANGELA E. WATSON

him *due to incomplete documentation*.  Ex. 3.  In other words, Citi failed to inform

Mr. Petrides of its belief that he was missing documentation prior to his denial.  Ex

5 at 83:14-87:25.  She repeats this maneuver in Ms. Grover's case as well, where,

despite Ms. Grover's frequent calls to check up on the status of her HAMP

underwriting, Citi did not inform Ms. Grover that she had incomplete documents

until nine months after she initially submitted them.  Azar Decl. Ex. 8 at 24:20-

242:03, Docket No. 317.2; Report ¶ 137.  Nor does she acknowledge that it was

Citi's own action that rendered Ms. Grover's documents incomplete.  Mot. at 6-7.

This is not "the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field," and thus Ms. Watson's report should be stricken.

*Kumho Tire Co.*, 526 US at 152.

## V.      CONCLUSION

For the reasons stated above, Plaintiffs request that the Court strike the

report of Angela E. Watson pursuant to Federal Rules of Evidence 104(a), 702, and

403 because she is unqualified, the report is irrelevant, and her methods are

unreliable and biased.  The report confuses the issues while causing unfair

prejudice.

Date: July 12, 2013                 **MILBERG LLP**
                                    DAVID E. AZAR
                                    NICOLE DUCKETT

                                    _____
                                        DAVID E. AZAR

                                    One California Plaza
                                    300 S. Grand Avenue, Suite 3900
                                    Los Angeles, CA  90071
                                    Telephone: (213) 617-1200
                                    Facsimile:  (213) 617-1975
                                    dazar@milberg.com
                                    nduckett@milberg.com

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO STRIKE TESTIMONY OF ANGELA E. WATSON

DOCS\664823v1

1
2
3
4

**MILBERG LLP**
ARIANA J. TADLER
1 Pennsylvania Plaza
New York, NY 10119
Telephone:  (212) 594-5300
Facsimile:   (213) 868-1229
atadler@milberg.com

5
6
7
8
9

**WESTERMAN LAW CORP.**
JEFF WESTERMAN
1925 Century Park East
Suite 2100
Los Angeles, CA  90067
Telephone: (310) 698-7450
Facsimile: (310) 201-9160
jwesterman@jswlegal.com

10
11

*Interim Lead Class Counsel*
*Counsel for Plaintiffs Beverly King and Nancy Glennon*

12
13
14
15
16
17

**KLEIN KAVANAGH COSTELLO, LLP**
GARY KLEIN
SHENNAN KAVANAGH
KEVIN COSTELLO
85 Merrimac Street, 4th Floor
Boston, Massachusetts 02114
Telephone: (617) 357-5500
Facsimile: (617) 357-5030
klein@kkcllp.com
kavanagh@kkcllp.com
costello@kkcllp.com

18
19

*Interim Lead Class Counsel*
*Counsel for Plaintiff Davidson Calfee*

20
21
22
23
24
25
26
27
28

- 16 -

## DECLARATION OF SERVICE BY ELECTRONIC MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, employed in the County of Los Angeles, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is One California Plaza, 300 South Grand Avenue, Suite 3900, Los Angeles, California 90071-3149.

2.      Declarant hereby certifies that on July 12, 2013, declarant served the PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE TESTIMONY OF ANGELA E. WATSON via electronic mail on:

Elizabeth D. Mann
Steven E. Rich
**MAYER BROWN LLP**
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Telephone: (213) 229-9500
Facsimile: (213) 625-0248
Email: emann@mayerbrown.com
srich@mayerbrown.com

Lucia Nale
Debra Bogo-Ernst
Stephen J. Kane
**MAYER BROWN LLP**
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
Email: lnale@mayerbrown.com
dernst@mayerbrown.com
skane@mayerbrown.com

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of July, 2013, at Los Angeles, California.

ELIZABETH VILLALOBOS-LOPEZ